David P. Legare
DAVID LEGARE LAW
100 N. 27th Street, Suite 550
P.O. Box 1080
Billings, MT 59103-1080
Phone: (406) 294-9450
Fax: (406) 294-9451
dplegare@legarelaw.com

*Attorney for Plaintiffs*

CLERK OF THE
DISTRICT COURT
TERRY HALPIN

2021 NOV -2  A 10: 44

FILED

BY _____
DEPUTY

### MONTANA THIRTEENTH JUDICIAL DISTRICT COURT, YELLOWSTONE COUNTY

|  |  |
|---|---|
| ANDERSON & LIECHTY, P.C., and MICHAEL ANDERSON, | Cause No. D V 2 1 - 0 1 3 5 3 |
| Plaintiffs, | Judge MARY JANE KNISELY |
| v. | COMPLAINT FOR DECLARATORY JUDGMENT AND SUPPLEMENTAL RELIEF |
| HARTFORD CASUALTY INSURANCE COMPANY and DOES I-X, | |
| Defendants. | |

Plaintiffs, Anderson & Liechty, P.C. and Michael Anderson, allege as follows for a declaratory judgment and supplemental relief against Defendants under the Montana Uniform Declaratory Judgments Act.

### THE PARTIES

1.    Plaintiff, Anderson & Liechty, P.C. ("A & L"), is a corporation incorporated under the laws of the State of Montana with its principal place of business in the County of Yellowstone.



EXHIBIT

1

2.      Plaintiff, Michael Anderson ("Michael"), is a citizen of the State of Montana and resides in the County of Yellowstone. At all times relevant to the events alleged in this Complaint,

        a.  Michael was a lawyer in good standing in Montana.

        b.  A & L operated as a law firm providing legal services in Montana.

        c.  Michael was an executive officer, director, and shareholder of A & L.

        d.  He acted as an officer and director of A & L.

3.      Defendant, Hartford Casualty Insurance Company ("Hartford"), is a corporation domiciled in the State of Indiana. Hartford is licensed to and does sell insurance in Montana.

4.      Defendants Does I-X are persons, firms, or entities who are believed to be citizens of the State of Montana or who have conducted business in the State of Montana sufficient to subject them to the jurisdiction of the Court. Plaintiffs do not know the true name of Defendants Does I-X, and therefore, sues them by fictitious names. Plaintiffs are informed and believes that each of the Doe defendants may in some manner be negligent and responsible for the event and happenings alleged in this complaint and for Plaintiffs' injuries and damages.

## JURISDICTION

5.      In part, this is an action for declaratory judgment pursuant to §§ 27-8-101 *et seq.*, MCA, to determine questions of an actual and legitimate controversy between the parties.

6.      The Montana Thirteenth Judicial District Court, Yellowstone County has both subject matter and personal jurisdiction in this case, and venue is proper in Yellowstone County.

7.      The acts of Defendants occurred in the County of Yellowstone, State of Montana.

8.      The Court has personal jurisdiction over Defendants because they are doing business in Montana, investigated and denied this Montana claim, issued this policy to cover

Montana operations, and would be required to appear and defend their insureds with respect to covered claims against them.

## GENERAL FACTUAL ALLEGATIONS

9.      Hartford sold A & L an insurance contract, policy number 65 SBA FS4968 DX ("Policy"). Based on information and belief, a copy of the Policy is attached to this Complaint. *See* Ex. 1, pp. 1-50.

10.      The Policy Period is from 12-28-2018 to 12-28-2019. *See* Ex. 1, p. 4.

11.      In the Policy, Hartford promises to pay for "those sums that the insured becomes legally obligated to pay as damages because of ... "property damage" ... to which this insurance applies." *See* Ex. 1, p. 19.

12.      A & L is the named insured. *See* Ex. 1, p. 4.

13.      Michael is also an insured. *See* Ex. 1, p. 28. *See also* Ex. 4, p. 5.

14.      "Property damage" means, in relevant part, "[l]oss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of "occurrence" that caused it." *See* Ex. 1, p. 41.

15.      "Occurrence" is defined in the Policy, in relevant part, as "an accident". *See* Ex. 1, p. 40.

16.      The term "accident" is not defined in the Policy; but under Montana law, the term "accident" includes intentional acts resulting in damages not objectively intended or expected from the perspective of the insured.

17.      The Policy applies to "the loss of use of tangible property not physically injured" caused by Michael's acts, intentional or otherwise, with unintended or unexpected damages from his perspective arising out of his rendering or failure to render legal services.

18.    There is no applicable exclusion in the Policy for "property damage" caused by an "occurrence" in rendering or failure to render legal services. The Policy initially excludes "legal" services from coverage in Section B Exclusion 1.j.(1); however, the Policy contains an endorsement that changes the terms and deletes "legal" services from the exclusion and limits it to only "Accounting or advertising services." *Comp.* Ex. 1, p. 24 *with* Ex. 1, p. 50.

19.    On October 19, 2019, two of the four beneficiaries of the Estate of Vesta Anderson ("Estate") sued Michael as the attorney for the personal representative, filed as Cause No. DV 19-1185C in the Montana Eighteenth Judicial District Court, Gallatin County ("Underlying Lawsuit"). *See* Ex. 2.

20.    While there are multiple causes of action asserted against Michael, the gravamen of the complaint results from Michael's rendering or failing to render legal services while representing the Estate's personal representative, and thus, depriving the plaintiffs of the use of the property of the Estate. *See* Ex. 2.

21.    The plaintiffs in the Underlying Lawsuit allege the following:

a.    Michael served as attorney at all relevant times.

b.    As the Estate's beneficiaries, they are third party beneficiaries of Michael's legal services provided to the Estate's personal representative.

c.    Michael owed them a duty to perform his legal services with reasonable care and skill as an attorney.

d.    The primary asset of the Estate was property referred to as the "Baxter Ranch," which the Estate held as tenants in common with Baxter Ranch Holdings, LTD ("BRH").

e.  Michael breached his duties in providing legal services when he allowed the personal representative to purchase BRH's interest in Baxter Ranch (BRH's Property), as an individual for the benefit of himself and not for the benefit of the Estate.

f.  Michael also breached his duties through delay in administration of the Estate that caused them to suffer the loss of use of the Estate property as beneficiaries of the Estate.

g.  As a result, they suffered damages by the loss of the use of BRH's Property and other Estate property.

h.  They demand as remedies a full accounting of the Estate's assets, voiding of the transaction between the personal representative and BRH, imposition of a constructive trust of the property, and award of compensatory damage caused by the loss of use of the property in amount to be proven at trial.

22.  After Michael was served with the complaint in the Underlying Lawsuit, he tendered it to Hartford to defend and indemnify him. *See* Ex. 3

23.  Hartford denied both its duty to defend and indemnify in a letter, dated November 6, 2021. *See* Ex. 4.

## CAUSES OF ACTION

### COUNT I:  DECLARATORY JUDGMENT

24.  Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-23 as if repeated herein.

25.    An actual controversy has arisen between the parties regarding the respective rights and obligations under the Policy as it applies to Hartford's duty to defend and indemnify Michael from the Underlying Lawsuit.

26.    Plaintiffs seek a declaration that Hartford owes a duty to defend the claims asserted against them and indemnify them for any judgment or settlement in the Underlying Lawsuit.

27.    Plaintiffs are entitled to payment of their attorney fees and costs pursuant to § 27-8-313, MCA.

## COUNT II: BREACH OF CONTRACT

28.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-27 as if repeated herein.

29.    Plaintiffs entered a contract of insurance, identified as the Policy, with Hartford to protect A & L and Michael.

30.    Hartford issued the Policy on behalf of A & L and for the benefit of Michael.

31.    A & L paid premiums to Hartford for the benefits of the Policy.

32.    Plaintiffs filed a claim for benefits in accord with the terms of the Policy.

33.    Hartford breached the insurance contract by its failure to defend and indemnify Michael pursuant to the terms of the Policy.

34.    Hartford's breach of insurance contract caused Plaintiffs to suffer past and future damages in an amount to be proven at trial.

## COUNT III: VIOLATIONS OF COVENANT OF
## GOOD FAITH and FAIR DEALING

35.    Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-34 as if repeated herein.

36.     In any contract there exists a Covenant of Good Faith and Fair Dealing between the parties and each party has a duty to follow the covenant.

37.     Through Hartford's intentional actions, Hartford violated the Covenant of Good Faith and Fair Dealing, and thereby, Hartford breached the contract with Plaintiffs causing them past damages and future damages in an amount to be proven at trial.

38.     Because of Hartford's actions, it is guilty of actual fraud as defined in § 27-1-221(3), MCA. Hartford acted with actual malice as defined in § 27-1-221(2), MCA. Plaintiffs are, therefore, entitled to an award of punitive damages.

## COUNT IV: ESTOPPEL

39.     Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-38 as if repeated herein.

40.     Hartford is estopped and prevented from denying coverage of Plaintiffs in the Underlying Lawsuit based on its unjustified refusal to provide a defense in the Underlying Lawsuit.

## COUNT V:  CAUSES OF ACTION
## FOR VIOLATIONS OF § 33-18-201, MCA

41.     Plaintiffs re-allege and incorporate by reference the allegations contained in Paragraphs 1-40 as if repeated herein.

42.     Hartford violated the Montana Unfair Trade Practices Act by, including without limitation,

    a.     misrepresenting pertinent facts or provisions of the Policy;

    b.     failing to provide a reasonable explanation of the basis in the Policy in relation to the facts or applicable law for the denial of the claim.

43.     Because of Hartford's actions, Plaintiffs suffered past and future damages in an amount to be proven at trial.

44.     Because of Hartford's actions, it is guilty of actual fraud as defined in § 27-1-221(3), MCA. Hartford acted with actual malice is defined in § 27-1-221(2), MCA. Plaintiffs are, therefore, entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request a judgment from the Court as follows:

1.     A declaration of the rights and obligations of each of the parties with regard to the stated coverage dispute;

2.     A declaration that there is coverage under the Policy in connection with the plaintiffs' claims in the Underlying Lawsuit, filed as Cause No. DV 19-1185C in the Montana Eighteenth Judicial District Court, Gallatin County.

3.     A declaration that Harford owes a duty to defend and indemnify Plaintiffs against the claims in the Underlying Lawsuit and to satisfy a judgment or settlement in the case;

4.     An award to Plaintiffs of attorney fees and costs pursuant to § 27-8-313, MCA.

5.     An award to Plaintiffs for past and future damages caused by Hartford's breach of the Policy in an amount to be proven at trial.

6.     An award of damages to Plaintiffs for the past and future harm caused by Hartford's breach of its duties under § 33-18-201, MCA, in an amount to be proven trial.

7.     An award of punitive damages under §§ 27-1-220 and 221, MCA, against Hartford for its breach of the Covenant of Good Faith and Fair Dealing in an amount to be proven at a hearing immediately after trial.

8.    An award of punitive damages under §§ 27-1-220 and 221, MCA, against Hartford for its violation of §§ 33-18-201 and 242, MCA, in an amount to be proven at a hearing immediately after trial.

9.    For attorney fees, costs, interest, pre-judgment interest as determined by the Court.

10.    For other and further relief as the Court deems proper under the circumstances.

DATED this ___ day of November 2021

David P. Legare, Esq.
*Attorney for Plaintiffs*



18185

*1100265FS49680119



## PRODUCER COMPENSATION NOTICE

You can review and obtain information on The Hartford's producer compensation practices at www.TheHartford.com or at 1-800-592-5717.

Form G-3418-0

**Ex. 1, p. 1**



THE
HARTFORD

**LOSS REPORTING FOR THE USAA BUSINESS INSURANCE PROGRAM**

When you have a claim, you want it resolved quickly. The Hartford's 24-hour loss reporting center, LossConnect, accelerates the process by taking the information from you directly over the phone...any time, day or night. LossConnect then electronically sends the information to the Hartford claim representative, who will investigate and resolve your claim quickly - so your overall costs can be reduced and you can get back to business.

# HOW TO REPORT A COMMERCIAL CLAIM

o   Get the facts regarding the incident.

o   Gather the information listed below to expedite the call.

o   Call 24 hours a day, 365 days a year at **1-877-383-7020.**

## Information you need before calling LossConnect

When reporting a loss, you will be asked questions regarding your insurance policy, as well as the date, time and type of loss. You may want to have your policy information available for easy reference.  The more information you have at hand, the less time the call will take -- and the less need for follow-up.

The **three** most important pieces of information you should have before calling in your loss are your:

| | |
|---|---|
| **Account Number:** | 34543 |
| **Policy Number:** | 65 SBA FS4968 |
| **USAA Member #:** | 103442612 |

The LossConnect representative will also ask for the following information about the incident:

**POLICY**
o   Policy number and limits

**INJURED PARTY**
o   Location of accident/incident (city/state)
o   Name and address of injured person(s)
o   Type of injury/part of body
o   Name and address of authorities contacted
o   Name and address of witness
o   Name and address of attorney

**AUTO/PROPERTY DAMAGE**
o   Name, address and phone number of other party
o   Auto - describe vehicle and damages
o   Property - describe vehicle and damages
o   Name and address of authorities contacted
o   Name and address of witnesses

**Losses should always be reported promptly, but please report serious accidents immediately even though all the information may not be readily available.**

### LossConnect

The only number Hartford customers need
to report Commercial Claims
**1-877-383-7020**

Form G-3260-1

© 2005,  The Hartford

Ex. 1, p. 2



18187

*1100265FS49680119

# IMPORTANT NOTICE TO POLICYHOLDERS

To help your insurance keep pace with increasing costs, we have increased your amount of insurance . . . giving you better protection in case of either a partial, or total loss to your property.

If you feel the new amount is not the proper one, please contact your agent or broker.

18188

*1100265FS49680119

68
49
FS
SBA

This **Spectrum Policy** consists of the Declarations, Coverage Forms, Common Policy Conditions and any other Forms and Endorsements issued to be a part of the Policy. This insurance is provided by the stock insurance company of The Hartford Insurance Group shown below.

**INSURER:**   HARTFORD CASUALTY INSURANCE COMPANY

ONE HARTFORD PLAZA, HARTFORD, CT 06155

COMPANY CODE: 3

**Policy Number:**   65 SBA FS4968  DX

## SPECTRUM POLICY DECLARATIONS          ORIGINAL

**Named Insured and Mailing Address:**          ANDERSON & LIECHTY, P.C.
(No., Street, Town, State, Zip Code)

PO BOX 3253
BILLINGS          MT   59103
USAA #: 103442612

**Policy Period:**          From     12/28/18     **To**     12/28/19     1     YEAR
12:01 a.m., Standard time at your mailing address shown above. **Exception:** 12 noon in New Hampshire.

**Name of Agent/Broker:**  USAA INSURANCE AGENCY INC/PHS
**Code:**   812845

**Previous Policy Number:**   65 SBA FS4968

**Named Insured is:**  CORPORATION

**Audit Period:**  NON-AUDITABLE

**Type of Property Coverage:**  SPECIAL

**Insurance Provided:** In return for the payment of the  premium and  subject to  all of the  terms of this policy, we agree with you to provide insurance as stated in this policy.

---

**TOTAL ANNUAL PREMIUM IS:**          $792

---

Countersigned by            *Susan L. Castaneda*

Authorized Representative

10/29/18
Date

---

**Form SS 00 02 12 06**
**Process Date:** 10/29/18

INSURED COPY

**Page** 001 (CONTINUED ON NEXT PAGE)
**Policy Expiration Date:** 12/28/19

Ex. 1, p. 4

18189

*1100265FS49680119

**SPECTRUM POLICY DECLARATIONS (Continued)**
**POLICY NUMBER: 65 SBA FS4968**

Location(s), Building(s), Business of Named Insured and Schedule of Coverages for Premises as designated by Number below.

**Location:** 001        **Building:** 001

2718 MONTANA AVE STE 218                    *404 N. 31st St. Ste 130*
BILLINGS              MT 59101

**Description of Business:**
LAWYERS & LAW FIRMS


**Deductible:** $   250 PER OCCURRENCE


**BUILDING AND BUSINESS PERSONAL PROPERTY   LIMITS OF INSURANCE**

  **BUILDING**

                                             NO COVERAGE


  **BUSINESS PERSONAL PROPERTY**

     **REPLACEMENT COST**                    $   153,100


  **PERSONAL PROPERTY OF OTHERS**

     **REPLACEMENT COST**                    NO COVERAGE

MONEY AND SECURITIES

  INSIDE THE PREMISES                        $   10,000
  OUTSIDE THE PREMISES                       $    5,000


**Form SS 00 02 12 06**                      Page 002 (CONTINUED ON NEXT PAGE)
**Process Date: 10/29/18**                   Policy Expiration Date: 11/28/19

Ex. 1, p. 5

## SPECTRUM POLICY DECLARATIONS (Continued)
POLICY NUMBER:  65 SBA FS4968

Location(s), Building(s), Business of Named Insured and Schedule of Coverages for Premises as designated by Number below.

**Location:**  001          **Building:**  001

**PROPERTY OPTIONAL COVERAGES APPLICABLE      LIMITS OF INSURANCE
       TO THIS LOCATION**

**SUPER STRETCH
FORM: SS 04 74
THIS FORM INCLUDES MANY ADDITIONAL
COVERAGES AND EXTENSIONS OF
COVERAGES. A SUMMARY OF THE
COVERAGE LIMITS IS ATTACHED.**

**SPECTRUM POLICY DECLARATIONS (Continued)**
POLICY NUMBER: 65 SBA FS4968

| PROPERTY OPTIONAL COVERAGES APPLICABLE TO ALL LOCATIONS | LIMITS OF INSURANCE |
|---|---|
| BUSINESS INCOME AND EXTRA EXPENSE COVERAGE | 12 MONTHS ACTUAL LOSS SUSTAINED |
| COVERAGE INCLUDES THE FOLLOWING COVERAGE EXTENSIONS: | |
| ACTION OF CIVIL AUTHORITY: | 30 DAYS |
| EXTENDED BUSINESS INCOME: | 30 CONSECUTIVE DAYS |

EQUIPMENT BREAKDOWN COVERAGE
  COVERAGE FOR DIRECT PHYSICAL LOSS
  DUE TO:
    MECHANICAL BREAKDOWN,
    ARTIFICIALLY GENERATED CURRENT
    AND STEAM EXPLOSION

| THIS ADDITIONAL COVERAGE INCLUDES THE FOLLOWING EXTENSIONS | |
|---|---|
|   HAZARDOUS SUBSTANCES | $  50,000 |
|   EXPEDITING EXPENSES | $  50,000 |

MECHANICAL BREAKDOWN COVERAGE ONLY
APPLIES WHEN BUILDING OR BUSINESS
PERSONAL PROPERTY IS SELECTED ON
THE POLICY

| IDENTITY RECOVERY COVERAGE | $  15,000 |
|---|---|
| FORM SS 41 12 | |

**SPECTRUM POLICY DECLARATIONS (Continued)**
**POLICY NUMBER:** 65 SBA FS4968

| BUSINESS LIABILITY | LIMITS OF INSURANCE |
|---|---|
| **LIABILITY AND MEDICAL EXPENSES** | $1,000,000 |
| **MEDICAL EXPENSES - ANY ONE PERSON** | $    10,000 |
| **PERSONAL AND ADVERTISING INJURY** | $1,000,000 |
| **DAMAGES TO PREMISES RENTED TO YOU**<br>     **ANY ONE PREMISES** | $   300,000 |
| **AGGREGATE LIMITS**<br>     **PRODUCTS-COMPLETED OPERATIONS** | $2,000,000 |
| **GENERAL AGGREGATE** | $2,000,000 |

**BUSINESS LIABILITY OPTIONAL**
**COVERAGES**

| | |
|---|---|
| **HIRED/NON-OWNED AUTO LIABILITY**<br>**FORM:  SS 04 38** | $1,000,000 |



18191

*1100265FS49680119

Ex. 1, p. 8

**SPECTRUM POLICY DECLARATIONS (Continued)**
**POLICY NUMBER:** 65 SBA FS4968

**Form Numbers of Forms and Endorsements that apply:**

```
SS 00 01 03 14     SS 00 05 12 06     SS 00 07 07 05     SS 00 08 04 05
SS 00 64 09 16     SS 84 15 09 07     SS 01 42 10 16     SS 89 93 07 16
SS 00 60 09 15     SS 00 61 09 15     SS 04 19 07 05     SS 04 22 07 05
SS 04 30 07 05     SS 04 38 09 09     SS 04 39 07 05     SS 04 41 03 18
SS 04 42 03 17     SS 04 44 07 05     SS 04 45 07 05     SS 04 46 09 14
SS 04 47 04 09     SS 04 74 09 07     SS 04 78 12 17     SS 04 80 03 00
SS 04 86 03 00     SS 40 18 07 05     SS 40 93 07 05     SS 41 12 12 17
SS 41 51 10 09     SS 41 63 06 11     IH 10 01 09 86     SS 05 47 09 15
SS 50 19 01 15     SS 50 38 10 03     SS 51 10 03 17     SS 51 11 03 17
IH 99 40 04 09     IH 99 41 04 09     SS 83 76 01 15
```



# SUPER STRETCH SUMMARY

**SUMMARY OF COVERAGE LIMITS**

This is a summary of the Coverages and the Limits of Insurance provided by the Super Stretch Coverage form SS 04 74 which is included in this policy. No coverage is provided by this summary. Refer to coverage form SS 04 74 to determine the scope of your insurance protection.

The Limits of Insurance for the following Additional Coverages are in addition to any other limit of insurance provided under this policy:



| **Blanket Coverage Limit of Insurance: $150,000** |
|---|
| **Blanket Coverages** |
| Accounts Receivable- On/Off Premises |
| Computers and Media |
| Debris Removal |
| Personal Property of Others |
| Temperature Change |
| Valuable Papers and Records- On/Off Premises |

| Coverage | Limit |
|---|---|
| Brands and Labels | Up to Business Personal Property Limit |
| Claim Expenses | $ 10,000 |
| Computer Fraud | $ 5,000 |
| Employee Dishonesty (including ERISA) | $ 25,000 |
| Fine Arts | $ 25,000 |
| Forgery | $ 25,000 |
| Laptop Computers- Worldwide Coverage | $ 10,000 |
| Off Premises Utility Services – Direct Damage | $ 25,000 |
| Outdoor Signs | Full Value |
| Pairs or Sets | Up to Business Personal Property Limit |
| Property at Other Premises | $ 10,000 |
| Salespersons' Samples | $ 5,000 |
| Sewer and Drain Back Up | Included Up to Covered Property Limits |
| Sump Overflow or Sump Pump Failure | $ 25,000 |
| Tenant Building and Business Personal Property Coverage-Required by Lease | $ 20,000 |
| Transit Property in the Care of Carriers for Hire | $ 10,000 |
| Unauthorized Business Card Use | $ 5,000 |

© 2007 The Hartford

Ex. 1, p. 110

The Limits of Insurance for the following Coverage Extensions are a replacement of the Limit of Insurance provided under the Standard Property Coverage Form or the Special Property Coverage Form, whichever applies to the policy:

| Coverage | Limit |
|---|---|
| Newly Acquired or Constructed Property – 180 Days | |
|     Building | $1,000,000 |
|     Business Personal Property | $ 500,000 |
|     Business Income and Extra Expense | $ 500,000 |
| Outdoor Property | $ 25,000 aggregate/ $1,000 per item |
| Personal Effects | $ 25,000 |
| Property Off-Premises | $ 25,000 |

The following changes apply only if Business Income and Extra Expense are covered under this policy. The Limits of Insurance for the following Business Income and Extra Expense Coverages are in addition to any other Limit of Insurance provided under this policy:

| Coverage | Limit |
|---|---|
| Business Income Extension for Off-Premises Utility Services | $ 25,000 |
| Business Income Extension for Web Sites | $ 50,000/7 days |
| Business Income from Dependent Properties | $ 50,000 |

The following Limit of Insurance for the following Business Income Coverage is a replacement of the Limit of Insurance provided under the Standard Property Coverage Form or the Special Property Coverage Form, whichever applies to the policy:

| Coverage | Limit |
|---|---|
| Extended Business Income | 90 Days |

The following changes apply to Loss Payment Conditions:

| Coverage | Limit |
|---|---|
| Valuation Changes | |
|     Commodity Stock | Included |
|     "Finished Stock" | Included |
|     Mercantile Stock - Sold | Included |

**Ex. 1, p. 11**
Form SS 84 15 09 07

# COMMON POLICY CONDITIONS

Form SS 00 05 12 06

# QUICK REFERENCE - SPECTRUM POLICY

## DECLARATIONS
### and
### COMMON POLICY CONDITIONS

## I.    DECLARATIONS

Named Insured and Mailing Address
Policy Period
Description and Business Location
Coverages and Limits of Insurance

## II.    COMMON POLICY CONDITIONS                    Beginning on Page

| | | |
|---|---|---:|
| **A.** | Cancellation | 1 |
| **B.** | Changes | 1 |
| **C.** | Concealment, Misrepresentation Or Fraud | 2 |
| **D.** | Examination Of Your Books And Records | 2 |
| **E.** | Inspections And Surveys | 2 |
| **F.** | Insurance Under Two Or More Coverages | 2 |
| **G.** | Liberalization | 2 |
| **H.** | Other Insurance - Property Coverage | 2 |
| **I.** | Premiums | 2 |
| **J.** | Transfer Of Rights Of Recovery Against Others To Us | 2 |
| **K.** | Transfer Of Your Rights And Duties Under This Policy | 3 |
| **L.** | Premium Audit | 3 |

Ex. 1, p. 13

# COMMON POLICY CONDITIONS

All coverages of this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 5 days before the effective date of cancellation if any one of the following conditions exists at any building that is Covered Property in this policy:

      (1) The building has been vacant or unoccupied 60 or more consecutive days. This does not apply to:

         (a) Seasonal unoccupancy; or

         (b) Buildings in the course of construction, renovation or addition.

      Buildings with 65% or more of the rental units or floor area vacant or unoccupied are considered unoccupied under this provision.

      (2) After damage by a Covered Cause of Loss, permanent repairs to the building:

         (a) Have not started; and

         (b) Have not been contracted for,

      within 30 days of initial payment of loss.

      (3) The building has:

         (a) An outstanding order to vacate;

         (b) An outstanding demolition order; or

         (c) Been declared unsafe by governmental authority.

      (4) Fixed and salvageable items have been or are being removed from the building and are not being replaced. This does not apply to such removal that is necessary or incidental to any renovation or remodeling.

      (5) Failure to:

         (a) Furnish necessary heat, water, sewer service or electricity for 30 consecutive days or more, except during a period of seasonal unoccupancy; or

         (b) Pay property taxes that are owing and have been outstanding for more than one year following the date due, except that this provision will not apply where you are in a bona fide dispute with the taxing authority regarding payment of such taxes.

   b. 10 days before the effective date of cancellation if we cancel for nonpayment of premium.

   c. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is canceled, we will send the first Named Insured any premium refund due. Such refund will be pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

7. If the first Named Insured cancels this policy, we will retain no less than $100 of the premium.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

© 2006, The Hartford

Ex. 1, p. 14

### C. Concealment, Misrepresentation Or Fraud

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This policy;
2. The Covered Property;
3. Your interest in the Covered Property; or
4. A claim under this policy.

### D. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to the policy at any time during the policy period and up to three years afterward.

### E. Inspections And Surveys

We have the right but are not obligated to:

1. Make inspections and surveys at any time;
2. Give you reports on the conditions we find; and
3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of any person. And we do not represent or warrant that conditions:

1. Are safe or healthful; or
2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

### F. Insurance Under Two Or More Coverages

If two or more of this policy's coverages apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

### G. Liberalization

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

### H. Other Insurance - Property Coverage

If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance; whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

### I. Premiums

1. The first Named Insured shown in the Declarations:
   a. Is responsible for the payment of all premiums; and
   b. Will be the payee for any return premiums we pay.

2. The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. If applicable, on each renewal, continuation or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

3. With our consent, you may continue this policy in force by paying a continuation premium for each successive one-year period. The premium must be:
   a. Paid to us prior to the anniversary date; and
   b. Determined in accordance with Paragraph 2. above.

   Our forms then in effect will apply. If you do not pay the continuation premium, this policy will expire on the first anniversary date that we have not received the premium.

4. Changes in exposures or changes in your business operation, acquisition or use of locations that are not shown in the Declarations may occur during the policy period. If so, we may require an additional premium. That premium will be determined in accordance with our rates and rules then in effect.

### J. Transfer Of Rights Of Recovery Against Others To Us

Applicable to Property Coverage:

If any person or organization to or for whom we make payment under this policy has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property.
2. After a loss to your Covered Property only if, at time of loss, that party is one of the following:
   a. Someone insured by this insurance;
   b. A business firm:
      (1) Owned or controlled by you; or
      (2) That owns or controls you; or

**COMMON POLICY CONDITIONS**

   **c.**  Your tenant.

You may also accept the usual bills of lading or shipping receipts limiting the liability of carriers.

This will not restrict your insurance.

**K.**  **Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**L.**  **Premium Audit**

   **a.**  We will compute all premiums for this policy in accordance with our rules and rates.

   **b.**  The premium amount shown in the Declarations is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Any additional premium found to be due as a result of the audit are due and payable on notice to the first Named Insured. If the deposit premium paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

   **c.**  The first Named Insured must maintain all records related to the coverage provided by this policy and necessary to finalize the premium audit, and send us copies of the same upon our request.

Our President and Secretary have signed this policy. Where required by law, the Declarations page has also been countersigned by our duly authorized representative.

Lisa Levin, Secretary

Douglas Elliot, President

**Ex. 1, p. 16**

# BUSINESS LIABILITY COVERAGE FORM

## QUICK REFERENCE
## BUSINESS LIABILITY COVERAGE FORM
## READ YOUR POLICY CAREFULLY

**BUSINESS LIABILITY COVERAGE FORM**                     **Beginning on Page**

| | | |
|---|---|---|
| **A.** | **COVERAGES** | 1 |
| | Business Liability | 1 |
| | Medical Expenses | 2 |
| | Coverage Extension - Supplementary Payments | 2 |
| **B.** | **EXCLUSIONS** | 3 |
| **C.** | **WHO IS AN INSURED** | 10 |
| **D.** | **LIABILITY AND MEDICAL EXPENSES** **LIMITS OF INSURANCE** | 14 |
| **E.** | **LIABILITY AND MEDICAL EXPENSES GENERAL CONDITIONS** | 15 |
| | **1.** Bankruptcy | 15 |
| | **2.** Duties In The Event Of Occurrence, Offense, Claim Or Suit | 15 |
| | **3.** Financial Responsibility Laws | 16 |
| | **4.** Legal Action Against Us | 16 |
| | **5.** Separation Of Insureds | 16 |
| | **6.** Representations | 16 |
| | **7.** Other Insurance | 16 |
| | **8.** Transfer Of Rights Of Recovery Against Others To Us | 17 |
| **F.** | **OPTIONAL ADDITIONAL INSURED COVERAGES** | 18 |
| | Additional Insureds | 18 |
| **G.** | **LIABILITY AND MEDICAL EXPENSES DEFINITIONS** | 20 |

Ex. 1, p. 18

Form SS 00 08 04 05



# BUSINESS LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the stock insurance company member of The Hartford providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **C. - Who Is An Insured.**

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **G. - Liability And Medical Expenses Definitions.**



## A. COVERAGES

1. **BUSINESS LIABILITY COVERAGE (BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY)**

   **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply.

   We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

   (1) The amount we will pay for damages is limited as described in Section **D. - Liability And Medical Expenses Limits Of Insurance;** and

   (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments, settlements or medical expenses to which this insurance applies.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Coverage Extension - Supplementary Payments.

   b. This insurance applies:

   (1) To "bodily injury" and "property damage" only if:

   (a) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   (b) The "bodily injury" or "property damage" occurs during the policy period; and

   (c) Prior to the policy period, no insured listed under Paragraph **1.** of Section **C. –** Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   (2) To "personal and advertising injury" caused by an offense arising out of your business, but only if the offense was committed in the "coverage territory" during the policy period.

   c. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section **C. –** Who Is An Insured, or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**BUSINESS LIABILITY COVERAGE FORM**

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

**d.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**e. Incidental Medical Malpractice**

**(1)** "Bodily injury" arising out of the rendering of or failure to render professional health care services as a physician, dentist, nurse, emergency medical technician or paramedic shall be deemed to be caused by an "occurrence", but only if:

**(a)** The physician, dentist, nurse, emergency medical technician or paramedic is employed by you to provide such services; and

**(b)** You are not engaged in the business or occupation of providing such services.

**(2)** For the purpose of determining the limits of insurance for incidental medical malpractice, any act or omission together with all related acts or omissions in the furnishing of these services to any one person will be considered one "occurrence".

**2. MEDICAL EXPENSES**

**Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(1)** The accident takes place in the "coverage territory" and during the policy period;

**(2)** The expenses are incurred and reported to us within three years of the date of the accident; and

**(3)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**3. COVERAGE EXTENSION - SUPPLEMENTARY PAYMENTS**

**a.** We will pay, with respect to any claim or "suit" we investigate or settle, or any "suit" against an insured we defend:

**(1)** All expenses we incur.

**(2)** Up to $1,000 for the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Business Liability Coverage for "bodily injury" applies. We do not have to furnish these bonds.

**(3)** The cost of appeal bonds or bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**(4)** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $500 a day because of time off from work.

**(5)** All costs taxed against the insured in the "suit".

**(6)** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**(7)** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

Any amounts paid under **(1)** through **(7)** above will not reduce the limits of insurance.

**Ex. 1, p. 20**

**b.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**(1)** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**(2)** This insurance applies to such liability assumed by the insured;

**(3)** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**(4)** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interest of the indemnitee;

**(5)** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**(6)** The indemnitee:

**(a)** Agrees in writing to:

**(i)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(ii)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(iii)** Notify any other insurer whose coverage is available to the indemnitee; and

**(iv)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(b)** Provides us with written authorization to:

**(i)** Obtain records and other information related to the "suit"; and

**(ii)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments.

Notwithstanding the provisions of Paragraph **1.b.(b)** of Section **B.** – Exclusions, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the Limits of Insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**(1)** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**(2)** The conditions set forth above, or the terms of the agreement described in Paragraph **(6)** above, are no longer met.

## B. EXCLUSIONS

**1. Applicable To Business Liability Coverage**

This insurance does not apply to:

**a. Expected Or Intended Injury**

**(1)** "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property; or

**(2)** "Personal and advertising injury" arising out of an offense committed by, at the direction of or with the consent or acquiescence of the insured with the expectation of inflicting "personal and advertising injury".

**b. Contractual Liability**

**(1)** "Bodily injury" or "property damage"; or

**(2)** "Personal and advertising injury"

for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

This exclusion does not apply to liability for damages because of:

**(a)** "Bodily injury", "property damage" or "personal and advertising injury" that the insured would have in the absence of the contract or agreement; or

Form SS 00 08 04 05

Ex. 1 Page 21

**(b)** "Bodily injury" or "property damage" assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purpose of liability assumed in an "insured contract", reasonable attorneys' fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage" provided:

    **(i)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract", and

    **(ii)** Such attorneys' fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

    **(a)** Employment by the insured; or

    **(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollution**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

    **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to any insured. However, this subparagraph does not apply to:

        **(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

        **(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

   **(i)** Any insured; or

   **(ii)** Any person or organization for whom you may be legally responsible;

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

   **(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or

released as part of the operations being performed by such insured, contractor or subcontractor;

   **(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

   **(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

18213

*1100265FS49680119

g. **Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.  Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

    (a) Less than 51 feet long; and

    (b) Not being used to carry persons for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft;

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment"; or

(6) An aircraft that is not owned by any insured and is hired, chartered or loaned with a paid crew.  However, this exception does not apply if the insured has any other insurance for such "bodily injury" or "property damage", whether the other insurance is primary, excess, contingent or on any other basis.

h. **Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice or preparation for, a prearranged racing, speed or demolition contest or in any stunting activity.

i. **War**

"Bodily injury", "property damage" or "personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

j. **Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional service.  This includes but is not limited to:

(1) Legal, accounting or advertising services;

(2) Preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders, designs or drawings and specifications;

(3) Supervisory, inspection, architectural or engineering activities;

(4) Medical, surgical, dental, x-ray or nursing services treatment, advice or instruction;

(5) Any health or therapeutic service treatment, advice or instruction;

(6) Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;

(7) Optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;



**(8)** Optometry or optometric services including but not limited to examination of the eyes and the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products;

**(9)** Any:

**(a)** Body piercing (not including ear piercing);

**(b)** Tattooing, including but not limited to the insertion of pigments into or under the skin; and

**(c)** Similar services;

**(10)** Services in the practice of pharmacy; and

**(11)** Computer consulting, design or programming services, including web site design.

Paragraphs **(4)** and **(5)** of this exclusion do not apply to the Incidental Medical Malpractice coverage afforded under Paragraph **1.e.** in Section **A. - Coverages.**

**k. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate Limit of Insurance applies to Damage To Premises Rented To You as described in Section **D. - Limits Of Insurance.**

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)** and **(4)** of this exclusion do not apply to the use of elevators.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraphs **(3)** and **(4)** of this exclusion do not apply to "property damage" to borrowed equipment while not being used to perform operations at a job site.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**l. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**m. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**n. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

BUSINESS LIABILITY COVERAGE FORM

**o. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**p. Personal And Advertising Injury**

"Personal and advertising injury":

**(1)** Arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity;

**(2)** Arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period;

**(3)** Arising out of a criminal act committed by or at the direction of the insured;

**(4)** Arising out of any breach of contract, except an implied contract to use another's "advertising idea" in your "advertisement";

**(5)** Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

**(6)** Arising out of the wrong description of the price of goods, products or services;

**(7)** Arising out of any violation of any intellectual property rights such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity.

However, this exclusion does not apply to infringement, in your "advertisement", of:

**(a)** Copyright;

**(b)** Slogan, unless the slogan is also a trademark, trade name, service mark or other designation of origin or authenticity; or

**(c)** Title of any literary or artistic work;

**(8)** Arising out of an offense committed by an insured whose business is:

**(a)** Advertising, broadcasting, publishing or telecasting;

**(b)** Designing or determining content of web sites for others; or

**(c)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **a.**, **b.** and **c.** under the definition of "personal and advertising injury" in Section **G.** – Liability And Medical Expenses Definitions.

For the purposes of this exclusion, placing an "advertisement" for or linking to others on your web site, by itself, is not considered the business of advertising, broadcasting, publishing or telecasting;

**(9)** Arising out of an electronic chat room or bulletin board the insured hosts, owns, or over which the insured exercises control;

**(10)** Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatags, or any other similar tactics to mislead another's potential customers;

**(11)** Arising out of the violation of a person's right of privacy created by any state or federal act.

However, this exclusion does not apply to liability for damages that the insured would have in the absence of such state or federal act;

**(12)** Arising out of:

**(a)** An "advertisement" for others on your web site;

**(b)** Placing a link to a web site of others on your web site;

**(c)** Content from a web site of others displayed within a frame or border on your web site. Content includes information, code, sounds, text, graphics or images; or

**(d)** Computer code, software or programming used to enable:

**(i)** Your web site; or

**(ii)** The presentation or functionality of an "advertisement" or other content on your web site;

Ex. 1, p. 26

**(13)** Arising out of a violation of any anti-trust law;

**(14)** Arising out of the fluctuation in price or value of any stocks, bonds or other securities; or

**(15)** Arising out of discrimination or humiliation committed by or at the direction of any "executive officer", director, stockholder, partner or member of the insured.

**q. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data".

**r. Employment-Related Practices**

"Bodily injury" or "personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" or "personal and advertising injury" to the person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**s. Asbestos**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" arising out of the "asbestos hazard".

**(2)** Any damages, judgments, settlements, loss, costs or expenses that:

**(a)** May be awarded or incurred by reason of any claim or suit alleging actual or threatened injury or damage of any nature or kind to persons or property which would not have occurred in whole or in part but for the "asbestos hazard";

**(b)** Arise out of any request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, encapsulate, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of an "asbestos hazard"; or

**(c)** Arise out of any claim or suit for damages because of testing for, monitoring, cleaning up, removing, encapsulating, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of an "asbestos hazard".

**t. Violation Of Statutes That Govern E-Mails, Fax, Phone Calls Or Other Methods Of Sending Material Or Information**

"Bodily injury", "property damage", or "personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**Damage To Premises Rented To You – Exception For Damage By Fire, Lightning or Explosion**

Exclusions **c.** through **h.** and **k.** through **o.** do not apply to damage by fire, lightning or explosion to premises rented to you or temporarily occupied by you with permission of the owner. A separate Limit of Insurance applies to this coverage as described in Section **D.** - Liability And Medical Expenses Limits Of Insurance.

18215

*1100265FS49680119*

**2. Applicable To Medical Expenses Coverage**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports or athletic contests.

**f. Products-Completed Operations Hazard**

Included with the "products-completed operations hazard".

**g. Business Liability Exclusions**

Excluded under Business Liability Coverage.

## C. WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a. Employees And Volunteer Workers**

Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or that "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

If you are not in the business of providing professional health care services, Paragraph **(d)** does not apply to any nurse, emergency medical technician or paramedic employed by you to provide such services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b. Real Estate Manager**

Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c. Temporary Custodians Of Your Property**

Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d. Legal Representative If You Die**

Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this insurance.

**e. Unnamed Subsidiary**

Any subsidiary and subsidiary thereof, of yours which is a legally incorporated entity of which you own a financial interest of more than 50% of the voting stock on the effective date of this Coverage Part.

The insurance afforded herein for any subsidiary not shown in the Declarations as a named insured does not apply to injury or damage with respect to which an insured under this insurance is also an insured under another policy or would be an insured under such policy but for its termination or upon the exhaustion of its limits of insurance.

**3. Newly Acquired Or Formed Organization**

Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain financial interest of more than 50% of the voting stock, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

**b.** Coverage under this provision does not apply to:

**(1)** "Bodily injury" or "property damage" that occurred; or

**(2)** "Personal and advertising injury" arising out of an offense committed

before you acquired or formed the organization.

**4. Operator Of Mobile Equipment**

With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person driving the equipment; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**5. Operator of Nonowned Watercraft**

With respect to watercraft you do not own that is less than 51 feet long and is not being used to carry persons for a charge, any person is an insured while operating such watercraft with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the watercraft, and only if no other insurance of any kind is available to that person or organization for this liability.

However, no person or organization is an insured with respect to:

**a.** "Bodily injury" to a co-"employee" of the person operating the watercraft; or

**b.** "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

**6. Additional Insureds When Required By Written Contract, Written Agreement Or Permit**

The person(s) or organization(s) identified in Paragraphs **a.** through **f.** below are additional insureds when you have agreed, in a written

BUSINESS LIABILITY COVERAGE FORM

contract, written agreement or because of a permit issued by a state or political subdivision, that such person or organization be added as an additional insured on your policy, provided the injury or damage occurs subsequent to the execution of the contract or agreement, or the issuance of the permit.

A person or organization is an additional insured under this provision only for that period of time required by the contract, agreement or permit.

However, no such person or organization is an additional insured under this provision if such person or organization is included as an additional insured by an endorsement issued by us and made a part of this Coverage Part, including all persons or organizations added as additional insureds under the specific additional insured coverage grants in Section F. – Optional Additional Insured Coverages.

**a.  Vendors**

Any person(s) or organization(s) (referred to below as vendor), but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business and only if this Coverage Part provides coverage for "bodily injury" or "property damage" included within the "products-completed operations hazard".

**(1)**  The insurance afforded to the vendor is subject to the following additional exclusions:

This insurance does not apply to:

**(a)**  "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

**(b)**  Any express warranty unauthorized by you;

**(c)**  Any physical or chemical change in the product made intentionally by the vendor;

**(d)**  Repackaging, except when unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

**(e)**  Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

**(f)**  Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

**(g)**  Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

**(h)**  "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

**(i)**  The exceptions contained in Subparagraphs (d) or (f); or

**(ii)**  Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

**(2)**  This insurance does not apply to any insured person or organization from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

**b.  Lessors Of Equipment**

**(1)**  Any person or organization from whom you lease equipment; but only with respect to their liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person or organization.

(2) With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after you cease to lease that equipment.

**c. Lessors Of Land Or Premises**

(1) Any person or organization from whom you lease land or premises, but only with respect to liability arising out of the ownership, maintenance or use of that part of the land or premises leased to you.

(2) With respect to the insurance afforded to these additional insureds, this insurance does not apply to:

(a) Any "occurrence" which takes place after you cease to lease that land or be a tenant in that premises; or

(b) Structural alterations, new construction or demolition operations performed by or on behalf of such person or organization.

**d. Architects, Engineers Or Surveyors**

(1) Any architect, engineer, or surveyor, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

(a) In connection with your premises; or

(b) In the performance of your ongoing operations performed by you or on your behalf.

(2) With respect to the insurance afforded to these additional insureds, the following additional exclusion applies:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or the failure to render any professional services by or for you, including:

(a) The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, designs or drawings and specifications; or

(b) Supervisory, inspection, architectural or engineering activities.

**e. Permits Issued By State Or Political Subdivisions**

(1) Any state or political subdivision, but only with respect to operations performed by you or on your behalf for which the state or political subdivision has issued a permit.

(2) With respect to the insurance afforded to these additional insureds, this insurance does not apply to:

(a) "Bodily injury", "property damage" or "personal and advertising injury" arising out of operations performed for the state or municipality; or

(b) "Bodily injury" or "property damage" included within the "products-completed operations hazard".

**f. Any Other Party**

(1) Any other person or organization who is not an insured under Paragraphs **a.** through **e.** above, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

(a) In the performance of your ongoing operations;

(b) In connection with your premises owned by or rented to you; or

(c) In connection with "your work" and included within the "products-completed operations hazard", but only if

(i) The written contract or written agreement requires you to provide such coverage to such additional insured; and

(ii) This Coverage Part provides coverage for "bodily injury" or "property damage" included within the "products-completed operations hazard".

(2) With respect to the insurance afforded to these additional insureds, this insurance does not apply to:

"Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

18217

*1100265FS49680119

    **(a)** The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, designs or drawings and specifications; or

    **(b)** Supervisory, inspection, architectural or engineering activities.

The limits of insurance that apply to additional insureds are described in Section **D. – Limits Of Insurance.**

How this insurance applies when other insurance is available to an additional insured is described in the Other Insurance Condition in Section **E. – Liability And Medical Expenses General Conditions.**

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## D. LIABILITY AND MEDICAL EXPENSES LIMITS OF INSURANCE

**1. The Most We Will Pay**

The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    **a.** Insureds;

    **b.** Claims made or "suits" brought; or

    **c.** Persons or organizations making claims or bringing "suits".

**2. Aggregate Limits**

The most we will pay for:

    **a.** Damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard" is the Products-Completed Operations Aggregate Limit shown in the Declarations.

    **b.** Damages because of all other "bodily injury", "property damage" or "personal and advertising injury", including medical expenses, is the General Aggregate Limit shown in the Declarations.

    This General Aggregate Limit applies separately to each of your "locations" owned by or rented to you.

    "Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway or right-of-way of a railroad.

This General Aggregate limit does not apply to "property damage" to premises while rented to you or temporarily occupied by you with permission of the owner, arising out of fire, lightning or explosion.

**3. Each Occurrence Limit**

Subject to **2.a.** or **2.b** above, whichever applies, the most we will pay for the sum of all damages because of all "bodily injury", "property damage" and medical expenses arising out of any one "occurrence" is the Liability and Medical Expenses Limit shown in the Declarations.

The most we will pay for all medical expenses because of "bodily injury" sustained by any one person is the Medical Expenses Limit shown in the Declarations.

**4. Personal And Advertising Injury Limit**

Subject to **2.b.** above, the most we will pay for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization is the Personal and Advertising Injury Limit shown in the Declarations.

**5. Damage To Premises Rented To You Limit**

The Damage To Premises Rented To You Limit is the most we will pay under Business Liability Coverage for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, lightning or explosion, while rented to you or temporarily occupied by you with permission of the owner.

In the case of damage by fire, lightning or explosion, the Damage to Premises Rented To You Limit applies to all damage proximately caused by the same event, whether such damage results from fire, lightning or explosion or any combination of these.

**6. How Limits Apply To Additional Insureds**

The most we will pay on behalf of a person or organization who is an additional insured under this Coverage Part is the lesser of:

    **a.** The limits of insurance specified in a written contract, written agreement or permit issued by a state or political subdivision; or

    **b.** The Limits of Insurance shown in the Declarations.

Such amount shall be a part of and not in addition to the Limits of Insurance shown in the Declarations and described in this Section.

If more than one limit of insurance under this policy and any endorsements attached thereto applies to any claim or "suit", the most we will pay under this policy and the endorsements is the single highest limit of liability of all coverages applicable to such claim or "suit". However, this paragraph does not apply to the Medical Expenses limit set forth in Paragraph **3.** above.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## E. LIABILITY AND MEDICAL EXPENSES GENERAL CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. **Notice Of Occurrence Or Offense**

      You or any additional insured must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. **Notice Of Claim**

      If a claim is made or "suit" is brought against any insured, you or any additional insured must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You or any additional insured must see to it that we receive a written notice of the claim or "suit" as soon as practicable.

   c. **Assistance And Cooperation Of The Insured**

      You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

   (2) Authorize us to obtain records and other information;

   (3) Cooperate with us in the investigation, settlement of the claim or defense against the "suit"; and

   (4) Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. **Obligations At The Insured's Own Cost**

      No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

   e. **Additional Insured's Other Insurance**

      If we cover a claim or "suit" under this Coverage Part that may also be covered by other insurance available to an additional insured, such additional insured must submit such claim or "suit" to the other insurer for defense and indemnity.

      However, this provision does not apply to the extent that you have agreed in a written contract, written agreement or permit that this insurance is primary and non-contributory with the additional insured's own insurance.

   f. **Knowledge Of An Occurrence, Offense, Claim Or Suit**

      Paragraphs **a.** and **b.** apply to you or to any additional insured only when such "occurrence", offense, claim or "suit" is known to:

      (1) You or any additional insured that is an individual;

      (2) Any partner, if you or an additional insured is a partnership;

      (3) Any manager, if you or an additional insured is a limited liability company;

      (4) Any "executive officer" or insurance manager, if you or an additional insured is a corporation;

      (5) Any trustee, if you or an additional insured is a trust; or

      (6) Any elected or appointed official, if you or an additional insured is a political subdivision or public entity.

*1100265FS49680119    18218

Form SS 00 08 04 05

**Ex. 1, p. 33**

This Paragraph f. applies separately to you and any additional insured.

3. **Financial Responsibility Laws**

   a. When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, the insurance provided by the policy for "bodily injury" liability and "property damage" liability will comply with the provisions of the law to the extent of the coverage and limits of insurance required by that law.

   b. With respect to "mobile equipment" to which this insurance applies, we will provide any liability, uninsured motorists, underinsured motorists, no-fault or other coverage required by any motor vehicle law. We will provide the required limits for those coverages.

4. **Legal Action Against Us**

   No person or organization has a right under this Coverage Form:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Form unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this insurance or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

5. **Separation Of Insureds**

   Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

   a. As if each Named Insured were the only Named Insured; and

   b. Separately to each insured against whom a claim is made or "suit" is brought.

6. **Representations**

   a. **When You Accept This Policy**

      By accepting this policy, you agree:

      (1) The statements in the Declarations are accurate and complete;

      (2) Those statements are based upon representations you made to us; and

      (3) We have issued this policy in reliance upon your representations.

   b. **Unintentional Failure To Disclose Hazards**

      If unintentionally you should fail to disclose all hazards relating to the conduct of your business at the inception date of this Coverage Part, we shall not deny any coverage under this Coverage Part because of such failure.

7. **Other Insurance**

   If other valid and collectible insurance is available for a loss we cover under this Coverage Part, our obligations are limited as follows:

   a. **Primary Insurance**

      This insurance is primary except when **b.** below applies. If other insurance is also primary, we will share with all that other insurance by the method described in **c.** below.

   b. **Excess Insurance**

      This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:

      (1) **Your Work**

         That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

      (2) **Premises Rented To You**

         That is fire, lightning or explosion insurance for premises rented to you or temporarily occupied by you with permission of the owner;

      (3) **Tenant Liability**

         That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner;

      (4) **Aircraft, Auto Or Watercraft**

         If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **A. – Coverages.**

      (5) **Property Damage To Borrowed Equipment Or Use Of Elevators**

         If the loss arises out of "property damage" to borrowed equipment or the use of elevators to the extent not subject to Exclusion **k.** of Section **A. – Coverages.**

**Ex. 1, p. 34**

BUSINESS LIABILITY COVERAGE FORM

**(6) When You Are Added As An Additional Insured To Other Insurance**

That is other insurance available to you covering liability for damages arising out of the premises or operations, or products and completed operations, for which you have been added as an additional insured by that insurance; or

**(7) When You Add Others As An Additional Insured To This Insurance**

That is other insurance available to an additional insured.

However, the following provisions apply to other insurance available to any person or organization who is an additional insured under this Coverage Part:

**(a) Primary Insurance When Required By Contract**

This insurance is primary if you have agreed in a written contract, written agreement or permit that this insurance be primary. If other insurance is also primary, we will share with all that other insurance by the method described in **c.** below.

**(b) Primary And Non-Contributory To Other Insurance When Required By Contract**

If you have agreed in a written contract, written agreement or permit that this insurance is primary and non-contributory with the additional insured's own insurance, this insurance is primary and we will not seek contribution from that other insurance.

Paragraphs **(a)** and **(b)** do not apply to other insurance to which the additional insured has been added as an additional insured.

When this insurance is excess, we will have no duty under this Coverage Part to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all the other insurance permits contribution by equal shares, we will follow this method also. Under this approach, each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**8. Transfer Of Rights Of Recovery Against Others To Us**

**a. Transfer Of Rights Of Recovery**

If the insured has rights to recover all or part of any payment, including Supplementary Payments, we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them. This condition does not apply to Medical Expenses Coverage.

**b. Waiver Of Rights Of Recovery (Waiver Of Subrogation)**

If the insured has waived any rights of recovery against any person or organization for all or part of any payment, including Supplementary Payments, we have made under this Coverage Part, we also waive that right, provided the insured waived their rights of recovery against such person or organization in a contract, agreement or permit that was executed prior to the injury or damage.

**Ex. 1, p. 35**

18219

*1100265FS49680119

## F. OPTIONAL ADDITIONAL INSURED COVERAGES

If listed or shown as applicable in the Declarations, one or more of the following Optional Additional Insured Coverages also apply. When any of these Optional Additional Insured Coverages apply, Paragraph 6. (Additional Insureds When Required by Written Contract, Written Agreement or Permit) of Section C., Who Is An Insured, does not apply to the person or organization shown in the Declarations. These coverages are subject to the terms and conditions applicable to Business Liability Coverage in this policy, except as provided below:

1. **Additional Insured - Designated Person Or Organization**

   WHO IS AN INSURED under Section C. is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

   a. In the performance of your ongoing operations; or

   b. In connection with your premises owned by or rented to you.

2. **Additional Insured - Managers Or Lessors Of Premises**

   a. WHO IS AN INSURED under Section C. is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations as an Additional Insured - Designated Person Or Organization; but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Declarations.

   b. With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

   This insurance does not apply to:

   (1) Any "occurrence" which takes place after you cease to be a tenant in that premises; or

   (2) Structural alterations, new construction or demolition operations performed by or on behalf of such person or organization.

3. **Additional Insured - Grantor Of Franchise**

   WHO IS AN INSURED under Section C. is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations as an Additional Insured - Grantor Of Franchise, but only with respect to their liability as grantor of franchise to you.

4. **Additional Insured - Lessor Of Leased Equipment**

   a. WHO IS AN INSURED under Section C. is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations as an Additional Insured – Lessor of Leased Equipment, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

   b. With respect to the insurance afforded to these additional insureds, this insurance does not apply to any "occurrence" which takes place after you cease to lease that equipment.

5. **Additional Insured - Owners Or Other Interests From Whom Land Has Been Leased**

   a. WHO IS AN INSURED under Section C. is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations as an Additional Insured – Owners Or Other Interests From Whom Land Has Been Leased, but only with respect to liability arising out of the ownership, maintenance or use of that part of the land leased to you and shown in the Declarations.

   b. With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

   This insurance does not apply to:

   (1) Any "occurrence" that takes place after you cease to lease that land; or

   (2) Structural alterations, new construction or demolition operations performed by or on behalf of such person or organization.

6. **Additional Insured - State Or Political Subdivision – Permits**

   a. WHO IS AN INSURED under Section C. is amended to include as an additional insured the state or political subdivision shown in the Declarations as an Additional

**Ex. 1, p. 36**

Insured – State Or Political Subdivision - Permits, but only with respect to operations performed by you or on your behalf for which the state or political subdivision has issued a permit.

**b.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to:

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" arising out of operations performed for the state or municipality; or

**(2)** "Bodily injury" or "property damage" included in the "product-completed operations" hazard.

**7. Additional Insured – Vendors**

**a.** WHO IS AN INSURED under Section **C.** is amended to include as an additional insured the person(s) or organization(s) (referred to below as vendor) shown in the Declarations as an Additional Insured - Vendor, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business and only if this Coverage Part provides coverage for "bodily injury" or "property damage" included within the "products-completed operations hazard".

**b.** The insurance afforded to the vendor is subject to the following additional exclusions:

**(1)** This insurance does not apply to:

**(a)** "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

**(b)** Any express warranty unauthorized by you;

**(c)** Any physical or chemical change in the product made intentionally by the vendor;

**(d)** Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

**(e)** Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

**(f)** Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

**(g)** Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor; or

**(h)** "Bodily injury" or "property damage" arising out of the sole negligence of the vendor for its own acts or omissions or those of its employees or anyone else acting on its behalf. However, this exclusion does not apply to:

**(i)** The exceptions contained in Subparagraphs **(d)** or **(f)**; or

**(ii)** Such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products.

**(2)** This insurance does not apply to any insured person or organization from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

**8. Additional Insured – Controlling Interest**

WHO IS AN INSURED under Section **C.** is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations as an Additional Insured – Controlling Interest, but only with respect to their liability arising out of:

**a.** Their financial control of you; or

**b.** Premises they own, maintain or control while you lease or occupy these premises.

Ex. 1, p. 37

This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

9. **Additional Insured – Owners, Lessees Or Contractors – Scheduled Person Or Organization**

   a. WHO IS AN INSURED under Section C. is amended to include as an additional insured the person(s) or organization(s) shown in the Declarations as an Additional Insured – Owner, Lessees Or Contractors, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

      (1) In the performance of your ongoing operations for the additional insured(s); or

      (2) In connection with "your work" performed for that additional insured and included within the "products-completed operations hazard", but only if this Coverage Part provides coverage for "bodily injury" or "property damage" included within the "products-completed operations hazard".

   b. With respect to the insurance afforded to these additional insureds, this insurance does not apply to "bodily injury", "property damage" or "personal an advertising injury" arising out of the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

      (1) The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, designs or drawings and specifications; or

      (2) Supervisory, inspection, architectural or engineering activities.

10. **Additional Insured – Co-Owner Of Insured Premises**

    WHO IS AN INSURED under Section C. is amended to include as an additional insured the person(s) or Organization(s) shown in the Declarations as an Additional Insured – Co-Owner Of Insured Premises, but only with respect to their liability as co-owner of the premises shown in the Declarations.

The limits of insurance that apply to additional insureds are described in Section D. – Limits Of Insurance.

How this insurance applies when other insurance is available to an additional insured is described in the Other Insurance Condition in Section E. – Liability And Medical Expenses General Conditions.

## G. LIABILITY AND MEDICAL EXPENSES DEFINITIONS

1. "Advertisement" means the widespread public dissemination of information or images that has the purpose of inducing the sale of goods, products or services through:

   a. (1) Radio;

      (2) Television;

      (3) Billboard;

      (4) Magazine;

      (5) Newspaper;

   b. The Internet, but only that part of a web site that is about goods, products or services for the purposes of inducing the sale of goods, products or services; or

   c. Any other publication that is given widespread public distribution.

   However, "advertisement" does not include:

   a. The design, printed material, information or images contained in, on or upon the packaging or labeling of any goods or products; or

   b. An interactive conversation between or among persons through a computer network.

2. "Advertising idea" means any idea for an "advertisement".

3. "Asbestos hazard" means an exposure or threat of exposure to the actual or alleged properties of asbestos and includes the mere presence of asbestos in any form.

4. "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

5. "Bodily injury" means physical:

   a. Injury;

   b. Sickness; or

   c. Disease

   sustained by a person and, if arising out of the above, mental anguish or death at any time.

6. "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above;

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in **a.** above;

**(2)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in the United States of America (including its territories and possessions), Puerto Rico or Canada, in a "suit" on the merits according to the substantive law in such territory, or in a settlement we agree to.

**7.** "Electronic data" means information, facts or programs:

**a.** Stored as or on;

**b.** Created or used on; or

**c.** Transmitted to or from

computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**8.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**9.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**10.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**11.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or

**b.** Your fulfilling the terms of the contract or agreement.

**12.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire, lightning or explosion to premises while rented to you or temporarily occupied by you with permission of the owner is subject to the Damage To Premises Rented To You limit described in Section **D. – Liability and Medical Expenses Limits of Insurance.**

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, including an easement or license agreement in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** Any obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement; or

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** includes that part of any contract or agreement that indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing.

However, Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    **(a)** Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders, designs or drawings and specifications; or

    **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(2)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(1)** above and supervisory, inspection, architectural or engineering activities.

**13.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**14.** "Loading or unloading" means the handling of property:

  **a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

  **b.** While it is in or on an aircraft, watercraft or "auto"; or

  **c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**15.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

  **a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

  **b.** Vehicles maintained for use solely on or next to premises you own or rent;

  **c.** Vehicles that travel on crawler treads;

  **d.** Vehicles, whether self-propelled or not, on which are permanently mounted:

    **(1)** Power cranes, shovels, loaders, diggers or drills; or

    **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

  **e.** Vehicles not described in **a.**, **b.**, **c.**, or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    **(2)** Cherry pickers and similar devices used to raise or lower workers;

  **f.** Vehicles not described in **a.**, **b.**, **c.**, or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

    **(1)** Equipment, of at least 1,000 pounds gross vehicle weight, designed primarily for:

      **(a)** Snow removal;

      **(b)** Road maintenance, but not construction or resurfacing; or

      **(c)** Street cleaning;

    **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

**16.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**17.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

  **a.** False arrest, detention or imprisonment;

  **b.** Malicious prosecution;

**Ex. 1, p. 40**

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that the person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral, written or electronic publication of material that violates a person's right of privacy;

f. Copying, in your "advertisement", a person's or organization's "advertising idea" or style of "advertisement";

g. Infringement of copyright, slogan, or title of any literary or artistic work, in your "advertisement"; or

h. Discrimination or humiliation that results in injury to the feelings or reputation of a natural person.

18. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

19. "Products-completed operations hazard";

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed to be completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

The "bodily injury" or "property damage" must occur away from premises you own or rent, unless your business includes the selling, handling or distribution of "your product" for consumption on premises you own or rent.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

(2) The existence of tools, uninstalled equipment or abandoned or unused materials.

20. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of "occurrence" that caused it.

As used in this definition, "electronic data" is not tangible property.

21. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

22. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

23. "Volunteer worker" means a person who:

a. Is not your "employee";



*1100265FS49680119    18222

**b.** Donates his or her work;

**c.** Acts at the direction of and within the scope of duties determined by you; and

**d.** Is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**24.** "Your product":

  **a.** Means:

    **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      **(a)** You;

      **(b)** Others trading under your name; or

      **(c)** A person or organization whose business or assets you have acquired; and

    **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)** The providing of or failure to provide warnings or instructions.

  **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**25.** "Your work":

  **a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

  **b.** Includes:

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

    **(2)** The providing of or failure to provide warnings or instructions.



**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# BUSINESS LIABILITY COVERAGE FORM AMENDATORY ENDORSEMENT- SUPPLEMENTARY PAYMENTS

This endorsement modifies insurance provided under the following:

**BUSINESS LIABILITY COVERAGE FORM**

**A.** Sub-subparagraph 3.a.(5) of Paragraph 3., Section A. **Coverages** is deleted and replaced with the following:

   **3.** **Coverage Extension - Supplementary Payments:**

      **a.** **(5)** All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# BUSINESS LIABILITY COVERAGE FORM
# AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**BUSINESS LIABILITY COVERAGE FORM**

**A.** Sub-subparagraphs 1.p. (7), (8), (15) of Paragraph 2., of Section B. **Exclusions** are deleted and replaced with the following:

**p. Personal and Advertising Injury:**

(7) **(a)** Arising out of any actual or alleged infringement or violation of any intellectual property right, such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity; or

**(b)** Any injury or damage alleged in any claim or "suit" that also alleges an infringement or violation of any intellectual property right, whether such allegation of infringement or violation is made by you or by any other party involved in the claim or "suit", regardless of whether this insurance would otherwise apply.

However, this exclusion does not apply if the only allegation in the claim or "suit" involving any intellectual property right is limited to:

(1) Infringement, in your "advertisement", of:

(a) Copyright;

(b) Slogan; or

(c) Title of any literary or artistic work; or

(2) Copying, in your "advertisement", a person's or organization's "advertising idea" or style of "advertisement".

(8) Arising out of an offense committed by an insured whose business is:

(a) Advertising, broadcasting, publishing or telecasting;

(b) Designing or determining content of web sites for others; or

(c) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs a., b. and c. of the definition of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

(15) Arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

**B.** Subparagraph 1.r. of Section B. **Exclusions** is deleted and replaced with the following:

**r. Employment-Related Practices**

"Personal and advertising injury" to:

(1) A person arising out of any "employment– related practices"; or

Ex. 1, p. 44

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any "employment-related practices" are directed.

This exclusion applies:

(a) Whether the injury-causing event described in the definition of "employment-related practices" occurs before employment, during employment or after employment of that person;

(b) Whether the insured may be liable as an employer or in any other capacity; and

(c) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**C.** Subparagraph 1.q. "Electronic Data" of Section B. **Exclusions** is deleted and replaced with the following:

**q. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

(1) Damages, other than damages because of "personal and advertising injury", arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

(2) Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph (1) or (2) above.

However, unless Paragraph (1) above applies, this exclusion does not apply to damages because of "bodily injury".

As used in this exclusion, electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data.

**D.** Sub-subparagraph 7.b.(1) Other Insurance of Section E. **Liability and Medical Expenses General Conditions** is deleted and replaced with the following:

**b. Excess Insurance**

**(1) Your Work**

That is Fire, Extended Coverage, Builder's Risk, Installation Risk, Owner Controlled Insurance Program or OCIP, Wrap Up Insurance or similar coverage for "your work".

**E.** Subparagraph 17. c. "Personal and Advertising Injury" of Section G, **Liability and Medical Expenses Definitions** is deleted and replaced with the following:

"Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person or organization occupies, committed by or on behalf of its owner, landlord or lessor;

**F.** Subparagraph 17.h. of Section G, **Liability and Medical Expenses Definitions** deleted.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SUPER STRETCH

This endorsement modifies insurance provided under the following:

**STANDARD PROPERTY COVERAGE FORM**
**SPECIAL PROPERTY COVERAGE FORM**

Except as otherwise stated in this endorsement, the terms and conditions of the policy apply to the insurance stated below.

A. The following changes apply to the Standard Property Coverage Form, Additional Coverages, **A.4.**, or to the Special Property Coverage Form, Additional Coverages, **A.5.:**

1. **Blanket Coverage Limit of Insurance**

   The following Additional Coverage is added:

   We will pay up to $150,000 in any one occurrence as a Blanket Coverage Limit of Insurance to apply at each "scheduled premises" to apply to sum of all covered loss under the coverages described in this section **A.1.a.** through **A.1.f.** arising out of a single Covered Cause of Loss occurrence. You may apportion this Limit among these coverages as you choose.

   This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for these coverages.

   a. **Accounts Receivable**

      Within the Blanket Coverage Limit of Insurance, we will pay for direct physical loss of or physical damage to your records of accounts receivable receivable on or away from your "scheduled premises", including while in transit.

      This Additional Coverage is subject to the provisions of Accounts Receivable, Form SS 04 39, with the exception of the Limit of Insurance provision contained in that form. Accounts Receivable, Form SS 04 39 is made a part of this policy whether or not Accounts Receivable coverage is indicated in the Declarations.

   b. **Computers and Media**

      Within the Blanket Coverage Limit of Insurance, we will pay for direct physical loss of or physical damage to your computer systems.

      This Additional Coverage is subject to the provisions of Computers and Media, Form SS 04 41, with the exception of the Limit of Insurance provision contained in that form. Computers and Media, Form SS 04 41 is made a part of this policy whether or not Computers and Media coverage is indicated in the Declarations.

   c. **Debris Removal**

      Within the Blanket Coverage Limit of Insurance, we will pay for increases under Debris Removal additional limit, **C.4.b.**

   d. **Personal Property of Others**

      Within the Blanket Coverage Limit of Insurance, we will pay for direct physical loss of or physical damage to personal property of others that is in your care, custody or control.

      This Additional Coverage is subject to the provisions of Personal Property of Others, Form SS 04 45, with the exception of the statement concerning Limit of Insurance applicable to Personal Property of Others shown in the Declarations, contained in that form. Personal Property of Others, Form SS 04 45 is made a part of this policy whether or not Personal Property of Others coverage is indicated in the Declarations.

   e. **Temperature Change**

      Within the Blanket Coverage Limit of Insurance, we will pay for direct physical loss of or physical damage to perishable stock caused by or resulting from a change of temperature or contamination by a refrigerant.

**Form SS 04 74 09 07**

© 2007, The Hartford

**Page 1 of 6**

Ex. 1, p. 46

This additional coverage is subject to the provisions of the Temperature Change, Form SS 04 46, with the exception of the Limit of Insurance provision contained in that form. Temperature Change, Form SS 04 46 is made a part of this policy whether or not Temperature Change coverage is indicated in the Declarations.

### f. Valuable Papers and Records

Within the Blanket Coverage Limit of Insurance, we will pay for direct physical loss of or physical damage to your valuable papers and records on or away from your "scheduled premises", including while in transit.

This Additional Coverage is subject to the provisions of the Valuable Papers and Records Coverage in form SS 04 47, with the exception of the Limit of Insurance provision contained in that form. Valuable Papers and Records Coverage, Form SS 04 47 is made a part of this policy whether or not Valuable Papers and Records coverage is indicated in the Declarations.

### 2. Brands and Labels

The following Additional Coverage is added:

In the event of covered physical loss or physical damage to merchandise that is branded or labeled, we will take all or part of the physically damaged property at an agreed or appraised value and we will pay for:

**a.** Expenses you incur to:

**(1)** Stamp salvage on the merchandise or its containers, if the stamp will not physically damage the merchandise; or

**(2)** Remove the brands or labels, if doing so will not physically damage the merchandise. You must relabel the merchandise and its containers to comply with the law.

**b.** Any reduction in the salvage value of the physically damaged merchandise as the result of the removal of the brand or label.

This Additional Coverage is included within the Business Personal Property Limit of Insurance.

### 3. Claim Expenses

The following Additional Coverage is added:

In the event of covered loss or physical damage, we will pay up to $10,000 in any one occurrence as an additional Limit of Insurance to cover reasonable expenses incurred by you at our specific request to assist us in:

**a.** The investigation of a claim or suit; or

**b.** The determination of the amount of loss, such as taking inventory, or auditing business records.

### 4. Computer Fraud

The following Additional Coverage is added:

We will pay up to $5,000 in any one occurrence for physical loss of or physical damage to "money", "securities", and other property having intrinsic value resulting directly from computer fraud. Computer fraud means any act of stealing property following and directly related to the use of any computer to fraudulently cause a transfer of that property from inside your premises or from a banking institution or similar safe depository, to a person (other than a "messenger") outside those premises or to a place outside those premises.

This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for this coverage.

### 5. Employee Dishonesty (including ERISA)

The following Additional Coverage is added:

We will pay up to $25,000 in any one occurrence as a Limit of Insurance to cover loss from employee dishonesty. This includes ERISA coverage. This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for this coverage.

This Additional Coverage is subject to the provisions of the Employee Dishonesty Coverage, Form SS 04 42, with the exception of the Limit of Insurance provision contained in that form. Employee Dishonesty Coverage, Form SS 04 42 is made a part of this policy whether or not Employee Dishonesty Coverage is indicated in the Declarations.

### 6. Fine Arts

The following Additional Coverage is added:

We will pay up to $25,000 in any one occurrence as a Limit of Insurance at each "scheduled premises" to apply to Fine Arts. This Limit of Insurance is in addition to any other Limit of Insurance that may be provided by this policy for this coverage.

This Additional Coverage is subject to the provisions of Fine Arts Coverage Form, Form SS 04 22, with the exception of the following:

**a.** The requirement contained under Paragraph **A.1.**, Under A. Coverage, to list and describe Fine Arts in the Declarations or Schedule is deleted when Fine Arts are covered under this Stretch endorsement; and

**b.** The Limit of Insurance provision does not apply.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PERILS SPECIFICALLY EXCEPTED

As used herein, "Peril" means a cause of physical loss or damage to property. It has this meaning whether or not it is called a "Peril" or a "Cause of Loss" in this policy.

Even if any of the terms of this policy might be construed otherwise, the following Perils, as described in Paragraphs A. and B. below, are **SPECIFICALLY EXCEPTED FROM THIS POLICY. WE DO NOT COVER OR INSURE AGAINST LOSS OR DAMAGE DIRECTLY OR INDIRECTLY CAUSED BY, RESULTING FROM, CONTRIBUTED TO OR AGGRAVATED BY, OR WHICH WOULD NOT HAVE OCCURRED BUT FOR, EITHER OF THESE PERILS:**

**A. ACTS, ERRORS OR OMISSIONS** by you or others in:

1. Planning, zoning, developing, surveying, testing or siting property;

2. Establishing or enforcing any building code, or any standard, ordinance or law about the construction, use or repair of any property or materials, or requiring the tearing down of any property, including the removal of its debris;

3. The design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction of all or any part of the following:

   a. Land or buildings or other structures;

   b. Roads, water or gas mains, sewers, drainage ditches, levees, dams, or other facilities; or

   c. Other improvements or changes in or additions to land or other property.

4. The furnishing of work, materials, parts or equipment in connection with the design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction of any of the above property or facilities; or

5. The maintenance of any of such property or facilities.

This exception A. applies whether or not the property or facilities described above are:

1. Covered under this policy; or

2. On or away from the covered premises.

This exception A. does not reduce the insurance for loss or damage caused directly by a Covered Peril.

As used in this endorsement:

1. If this policy is written to cover the risk of loss from specifically named causes, "Covered Peril" means any Peril specifically named as covered; or

2. If written to cover the risk of loss without specifying specifically named causes, "Covered Peril" means any Peril not described above and not otherwise excluded or excepted from the causes of loss covered by this policy.

**B. COLLAPSE, "CRACKING" OR "SHIFTING"** of buildings, other structures or facilities, or their parts, if the collapse, "cracking" or "shifting":

1. Occurs during "earth movement," "volcanic eruption" or "flood" conditions or within 72 hours after they cease; and

2. Would not have occurred but for "earth movement," "volcanic eruption" or "flood."

But if loss or damage by a covered Peril ensues at the covered premises, we will pay for that ensuing loss or damage.

This exception B. applies whether or not there are other provisions in this policy relating to collapse, "cracking" or "shifting" of buildings, other structures or facilities, or their parts. Any such provision is revised by this endorsement to include this exception.

But if this policy specifically covers (by endorsement or in any other way) loss or damage caused by one or more of the following Perils:

1. Earthquake;

2. Flood;

3. Volcanic action;

4. Volcanic eruption; or

5. Sinkhole collapse,

this exception B. will not reduce that coverage.

As used in this exception B.:

Page 1 of 2

Ex. 1, p. 48

1. "Cracking" means cracking, separating, shrinking, bulging, or expanding;

2. "Shifting" means shifting, rising, settling, sinking, or lateral or other movement;

3. "Earth movement" means any earth movement, including but not limited to "earthquake," landslide, mudflow, erosion, contraction or expansion, subsidence, any movement of earth resulting from water combining with the ground or soil, and any other "shifting" of earth; all whether or not combined with "flood" or "volcanic eruption." It does not include sinkhole collapse if loss by sinkhole collapse is specifically covered in this policy;

4. "Earthquake" means a shaking or trembling of the earth's crust, caused by underground volcanic or tectonic forces or by breaking or "shifting" of rock beneath the surface of the ground from natural causes. An "Earthquake" includes all related shocks and after shocks;

5. "Volcanic eruption" means the eruption, explosion or effusion of a volcano. It does not include volcanic action if loss by volcanic action is specifically covered in this policy;

6. "Flood" means:

   a. Flood, surface water, waves, tides, tidal water, tidal waves, high water, and overflow of any body of water, or their spray, all whether driven by wind or not;

   b. Release of water held by a dam, levy or dike or by a water or flood control device;

   c. Water that backs up from a sewer or drain; or

   d. Water under the ground surface pressing on, or flowing, leaking or seeping through:

      (1) Foundations, walls, floors or paved surfaces;

      (2) Basements, whether paved or not; or

      (3) Doors, windows or other openings.

Ex. 1, p. 49

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITED EXCLUSION - PERSONAL AND ADVERTISING INJURY - LAWYERS

This endorsement modifies insurance provided under the following:

**BUSINESS LIABILITY COVERAGE FORM**

**A.** Exclusion **1.j. Professional Services** of Section **B. Exclusions** is changed to replace **1.j.(1)** with the following:

**j.(1)**   Accounting or advertising services;

**B.** The following is added to Exclusion **p. "Personal and Advertising Injury"** of Section **B.** Exclusions:

This insurance does not apply to "personal and advertising injury" arising out of the rendering of or failure to render professional services as a lawyer.

© 2003, The Hartford

Ex. 1, p. 50

Leah K. Corrigan, MT Bar No. 9900
Moffett & Corrigan LLP
350 East Broadway
P.O. Box 4797
Jackson, WY 83001
(307) 733-8734 |
307) 733-3994 –Facsimile

GALLATIN COUNTY CLERK
OF DISTRICT COURT
JENNIFER BRANDON

2019 OCT 17 AM 10: 37

FILED

BY_____DEPUTY

## MONTANA EIGHTEENTH JUDICIAL DISTRICT COURT
## GALLATIN COUNTY

LISA PERKINS and
CHRISTIN E. SEIFERT
Beneficiaries of the Estate of Vesta F. Anderson

            Plaintiffs,

vs.

SPENCER NEIL ANDERSON,
Individually, and as Personal Representative
of the Estate of Vesta F. Anderson

and

MICHAEL ANDERSON, Esq., of Anderson &
Liechty, PC, Individually and in his capacity as
attorney for the Estate of Vesta F. Anderson

and

BANK OF THE ROCKIES, N.A., a
subsidiary of Countricorp, a Montana corporation

            Defendants.

Civil Action No. DV-19-1185C

---

## VERIFIED COMPLAINT

---

COMES NOW, Plaintiffs Lisa Perkins and Christin E. Seifert, by and through their undersigned counsel Leah K. Corrigan of Moffett & Corrigan LLP, and for their Complaint against Defendants, state and allege as follows:

**Ex. 2, p. 1**

## I.    PARTIES

1. Plaintiff Lisa Perkins is a Wyoming resident, and a devisee of the Estate of Vesta F. Anderson ("the Estate").    Plaintiff Christin E. Siefert is a Montana resident, and devisee/beneficiary of the Estate.

2. Defendant Spencer Anderson is a Gallatin County, Montana, resident, and the Personal Representative of the Estate.

3. Defendant Attorney Michael Anderson is a Yellowstone County, Montana, resident, and served as the attorney for the Estate at all relevant times. Michael Anderson is also the father of Spencer Anderson and a devisee/beneficiary of the Estate.

4. Defendant Bank of the Rockies, N.A. is a subsidiary of Countricorp, a corporation duly organized under the laws of the State of Montana.

5. Defendant Bank of the Rockies, N.A. is named solely for the purpose of the quiet title action specified herein.

## II.    JURISDICTION AND VENUE

6. This is a dispute centering around the tortious conduct of Defendant Spencer Anderson and Defendant Michael Anderson in their administration of the Estate. The primary asset of the Estate is a tract of land located in Gallatin County, Montana, known as the "Baxter Ranch."

7. This Court has subject matter jurisdiction pursuant to M.C.A. § 3-5-302 and/or M.C.A. 72-1-202.

8. This Court has personal jurisdiction over the Defendant Spencer Anderson and Defendant Michael Anderson, both of whom are residents of the State of Montana, and Defendant

Ex. 2, p. 2

Bank of the Rockies, N.A., which is a subsidiary of Countricorp, a Montana corporation doing business in the State of Montana.

9.  Venue is proper in this Court pursuant to M.C.A. §§ 25-2-118(1) and 122(1)(a). Defendant Spencer Anderson is a resident of Gallatin County, Montana.

10. As devisees of the Estate, the Plaintiffs have standing to sue the personal representative for tortious conduct pursuant to M.C.A. § 72-1-103(25).  As third party beneficiaries of the services of Attorney Michael Anderson, and the victims of Michael Anderson's conduct violating M.C.A. § 37-61-407, the Plaintiffs have standing to sue Defendant Michael Anderson.  The Plaintiffs have standing and the obligation to sue Bank of the Rockies, N.A. for quiet title pursuant to M.C.A. § 70-28-101, as Bank of the Rockies, N.A. holds an encumbrance on land to which the Plaintiffs claim equitable title.

## III.   FACTS COMMON TO ALL CAUSES OF ACTION

11. Vesta F. Anderson died on March 3, 2006.  At the time of her death, she owned[1] an undivided one-half interest in the 720 acre Baxter Ranch just outside of Bozeman, Montana, along with her sister, as tenants in common.  Vesta Anderson was deemed to have died intestate, and her assets, including the Baxter Ranch, were to be divided equally between her five children in accordance with the probate code. (Plaintiffs Christin E. Seifert ("Christin") and Lisa Perkins ("Lisa"); Defendant Michael Anderson ("Michael"); non-party Mary Donaghy; and now deceased Richard Anderson.)[2]  Vesta's grandson, Defendant Spencer Anderson ("Spencer") was appointed to serve as the personal representative of the Estate.

---

[1] Vesta Anderson also owned other real property and other various liquid and illiquid assets at the time of her death, which are only tangentially relevant to this matter.
[2] Richard Anderson was developmentally disabled, and was under a conservatorship with Michael Anderson as conservator.  Upon information and belief, the Conservator disclaimed Richard's share in the Estate in order to secure Medicare benefits.  Richard passed away in 2015.

Ex. 2, p. 3

12.    The Estate incurred a significant estate tax liability upon Vesta Anderson's death, in the principal amount of $3,132,599.

13.    On March 28, 2006, the Estate was opened in the Yellowstone County, Montana, Probate Court. Personal Representative Spencer Anderson was the grandson of Vesta Anderson. Defendant Michael Anderson is both Spencer Anderson's father, and a beneficiary of the Estate. He was at all relevant times (and upon information and belief remains) the attorney for the Estate.[3]

14.    From the inception of the Estate, Defendant Michael Anderson acted as counsel for the Estate. While Spencer Anderson was the named personal representative, upon information and belief, Michael Anderson effectively acted as the personal representative, individually handling and directing virtually all material aspects of the administration of the Estate.

15.    At the time of Vesta Anderson's death, her children functioned as an intact family. Devisee Richard Anderson was disabled, and the family became distant due to disagreements between Michael and his sisters over Richard's care subsequent to Vesta's death. This discord occurred in approximately 2014.

16.    Upon Vesta's death in 2006, the Baxter Ranch was valued at $23,900,000. (See, Exhibit A, attached hereto). The Estate's one-half interest in the Baxter Ranch as of 2006 was therefore roughly $11,950,000. The Estate's tax liability was approximately $3,132,599. The total remaining value of the beneficiaries' interest in the Baxter Ranch was therefore roughly $8,817,401. The value of the interest of each current estate beneficiary's interest upon Vesta's death was approximately $2,204,350.

---

[3] Upon information and belief, Attorney Andrew Billstein became counsel of record for the Personal Representative of the Estate along with Michael Anderson in 2018, and Attorney Ralph Steele entered an appearance as attorney for Spencer Anderson in his individual capacity.

17.  The Estate had grossly insufficient other assets to satisfy the Estate's tax liability, which was $3,132,599.

18.  Between 2006 and the date of Mary Nelson's death in 2009, the Estate was as a tenant in common with, upon information and belief, an entity controlled by Mary Nelson (the beneficiaries' aunt) called Baxter Ranch Holdings, LTD ("BRH").

19.  From 2006 to 2008, the Bozeman real estate market continued to flourish, and the Baxter Ranch increased in value.  Upon information and belief, the Anderson Defendants did not actively market the Baxter Ranch for sale, despite the looming (and increasing) tax obligation, and despite BRH's willingness to sell the entire ranch.

20.  Despite the estate tax obligation, no attempt was made to judicially partition the Estate's interest in the Baxter Ranch from that of Mary Nelson in order to facilitate a sale sufficient to pay off the debt to the Internal Revenue Service.

21.  In 2008, the Bozeman real estate market crashed as a result of the nationwide recession. The value of the Baxter Ranch declined precipitously, though the Estate's tax liability continued to increase.  Also in 2008, Defendant Spencer Anderson claimed $186,719 in personal representative's fees, and Defendant Michael Anderson claimed $280,080 in attorney fees.  Upon information and belief, the Anderson Defendants later collected those fees as they liquidated portions of the Ranch.  Upon information and belief, no judicial approval of the personal representative or attorney fees was sought, and the fees were not reasonable or proportionate to the amount of work undertaken by the Anderson Defendants in the administration of the Estate.

22.  On October 15, 2009, Mary Nelson passed away.  Her estate's tax liability was (in part due to proper estate planning and in part due to the precipitous decline in property values)

**Ex. 2, p. 5**

relatively insignificant. Communication with BRH regarding the potential sale of all or portions of the Baxter Ranch reflected BRH's understanding and acquiescence to the fact that the ranch, or portions of it, would have to be sold in order to satisfy the Estate's tax liability.

23.  From 2008 until 2016, Defendant Michael Anderson with the acquiescence of Defendant Spencer Anderson, leased and sold various portions of the ranch and negotiated with the Internal Revenue Service regarding payments on the Internal Revenue Service's rapidly increasing tax lien. The Plaintiffs were generally not kept apprised or notified of the status of the negotiations with the Internal Revenue Service, the sales of portions of the Baxter Ranch, the leases of the agricultural land for grain and/or hay production, or the lease or occupancy of the residences on the Baxter Ranch. Accountings of any nature became infrequent as years passed.

24.  Upon information and belief, the Anderson Defendants utilized Baxter Ranch property for their own personal interests and for the interests of family members without collecting any rents for such use.

25.  Upon information and belief, Defendant Spencer Anderson and his family resided in the ranch house on the Baxter Ranch, rent-free.

26.  Upon information and belief, the Bozeman area real estate market began to rebound in roughly 2010, and with it the value of the Baxter Ranch. Despite the continuing threat of foreclosure by the Internal Revenue Service and the accrual of significant penalties and interest, and BRH's acquiescence and agreement to list all or portions of the Baxter Ranch, the Anderson Defendants made no attempt to judicially partition the Baxter

Ranch, nor any meaningful[4] attempt to actively market the Baxter Ranch, or any portions of it for sale.    Upon information and belief, the Anderson Defendants made no meaningful attempt to secure financing to satisfy the Estate's tax lien.

27.    On March 14, 2018, the Internal Revenue Service filed an action to foreclose its lien on the Baxter Ranch (the "IRS action") in the United States District Court in Butte, Montana.  Defendant Michael Anderson entered an appearance as the attorney for the Estate and for Spencer Anderson as an individual defendant in that proceeding.  The Plaintiffs were not notified of the pendency of the IRS action.  At the time the IRS action was filed, the Estate had incurred approximately $1,994,826.77 additional tax liability in penalties and interest. Even after the IRS action was filed and the foreclosure that was likely to eradicate the entirety of the Estate beneficiaries' interest was imminent, the Anderson Defendants made no attempt to partition the Baxter Ranch or list it for sale.

28.    Upon information and belief, in approximately March of 2018, the Anderson Defendants were approached by a qualified buyer, Bryan Klein, ("Klein") regarding the purchase of an approximately 160 acre parcel of the Baxter Ranch, for a sum of approximately eight million dollars ($8,000,000).

29.    Upon information and belief, between January, 2018 and May, 2018, the Anderson Defendants were communicating with BRH to negotiate a buyout of BRH's remaining interest in Baxter Ranch for the sum of one million dollars, immediately subsequent to the Klein sale, in exchange for the Estate's agreement to forfeit a disproportionate share of the proceeds of the Klein sale to BRH.   Upon information and belief, the value of BRH's interest in the property that would remain after the Klein sale (approximately 402

---

[4] Upon information and belief, the Anderson Defendants may have listed, or asked relator Tony Novatny to put a "land for sale" sign on the Baxter Ranch in 2014, but the entire Ranch was not actively marketed for sale.

Ex. 2, p. 7

acres) was approximately $10,050,000.    Upon information and belief, BRH negotiated the sale of its interest in the Baxter Ranch with the understanding and belief that the sale would be to the Estate and would benefit the Estate beneficiaries.

30.  Upon information and belief, as of May, 2018, Defendant Spencer Anderson began to undertake to individually purchase BRH's interest in the Baxter Ranch, and to secure financing for his purchase of the BRH interest.  Upon information and belief, Defendant Michael Anderson acquiesced, colluded in, and/or directed Defendant Spencer Anderson's aim to personally purchase the BRH interest in the Baxter Ranch at the expense of the Plaintiffs.    Upon information and belief, neither Defendant sought financing for the buyout of the BRH interest on behalf of the Estate.

31.  On June 6, 2018, Klein formally made an offer to purchase a 160 acre parcel of the Baxter Ranch.  Upon information and belief, for the remainder of the month of June, 2018, Defendant Michael Anderson was negotiating the terms of the sale with attorneys for Klein.  A contract with Klein for the purchase of the parcel for the sum of $7,980,000 was executed on August 1, 2018.

32.  It was not until July 3rd, 2018, that the Plaintiffs and beneficiary Mary Donaghy were sent an email notifying them of: 1) the pendency of the IRS action; 2) the negotiations with BRH for the purchase of its interest in the Baxter Ranch; and 3) that Defendant Spencer Anderson intended to purchase BRH's interest in his individual capacity unless the beneficiaries would each commit to immediately coming up with $250,000 to fund the purchase of BRH's interest.

33. On July 4th, 2018, the Plaintiffs received the email, and Plaintiff Lisa Perkins[5] responded with a suggestion that the parties schedule a conference call. Defendant Michael Anderson responded by saying that he was only available on the 5th or the 6th of July, and would be unavailable thereafter for a week. Given the apparent urgency of the situation, the Plaintiffs agreed to hold the call on July 6th. Thus, the Plaintiffs had no time to meaningfully evaluate the limited information provided to them, nor seek the advice of counsel prior to the scheduled conference call.

34. During the conference call, Defendant Michael Anderson advised the Plaintiffs[6] and Mary Donaghy that unless each estate beneficiary came up with $250,000 in cash in order to finance a buyout of BRH's interest, Defendant Spencer Anderson would purchase the interest himself. Neither Defendant disclosed the fact that no attempt to seek financing on the Estate's behalf had been made, nor that the Anderson Defendants had been aware of the potential opportunity to purchase the BRH interest for months, nor that BRH's offer was to the Estate, and BRH was unaware that Defendant Spencer Anderson was proposing to purchase its interest in the Baxter Ranch rather than the Estate.

35. Plaintiff Lisa Perkins and her husband, Wayne Perkins, both participated in the call, and indicated that Wayne did not believe he would be able to pull $250,000 from his retirement account, without penalty. Without knowing the extent and nature of the withdrawal penalties, Lisa could not commit to the buyout on those terms. Defendant Michael Anderson and Mary Donaghy each agreed to contribute $250,000. Plaintiff Christin E. Seifert indicated her willingness and ability to leverage her personal assets in

---

[5] Lisa's husband, Wayne Perkins, responded to the email on her behalf.
[6] Plaintiff Seifert's counsel, Susan Swimley, was present with Mrs. Seifert during the call.

Ex. 2, p. 9

order to finance the remainder of the purchase price <u>on the Estate's behalf</u>. The Anderson Defendants refused to consider or entertain any option unless all four beneficiaries contributed $250,000.

36. On July 9th, 2018, the following Monday, a second conference call was held, from which Plaintiff Lisa Perkins was excluded. Plaintiff Christin E. Seifert participated in the call, along with her counsel, Susan Swimley. Plaintiff Christin E. Seifert again reiterated that the Estate (not any individual) should purchase BRH's interest, and that she had the ability and willingness to leverage her personal assets in order to fund the Estate's purchase. The Defendants again rejected and rebuffed that suggestion and approach, insisting that unless all four beneficiaries could come up with or finance the BRH purchase in the amount of $1,000,000, Spencer would purchase BRH's interest individually.

37. On August 10th, 2018, Defendant Michael Anderson and Plaintiff Christin E. Seifert had a phone call wherein Christin E. Seifert again confirmed and committed that she could individually obtain all necessary financing in order to secure the BRH interest on behalf of the Estate. The Anderson Defendants did not follow up on or seek clarification of this offer.

38. At no time during either of the telephone conferences did the Defendants disclose Spencer Anderson's intent to encumber the estate beneficiaries' interest in the Baxter Ranch in order to secure a loan to fund his individual purchase of the BRH interest in the Baxter Ranch, or to transfer a portion of the Baxter Ranch to himself outright in order to secure financing for his individual purchase of BRH's interest.

39.   On August 1, 2018, the Estate executed a purchase agreement with Klein (the "Klein Contract"). (See, Exhibit B, attached hereto).

40.   On August 1, 2018, the Estate executed the contract with BRH for the Estate's purchase of BRH's interest in the Baxter Ranch for the sum of $1,000,000 (the "BRH contract"). (See, Exhibit C, attached hereto).

41.   On August 9, 2018, the IRS provided a conditional lien release commitment based upon the Klein sale. The total amount required to satisfy the IRS lien was $2,982,877.04.

42.   On August 16, 2018, the parties to the IRS action filed a joint motion to stay the IRS action pending the closing of the Klein sale. The IRS action was stayed by Order dated August 20, 2018.

43.   On August 23, 2018, Defendant Spencer Anderson, as an individual, executed a contract with himself in his capacity of personal representative of the Estate, for his individual purchase of BRH's interest in the Baxter Ranch (the "Spencer Contract"). (See, Exhibit D, attached hereto).

44.   It was not until August 28, 2018 that the beneficiaries were provided copies of the Klein contract, the BRH contract, and the Spencer contract. In summary, the transactions as contracted for would result in the following: 1) BRH and the Estate would sell approximately 160 acres to Klein for the sum of $7,980,000 (the "Klein Transaction"); 2) BRH would receive approximately $4,504,000 of the proceeds and convey its remaining interest in the Baxter Ranch to the Estate ("the Estate Transaction"); 3) that the Estate would receive $3,476,000 of the proceeds, of which approximately $493,000 would remain in liquid funds subsequent to payment of the IRS lien; 3) that the Estate would convey the a one-half interest in the Baxter Ranch (worth approximately $10,500,000) to

Spencer Anderson as an individual, and that Spencer would place a mortgage on forty acres of the Baxter Ranch and finance a payment of $1,000,000 to the Estate ("the Spencer Transaction"). Defendant Spencer Anderson therefore contracted with himself in his capacity as Personal Representative of the Estate to purchase an undivided one-half interest in the Baxter Ranch with a fair market value of approximately $10,500,000 from the Estate for the sum of $1,000,000, to the determinant of the beneficiaries of the Estate. The Defendant did not disclose to the Court or to the Plaintiffs the Defendant's apparent intent to convey outright (rather than to mortgage) a forty acre parcel of the Estate's interest in the Baxter Ranch to himself individually, without any consideration, in order to secure financing of his individual loan to purchase the BRH interest.

45. At no point did the Anderson Defendants seek to secure financing on behalf of the Estate to fund the Estate's purchase of the BRH interest. Plaintiff Christin E. Seifert made a written proposal offer to loan the estate, the total amount needed to fund the BRH purchase by the Estate. The Anderson Defendants did not respond to this proposal.

46. Nearly three months later, Defendant Spencer Anderson filed a Petition to approve the transactions pursuant to MCA §72-3-615 with the Yellowstone County Probate Court. The Plaintiffs timely objected to the Petition. On January 30th, 2019, a hearing on the Petition was held. The hearing resulted in a verbal stipulation, reduced to writing in the form of a Stipulation dated February 15, 2019. (See, Exhibit E, attached hereto). The parties stipulated to the Court's approval of the transactions, but expressly reserved the future right to bring claims arising out of the administration of the Estate and specifically out of the transactions. The Petition did not disclose Defendant Spencer Anderson's apparent intent to convey outright the Estate's interest in a forty acre parcel of the Baxter

Ex. 2, p. 12

Ranch to himself as an individual. Neither the Stipulation entered into by the parties, nor the Order approving the transactions, contemplated an outright transfer of the Estate's interest in the forty acre parcel of the Baxter Ranch to Defendant Spencer Anderson as an individual.

47. On June 6, 2019 the Klein transaction closed. (See, Exhibit F, attached hereto). On June 11, 2019 the BRH and Spencer transactions closed. (See, Exhibits G and H, attached hereto). As part of the Spencer transaction, Spencer, in his capacity as Personal Representative of the Estate, deeded the Estate's interest in a forty acre parcel of the Baxter Ranch to himself, thereby eliminating the Estate's interest in that parcel, which interest had value of approximately $1,000,000, without paying any consideration to the Estate. (See, Exhibit I, attached hereto). The mortgage securing Defendant Bank of the Rockies, N.A.'s one million dollar loan to Defendant Spencer Anderson for the purchase of the one-half interest in the Baxter Ranch was recorded as an encumbrance against the above referenced forty acre parcel. (See, Exhibit J, attached hereto). As of June 12, 2019, Defendant Spencer Anderson became a tenant in common with the Estate in the remaining portions of the Baxter Ranch, and remains the Personal Representative. Defendant Spencer Anderson's interests are now directly adverse to those of the Plaintiffs.

## FIRST CAUSE OF ACTION - BREACH OF FIDUCIARY DUTY

48. Plaintiffs incorporate by reference the allegations in the foregoing paragraphs as if fully set forth herein.

49. As the personal representative of the Estate, Defendant Spencer Anderson has a fiduciary duty to the devisees/beneficiaries of the Estate. (M.C.A. §72-1-103(17). Pursuant to

M.C.A. § 72-3-610, a personal representative has the same fiduciary obligations as that of a trustee.

50. Pursuant to M.C.A. § 72-38-813(1) and (3), Defendant Spencer Anderson was obligated to keep the Estate's beneficiaries reasonably informed about the administration of the estate and the material facts necessary for them to protect their interests; and to provide the beneficiaries with an annual report of the estate's property, liabilities, receipts and disbursements, source and amount of trustee compensation, and listing of assets along with fair market values of the same.   As the Attorney for the Estate, Defendant Michael Anderson had a duty to the Plaintiffs as third party beneficiaries to his services as an Attorney for the Estate in both the probate matter and the IRS action, to competently perform those services, in good faith.

51. Defendant Spencer Anderson breached this duty by failing to keep the beneficiaries apprised of the material facts relating to the amount and status of the IRS's lien upon the Baxter Ranch for the payment of estate tax and the amount of the penalties and interest accruing, the challenges related to co-management of the Ranch with BRH, BRH's interest in listing the entire ranch for sale, the multiple sales of parcels of the Baxter Ranch to various entities, leases or the lack thereof of agricultural and residential properties owned by the Estate, the amount of personal representative and attorney compensation, and upon information and belief, other facts and occurrences material to the beneficiaries' interests.

52. Pursuant to M.C.A. §§ 72-38-801, 804, 809, and 901, Defendant Spencer had a duty to administer the estate expeditiously, in good faith, and in accordance with the beneficiaries' interests; and to exercise prudence, reasonable care, skill and caution in his

administration of the Estate; to take control of and protect the Estate's property; and to manage the Estate's assets as a prudent investor would.

53.   Defendant Spencer Anderson breached these duties by failing to inform and report to the beneficiaries; by his failure to take action to separate or partition the Estate's interest from BRH's interest; by his failure to actively and meaningfully market the Baxter Ranch, or any portion of it sufficient to satisfy the IRS lien, for sale; by his failure to attempt to secure financing to satisfy the debt to the IRS; by his failure to close the probate of the Estate within a reasonable time; by his failure to secure lease payments from family members and his own personal use of the residences on the Baxter Ranch; by his failure to secure an attorney without a conflict of interest; by his failure to monitor and approve the actions of his attorney, Defendant Michael Anderson; upon information and belief, by his acquiescence to attorney fees for administration of the Estate in excess of the statutory maximum (M.C.A. § 72-3-633); by his failure to secure appraisals to determine whether sales of various Baxter Ranch parcels were for fair market value and did not work to devalue the remaining acreage; by selling a one-half interest in the Baxter Ranch worth approximately $10,500,000 to himself for the sum of $1,000,000; and by eliminating the Estate's interest in a forty acre parcel of the Baxter Ranch in favor of his individual undivided interest, without consideration paid to the Estate for its interest in the parcel (worth approximately $1,000,000).

54.   Pursuant to M.C.A. § 72-38-802, Defendant Spencer Anderson owes the beneficiaries a fiduciary obligation of undivided loyalty. Spencer was obligated to administer the estate solely in the interest of the beneficiaries; and by "A transaction not concerning [Estate] property in which the [Personal Representative] engages in the [Personal

Representative's] individual capacity involves a conflict between personal and fiduciary interest if the transaction concerns an opportunity belonging to the [Estate]." *Id.*

55. Defendant Spencer Anderson breached his duty of loyalty by engaging in the conflict of interest transaction of purchasing a one-half interest in the Baxter Ranch that was, at the time of the transaction, wholly owned by the Estate for an amount well below market value; by becoming a tenant in common with the beneficiaries; by eliminating the Estate's interest in a forty acre parcel of the Baxter Ranch in favor of his individual undivided interest, without consideration paid to the Estate for its interest in the parcel (worth approximately $1,000,000); and by using Estate property for his own personal use and the use of his family members without compensating the Estate. Defendant Spencer Anderson leveraged his position as Personal Representative to take an opportunity belonging to the Estate (purchase of the BRH interest in the Baxter Ranch), ultimately purchasing the property from the Estate at far below market value. Defendant Spencer Anderson's dual roles as tenant in common with, and Personal Representative of the Estate present a continuing conflict of interest. Defendant Spencer Anderson's actions violate his fiduciary duty of loyalty. *In re: Guardianship and Conservancy of Saylor*, 2005 MT 236, ¶24, 121 P.2d 542 (Mont. 2001).

56. Defendant Spencer Anderson owes the beneficiaries a fiduciary duty to make the Estate's real property productive. *Id.*

57. Defendant Spencer Anderson breached his duties to make Estate property productive by, upon information and belief, personally utilizing the Estate's real property for his own benefit and the benefit of his family without paying rent or consideration to the Estate; and by failing to lease portions of the Baxter Ranch and the residences thereon.

Ex. 2, p. 16

58. Each of Defendant Spencer Anderson's breaches of his fiduciary duties constituted an improper exercise of his power as the personal representative of the Estate pursuant to W.S. § 72-3-316.

59. Upon information and belief, Defendant Michael Anderson advised Defendant Spencer Anderson to breach, or to fail to act in accordance with his fiduciary obligations and colluded in Spencer Anderson's breach of his fiduciary duty to the Plaintiffs, aiding and abetting Spencer's breaches of fiduciary duty.

60. Defendant Spencer Anderson's multiple breaches of his fiduciary obligations and Defendant Michael Anderson's participation, direction, and collusion therein were the proximate cause of the Plaintiffs' damages.

61. Defendant Michael Anderson is jointly and severally liable to the Plaintiffs for Spencer's breaches of his fiduciary obligations.

## SECOND CAUSE OF ACTION: UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST

62. Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

63. Defendant Spencer Anderson received a benefit – a one-half interest in the Baxter Ranch, which interest has a fair market value of approximately $10,500,000, for the sum of $1,000,000; and an undivided interest in a forty acre parcel of land at the expense of the Estate's one-half interest in the same, without paying any consideration to the Estate. Defendant Spencer Anderson also received the benefit of his personal use of Baxter Ranch property without payment of any rents to the Estate.

64. Defendant Spencer Anderson knew about and appreciated the benefits. He engineered the conflict of interest transaction culminating in his receipt of the benefits.

65. Defendant Spencer Anderson accepted and retained the benefits under circumstances where it was inequitable to do so, because the benefit was the result of Spencer Anderson's breaches of his fiduciary duties, including breach of the duty of loyalty, and was directly adverse and contrary to the interests of the Plaintiffs to whom he owed a fiduciary duty.

66. The Court should impose a constructive trust upon Defendant Spencer Anderson's interest in the Baxter Ranch, including the forty acre parcel now owned in an undivided interest by Defendant Spencer Anderson.

67. Defendant Michael Anderson advised, colluded with, and/or acquiesced in Spencer's breaches of fiduciary duty resulting in Spencer's unjust enrichment, and is jointly and severally liable therefore.

## THIRD CAUSE OF ACTION: CONSTRUCTIVE FRAUD, M.C.A. § 28-2-406, OR IN THE ALTERNATIVE, A CLAIM AT COMMON LAW

68. Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

69. Defendant Spencer Anderson had fiduciary obligations to the Plaintiffs as fully set forth above.

70. Defendant Spencer Anderson breached his fiduciary duties as fully set forth above.

71. Defendant Spencer Anderson's breaches of his fiduciary obligations were fraudulent by law, including, but not limited to his false and misleading representation that the Estate could not secure financing to consummate the purchase of the BRH interest in Baxter Ranch, and his unlawful termination of the Estate's interest in a forty acre parcel of the Baxter Ranch without consideration to the Estate.

72. Defendant Spencer Anderson gained an advantage over the Plaintiffs as a result of his fraudulent breach of his fiduciary obligations.

73. Defendant Michael Anderson advised, colluded with, and/or acquiesced in fraudulent breaches of fiduciary duty, and is jointly and severally liable therefore.

## FOURTH CAUSE OF ACTION: REMOVAL OF PERSONAL REPRESENTATIVE AND FORCIBLE WITHDRAWAL OF DEFENDANT MICHAEL ANDERSON AS ATTORNEY FOR THE ESTATE

74. Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

75. Pursuant to M.C.A. § 72-3-526, Defendant Spencer Anderson should be removed as Personal Representative of the Estate due to his multiple and serious breaches of his fiduciary obligations, his mismanagement of the Estate, and his continuing and incurable conflict of interest that renders him incapable of discharging his fiduciary obligation to act in the interests of the Estate's beneficiaries.

76. The Plaintiffs' claims against Defendant Spencer Anderson warrant his immediate removal. *In re Estate of Anderson-Feely*, 2007 MT 354, ¶ 13, 340 Mont. 352, 356, 174 P.3d 512, 514 (Mont. 2007). Defendant Spencer Anderson's actions warrant disgorgement of his fees as Personal Representative pursuant to M.C.A. § 72-38-1001.

77. Defendant Michael Anderson aided and abetted Defendant Spencer Anderson's breaches of his fiduciary duty resulting in the Plaintiffs' claims, and should be required to withdraw as counsel for the Estate and to be disgorged of all attorney fees.

## FIFTH CAUSE OF ACTION: INTENTIONAL MISREPRESENTATION

78. Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

79. The Anderson Defendants made representations to the Plaintiffs that the Estate was unable to finance the purchase of BRH's interest, and that if Defendant Spencer Anderson purchased the BRH interest, the Estate would retain its entire interest in the Baxter Ranch.

80. The representations were material and untrue.

81. The representations were made with the intent to induce the Plaintiffs to rely upon them.

82. The Plaintiffs were unaware that the representations were false, and were justified in that belief.

83. The Plaintiffs relied upon the Anderson Defendants' representations in determining what action they could or should take or forgo with respect to financing the BRH transaction either on behalf of the Estate or in their individual capacities, and with respect to the method and appropriate avenue to challenge the transactions.

84. As a result of their reliance, the Plaintiffs were unable to consummate a purchase of the BRH interest in the Baxter Ranch; and unknowingly failed to prevent Defendant Spencer Anderson from terminating a portion of their interests in the Baxter Ranch, and suffered damage thereby.

**SIXTH CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION**

85. Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

86. The Anderson Defendants made representations to the Plaintiffs that the Estate was unable to finance the purchase of BRH's interest, and that if Defendant Spencer Anderson purchased the BRH interest, the Estate would retain its interest in the entire Baxter Ranch.

87.  The representation was made without any reasonable grounds for believing it to be true.

88.  The representation was made with the intent to induce the Plaintiffs to rely upon it.

89.  The Plaintiffs were unaware that the representation was false, and were justified in that belief.

90.  The Plaintiffs relied upon the Anderson Defendants' representations in determining what action they could or should take or forgo with respect to financing the BRH transaction either on behalf of the Estate or in their individual capacities, and with respect to the method and appropriate avenue to challenge the transactions.

91.  As a result of their reliance, the Plaintiffs were unable to consummate a purchase of the BRH interest in the Baxter Ranch; and unknowingly failed to prevent Defendant Spencer Anderson from terminating a portion of their interests in the Baxter Ranch, and suffered damage thereby.

### SEVENTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH EXPECTANCY INTEREST

92.  Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

93.  The Plaintiffs had an expectancy interest in the Baxter Ranch comprised of an undivided half interest in the entire acreage of the Baxter Ranch.

94.  The Anderson Defendants intentionally interfered with that interest by causing the Estate to deed its interest in a forty acre parcel of the Baxter Ranch to Spencer Anderson in his individual capacity. (See, Exhibit I, attached hereto).

95.  The interference was tortious in nature, as it was fraudulent, and a breach of fiduciary duty.

96. Absent the Anderson Defendants' tortious interference, the Plaintiffs would have received their interest in the forty acre parcel of the Baxter Ranch now wholly owned by Spencer Anderson in his individual capacity.

97. The Plaintiffs have been damaged by the Anderson Defendants' tortious interference with their expectancy interest.

### EIGHTH CAUSE OF ACTION: ATTORNEY MALPRACTICE (DEFENDANT MICHAEL ANDERSON)

98. Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

99. As the Attorney for the Personal Representative of the Estate in the Probate matter and the Attorney for the Estate in the IRS action, Defendant Michael Anderson owed the Plaintiffs, as third party beneficiaries of his legal services, a duty of care to perform his duties with reasonable care and skill.

100. Upon information and belief, Defendant Michael Anderson breached this duty by directly taking actions on behalf of the Estate (or failing to take action required of the personal representative of the Estate) that constituted breaches of the fiduciary duties of a personal representative. Additionally, or in the alternative, Defendant Michael Anderson acquiesced or directed Defendant Spencer Anderson to take actions constituting breaches of the fiduciary obligations of the personal representative. In the alternative, Defendant Michael Anderson failed to properly advise the Personal Representative regarding the fiduciary duties owed to the Plaintiffs and regarding the proper administration of the Estate. All such allegations are set forth in detail in the preceding paragraphs.

101. Defendant Michael Anderson acquiesced or participated in Defendant Spencer Anderson's tortious conduct, contrary to the interests of the Estate and its beneficiaries to whom he owed a duty of care.

102. The Plaintiffs suffered damages as a result of Defendant Michael Anderson's failure to perform his professional obligations with reasonable care and skill, and as a result of Defendant Michael Anderson's tortious conduct as set forth herein.

### NINTH CAUSE OF ACTION: QUIET TITLE PURSUANT TO MCA § 70-28-101 (DEFENDANTS SPENCER ANDERSON AND BANK OF THE ROCKIES, N.A)

103. Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

104. As beneficiaries of the Estate, the Plaintiffs claim equitable and legal title to a portion of the Baxter Ranch, including forty acres legally described as:

Tract 1 of Certificate of Survey No. 2552, located in the Northeast Quarter of Section 5, Township 2 South, Ranch 5 East, P.M.M., Gallatin County, Montana, according to the official plat thereof on File and of record in the office of the County Clerk and Recorder of Gallatin County, Montana.

105. The Estate's interest in the above-described parcel of land was tortiously and improperly deeded to Spencer Anderson in his individual capacity by Spencer Anderson as personal representative of the Estate, thereby purportedly eliminating the Estate's interest in said parcel of land.   (See, Exhibit I, attached hereto).   Upon information and belief, no consideration was paid to the Estate by Spencer Anderson.

106. Defendant Spencer Anderson consented to an encumbrance upon said parcel of land by Defendant Bank of the Rockies, N.A.  Bank of the Rockies, N.A.'s encumbrance upon said parcel of land is unlawful, as it is the product of Defendant Spencer Anderson's tortious conduct as described herein.

107. Title to the above-referenced parcel should be quieted in the name of the Estate.

## TENTH CAUSE OF ACTION:  PETITION TO VOID TRANSACTION PURSUANT TO MCA § 72-3-615

108. Plaintiffs incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

109. Defendant Spencer Anderson, in his capacity as Personal Representative of the Estate, deeded to himself, without paying any consideration, the Estate's interest in forty acres of the Baxter Ranch, legally described as:

Tract 1 of Certificate of Survey No. 2552, located in the Northeast Quarter of Section 5, Township 2 South, Ranch 5 East, P.M.M., Gallatin County, Montana, according to the official plat thereof on File and of record in the office of the County Clerk and Recorder of Gallatin County, Montana.  (See, Exhibit H, attached hereto).

110. This transaction was not approved by the probate court, nor consented to by the Plaintiffs, who are beneficiaries of the Estate.

111. This sale should therefore be voided pursuant to MCA § 72-3-615.

## PRAYER FOR RELIEF

WHEREFORE, pursuant to Rule 38 of the Montana Rules of Civil Procedure, the Plaintiffs demand a trial by a jury for all issues triable, and for relief as follows:

a)  A full accounting of the Estate assets in accordance with M.C.A. § 72-38-813(3);

b)  Compensatory damages in an amount to be proven at trial;

c)  Removal of Defendant Spencer Anderson as the Personal Representative of the Estate and of Defendant Michael Anderson as attorney for the Estate;

d)  Disgorgement of the Anderson Defendant's personal representative and attorney fees;

e)  Imposition of a constructive trust upon Defendant Spencer Anderson's interest in the Baxter Ranch;

f)  An order declaring that Defendant Michael Anderson, in his capacity as a beneficiary, is barred from collecting any damages or securing any interest in the property to be included within the constructive trust, based upon the doctrine of unclean hands;

g)  An award of treble damages pursuant to M.C.A. § 37-61-407;

h)  The imposition of joint and several liability upon the Defendants for all tortious conduct of Defendant Spencer Anderson;

i)  Attorneys fees and the costs of litigation;

j)  Prejudgment interest at the statutory rate;

k)  Quieting title in the Estate to the forty acre parcel of the Baxter Ranch legally described as:

Tract 1 of Certificate of Survey No. 2552, located in the Northeast Quarter of Section 5, Township 2 South, Ranch 5 East, P.M.M., Gallatin County, Montana, according to the official plat thereof on File and of record in the office of the County Clerk and Recorder of Gallatin County, Montana.  (See, Exhibit H, attached hereto);

l)  Voiding the transactions resulting in the recordation of the Deed and Mortgage attached hereto as Exhibits I and J; and

m)  For such other and further relief as the Court deems just and proper.

DATED this 16th day of October, 2019.

Leah K. Corrigan, MT Bar No. 9900
Moffett & Corrigan LLP
P.O. Box 4797
Jackson, WY 83001
(307) 733-8734
(307) 733-3994 Facsimile
lkc@moffettcorriganlaw.com

## VERIFICATION

I, Lisa Perkins, hereby verify that I have read the foregoing Verified Complaint, and it is true and accurate to the best of my knowledge.

Dated this _16_ day of October, 2019.

_Lisa Perkins_ (signature)

**Lisa Perkins**

STATE OF WYOMING        )
                        ) ss.
COUNTY OF LINCOLN       )

The foregoing Verification was subscribed to and acknowledged before me by Lisa Perkins this _16_ day of October, 2019.

Witness my hand and official seal.

_Sharon Walker_ (signature)

✓NOTARY PUBLIC

My Commission Expires: _6-14-2020_

SHARON W.
COUNTY      NOTARY PUBLIC
LINCOLN      STATE OF
MY COMMIS...   WYOMING
              ...14, 2020

## VERIFICATION

I, Christin E. Seifert, hereby verify that I have read the foregoing Verified Complaint, and it is true and accurate to the best of my knowledge.

Dated this _15_ day of October, 2019.

_Christin E. Seifert_
Christin E. Seifert

STATE OF MONTANA    )
                    ) ss.
COUNTY OF GALLATIN  )

The foregoing Verification was subscribed to and acknowledged before me by Christin E. Seifert this _15_ day of October, 2019.

Witness my hand and official seal.

_Cassi Clampitt_
NOTARY PUBLIC

My Commission Expires: _11/23/2019_

CASSI CLAMPITT
Notary Public
for the State of Montana
Residing at
Bozeman, Montana
My Commission Expires:
November 23, 2019

*Perkins & Seifert v. Anderson et. al.*
*Verified Complaint*
*Page 27 of 27*

**Ex. 2, p. 27**



*Real Estate Appraisals*

*Brokerage*

*Consulting*

*Management*

**Bozeman Office:**
N. Clark Wheeler, ARA, Broker/Owner, MT & ID
Certified General Appraiser, MT & WY

Scott Krushensky
Certified General Appraiser, MT

Andrew A. D. Rahn IV
Appraisal Apprentice
Real Estate Sales Associate, MT

**Sheridan Office:**
Kevin T. Pearce, ARA, Broker, MT & ID
Certified General Appraiser, MT & WY

**Missoula Office:**
Parnic David Neibergs, M.A./ARA
Certified General Appraiser, MT & ID
Real Estate Sales Associate, MT & ID

June 15, 2006

Michael Anderson
Anderson & Liechty
Wells Fargo Center, Suite 1303
175 North 27th Street
Billings, MT  59101

RE:    Real Estate Appraisal of the Marie Baxter Farm
       706 Total Deeded Acres, Gallatin County, MT
       Estate of Vesta Fern Anderson



Dear Mr. Anderson:

Pursuant to your request, we have personally inspected and prepared an appraisal of the real property associated with the property commonly known as the Marie Baxter Farm, located in Gallatin County, Montana.  The ownership of the property is now vested in the ownership of Vesta Anderson and Mary Nelson.  The property described herein is comprised of 706 total deeded acres and represents an improved agricultural property located on the western edge of the city limits of Bozeman, Montana.  The property, which historically has been within an agricultural market, is now experiencing transition value influences related to subdivision and sprawl from Bozeman.

It is our understanding this appraisal is for estate planning and reporting purposes and the effective date is as of March 3, 2006, the date of death of Vesta Fern Anderson.  This appraisal represents a retrospective valuation as defined by current Uniform Standards of Professional Appraisal Practice (USPAP).  The Uniform Standards of Professional Appraisal Practice are the generally accepted standards for professional appraisal practice in the United States.

421 W. Mendenhall, Bozeman, MT 59715         Building 31, Fort Missoula Rd., Suite 3         117-A N. Main Street, P.O. Box 774
P.O. Box 1053, Bozeman, MT 59771                  Missoula, MT 59804                                      Sheridan, MT 59749
Phone: 406/587-7701, Fax: 406/587-2638       Phone: 406/829-3773; Fax: 406-829-3964       Phone: 406/842-7400, Fax: 406/842-7401


REALTOR®

*Web site: ncwheeler.com*              *ARA - Accredited Rural Appraiser*    **Ex. 2, p. 28**

The property has been inspected on multiple occasions, including May 17 and June 7, 2006. The conditions of the property on those dates where reported to be consistent to the effective date, and the value and sale data used was considered to be applicable as of the effective date of the appraisal. Therefore, no hypothetical or extraordinary assumptions were made in completing this appraisal. The appraisal conducted herein is presented to you in a narrative **Summary Appraisal Report** all in compliance with current USPAP guidelines. The objective of this analysis was to estimate the Market Value of the subject property on an "as-is" basis including land and appurtenant improvements.

Based on our inspection and analysis, it is our opinion that as of **March 3, 2006** the estimated market value of the Marie Baxter Farm real property was **$23,900,000**. This represents the cash value of the fee simple ownership rights associated with the appraised property, exclusive of reservations of record. This value includes any contributory value for mineral or water rights as described herein. The appraised value is based on an exposure time of less than twelve months and our value conclusion does not include personal property, fixtures, emblements, or intangible items.

Respectfully submitted,

N. Clark Wheeler, Broker
Accredited Rural Appraiser #673
MT Licensed General Certified Appraiser #95
WY Licensed General Certified Appraiser #222

Andrew A. D. Rahn IV
Appraiser Trainee #776RET



## III.   VALUATION PROCESS

### A.    Introduction and Outline

The appraisal process is an orderly program whereby the appraisal problem and purpose is defined, the work necessary to solve the problem is outlined, and the pertinent data is acquired, classified, analyzed, and interpreted into an estimate of value.

Generally accepted appraisal procedures follow a typical sequence to estimate market value of any subject property.  The sequence is outlined below:

1.)    Research and analyze the subject property and its corresponding market;

2.)    Determine Highest and Best Use of the subject property;

3.)    Select appropriate appraisal method(s) to estimate property value;

4.)    Apply selected method(s) to the subject property;

5.)    Correlate and/or reconcile values indicated by the selected method(s) into a final estimate of value;

6.)    Analyze extraordinary circumstances, if any, of the subject property that may have an effect on the final conclusion of value.

For purposes of this assignment, the appraisal process will follow Steps 1 through 5 to estimate the market value of the subject property.  There does not appear to be any extraordinary or unusual circumstances associated with the subject property and the values will be reconciled after Step 5.

### B.    Highest and Best Use

A property is valued according to its highest and best use.  Highest and best use is that use of land and its improvements that can reasonably be expected to produce the greatest net return over a given period of time or over the remaining life of the improvements.  In assigning a highest and best use, these issues are considered:

• market trends,
• market demands,
• established uses in the area, and,
• the property's unique features.

Ex. 2, p. 30

Criteria considered and met should lead to a highest and best use conclusion that reasonably exists, or will exist in the near future, and which is:

• physically possible,
• legally permissible,
• financially feasible, and
• maximally productive.

Highest and best use correlates to a property's maximum economic use measured in terms of the property's income potential or its actual income. The American Society of Farm Managers and Rural Appraisers (ASFMRA) defines highest and best use as the most profitable likely legal use to which a property can be put. The ASFMRA also believes that the opinion of such use may be based on the highest and most profitable continued use to which the property is both adapted and needed or likely to be in demand for in the reasonably near future

The theory of highest and best use is difficult to apply in the present urban/rural interface investment/development market surrounding Bozeman, Montana, because sale prices do not correlate on an income basis to the physical highest and best use of the property. Speculation, investment, personal use and anticipation are strongly related to value in the current market. These elements have limited direct physical use on an income basis, but drive a return of value over time.

For years, values being paid for agricultural properties in Gallatin County have not been justified by the agricultural operation of these properties. Economic operations on these properties have produced rates of return from less than 0%, to 2% on an actual cash basis. The capitalization rates indicate a transition from agriculture to some higher use. Rates of return for these properties based on land appreciation have, over time, provided enough additional value to properties that, overall, rural lands have been a good investment. But, appreciation evidenced in the current market is difficult to direct as a "highest and best use," as it is not an income producing activity.

Multiple uses affect highest and best use in the Montana land market. Often, properties such as the subject have "augmenting" uses such as recreational, development, and subdivision uses. These uses are often paired to what are known as "complementary" uses. Complementary uses may be agricultural, timber, hunting, or recreational lease uses. Usually, augmenting uses represent the primary elements of the property that drive value and speculation, while complementary uses provide some income to the owner while the property is held for investment. Complementary uses often represent the interim physical use of a property and, in a speculative market such as that affecting rural lands described in this appraisal, property is often held back from terminal uses such as subdivision.

Sales comparable to the property show that no individual physical use can sustain the sale value of these properties under the standard application of a single highest and best use equation. It is evident that larger properties have some immediate development potential and substantial future potential as the property and market evolve. While the immediate

Ex. 2, p. 31

development potential may not spread across the entire property on an economic basis, it is an element of value based on the principle of anticipation. Development does not necessarily manifest as systematic small tract development with primary services, but more often represents sporadic sales of undeveloped tracts of various sizes. Many are sold to periodic users for seasonal use who may add substantial building improvements.

As land values have increased on larger tracts, additional emphasis on and pressure for subdivision has occurred, as many buyers have been priced out of the market for larger parcels and are now seeking smaller, well-located parcels for individual development. In some areas, high land prices for larger parcels have increased the amount of property being sold away from historic large ranches. Buyers are strongly evident in the market for various types of subdivided parcels running from small tract to larger 160 acres "tracts." Sale values running upwards of several million dollars are being paid for well placed building sites on smaller acreage tracts.

### 1.   Market Overview

As identified, the property is located on the outskirts west of Bozeman and adjoins the current city limits in an area of transitional land use. The property is large and due to size represents a unique ownership in the direct area. Over the years most larger ranch and farm properties in the valley area around Bozeman have been subdivided or sold in smaller units. Average farm land ownership or sales in the outskirts area over the past several years have mostly been in the 80 to 320 acre range. A tract the size of the subject is unusual and represents an extremely large ownership at 706 deeded acres. The property is strongly influenced by the suburban and residential development spreading out from Bozeman.

Over the past 10 years a substantial amount of development has occurred to the west of Bozeman and the City has continually annexed in portions of land in the area of the subject to be provided city services for residential lot development. To the south of the subject along Durston Road there has been a substantial amount of tract development, but most of this development has been related to properties which had been purchased in relatively small tracts varying from five to 15 acres. Typically, what is seen in the market is that smaller tracts are annexed into the city and then sold for development to various area developers and builders. There is definitely several different submarkets within the direct area of the subject which includes small tracts of 10 to 20 acres being bought for immediate development, speculative tracts of 20 to 100 acres being bought for future development, and a transitional investment market affecting larger properties running 100 acres in size and greater.

Considering the location of the subject property, it is apparent that the property is in the direct path of residential subdivision spreading from Bozeman and that a probable use of the property in the foreseeable future would be for some type of residential development on portions of the property, if made available. Currently over the past 12 months, there has been a substantial amount of rural development land approved by the city and county for residential development and upwards of 1,500 to 1,600 lots are being developed and

Ex. 2, p. 32

Norman C. Wheeler Associates

Confidential Sales Data



Bozeman Lot Sales Data

made available to the market at this time. See graph of Bozeman lots sale data on *facing page*. Current research would indicate, that there is within this market an unknown saturation point relative to residential lot development in the area of the subject property and as such, there is a limit to the immediate demand for additional property to be developed, unless such property were to be offered to the market at a substantial discount. This would be the only competitive advantage that new property being brought on to the market could offer and at current prices, the potential for such development is limited. While the use of the subject may be interim, due to these factors and its size, its overall classification as a development property at this time is limited.

The property has good water rights and agricultural amenities and would be desirable or in demand within the agricultural market as an interim use property. The property would be in demand in the transitional market for hobby farm or expanding agricultural uses. These types of uses are also consistent with the overall size of the subject property.

The problem in assigning a highest and best use and value to the property, as well be illustrated herein, is its unique characteristics relative to its size and location. At least a portion of the property must be recognized as having inherent or accelerated development potential. However, in this appraisal assignment, which is an estate analysis of the property, the overall valuation question is the value of the larger parcel. The value of such a large property can not predicated on its theoretic subdivision potential. A subdivision analysis of the property would require a detailed analysis of absorption rates and discount rates and many extraordinary assumptions related to levels of allowed use, which are subject to a complicated and often unclear legal and zoning process.

 2. Highest and Best Use Analysis
  Legal, Physical, Financially Feasible, Maximally Productive Summary

**Legal limitations** affecting the subject's use includes zoning and City/County growth policies. The property is bordered on most of its south edge, and part of its northeast corner by the current Bozeman City Limits boundary. All but the western most 80 acres is within the Gallatin County/Bozeman Area Zoning District, commonly referred to as the "Donut." The property is also bisected by the line designating the City of Bozeman's 2020 Community Plan, which outlines planning priorities for the future growth of the City. The area within this plan represents the City's priority for future annexation. Areas outside the plan boundary are said to be off-limits for annexation by the City until the areas within the boundary are annexed. Therefore, portions of the subject property are readily eligible for annexation into the City, while portions lying outside the plan boundary are not as likely to be approved for annexation.

Varied uses are legally permissive for the subject and these uses include agricultural, recreational, development, investment, as well as the application of a conservation easement, a trade to the government, and variations of residential and commercial development. Montana subdivision law requires county approval of land divisions of less than 160 acres and the subdivision laws do allow various levels of subdivision. County commissioners may approve minor subdivisions, i.e., five lots or less, without public

**Ex. 2, p. 34**

meeting or comment. These subdivisions must meet general state sanitation requirements, but more stringent subdivision requirements relative to roads and other services may not be considered.

Subdivision law also allows the subdivision of individual properties or smaller tracts for occasional sale to a family member. Larger and more intense subdivision requires a complete subdivision review process and such developments are apparent and continuing to be approved in the area of the subject.

In summary, research of the surrounding and competing areas reveals that the primary uses of similar properties are agricultural, subdivision development, and investment oriented, often in a combined use. Typical buyers are out-of-state investors.

**Physical qualities** influencing utility or appeal of the property include:

1) No contrary easements present physical problems for the property.

2) The property is contiguous, as the property lies in six adjoining legal parcels.

3) Accessibility is rated excellent to the southern end of the 80 acre parcel, as this parcel is fronted by Durston Road, a primary residential artery. The rest of the subject property has good access via Flandersmill and Baxter Roads. This appraisal assumes legal and physical access exists as this parcel relates to the entire ownership.

4) The topography of the subject is mostly level and not subject to physical barriers or restrictions.

5) The vegetation on the ranch consists of cropland that would not hamper alternative uses.

6) Electrical and telephone utilities are available to the buildings, and in various locations along the roadways.

7) The sales data suggests that most of the surface uses in the area are agricultural and development oriented. Grain, hay, and grazing operations dominate agricultural use. Suburban and rural tract developments from small acreage lots to larger parcels running from 20 to 160 acres are also apparent.

8) No mineral extraction is apparent in the immediate area of the subject. Sales in this market do not reflect additional consideration for minerals.

Because of these physical qualities, the property as if vacant is considered an investment property with agricultural interim uses and strong development overtones. The property has many good building sites. The property's site amenities are good in that it has an aesthetic setting and good access to recreational features. Wildlife habitat is viewed as positive in this type of use.

**Ex. 2, p. 35**

The physical uses capable on the property at the time of purchase, such as subdivision, development, and agricultural uses, do not in and of themselves warrant the investment required to purchase and hold the property, but all appear possible.

The **Financially feasible** use of the property within an appreciating investment market is difficult to ascertain as there is limited monetary cash flow or income; however, the market is driven by the anticipated return on investment including the appreciation mentioned. The financial feasibility of the subject in agriculture production and other "complementary" uses is limited because of the transitional nature of the market. The financial feasibility of holding this property as an investment property to realize appreciation and return on investment is good, and ultimately some form of land development is most probable as the most financially feasible use.

Buyers in this market place a high value on the personal amenities and uses the property offers during ownership. The potential to sell or grant a conservation easement is often an important factor in the determination of feasibility. Since these properties have limited income streams, easement potential is seen as an alternative method to generate cash flow either by sale or through tax credits. Also, investors seeking out larger parcels must compete with small tract development, and may reacquire tracts or pay market value for larger tracts that do not reflect bulk discounts.

Standard subdivision development is increasingly driving values in this area. Cost constraints related to septic systems, power and road development, which have precluded development in many of these areas in the past, are lessening. City services are expanding and are currently available to properties surrounding the subject. Larger land parcels are being sold undeveloped and without roads and utilities. Often, it is the sole responsibility of the buyer to develop basic amenities. It can cost several hundred thousand dollars to bring services to building sites. Environmental and sanitation requirements would generally not restrict development of the property, though water tables and septic systems may be at issue.

The **maximally productive** use, or that use which generates the greatest overall return within the context of the current market, is a combination as described herein of development and investment use as properties pass through transition from agriculture to a higher or more terminal use. As will be discussed below, a portion of the property can be expected to have accelerated development potential relative to the demand for residential subdivision bordering Bozeman. The remaining acreage would be held as investment and developed as the market absorbs existing lots and as services and demand for development spreads west from Bozeman. Maximum return can be achieved by holding the property for appreciation over time or through development.

3.    Assignment of Highest and Best Use

The Highest and Best Use of the subject property at the current time is affected by multiple uses and considerations, as described in the proceeding analysis. The property, being located on the edge of Bozeman, is part of a strong development market which

Norman C. Wheeler & Associates                33                Marie Baxter Farm

**Ex. 2, p. 36**

evidences speculation and investment buying. Historically, the valley area was owned and controlled by large ranch properties; however over the past ten to twenty years, many of these properties have been subdivided or sold.

Currently, all of southwestern Montana is experiencing rapid value growth and development, which has been spurred not only by the immense natural resources and recreational features of the area, but also the nearby location of Bozeman and its associated services including a full service airport, university, and hospital. The market is in strong transition at the current time and many sales of smaller parcels of land being bought for subdivision are being made to local realtors which are exercising opportunistic buys on properties which are not well exposed to the market.

In consideration of the locational and size attributes of the subject property, it would be probable to conclude that the property could be purchased as a larger parcel for speculative investment or as a larger parcel to be subdivided and developed into various acreage tracts. As noted, Montana Subdivision Law precludes the subdivision of properties below 160 acres without subdivision review, but the subject property is currently divided into six legal parcels ranging from 40 to 280 acres. These smaller parcels could be exposed to the market with limited service or roads installed. As will be described in the Market Valuation Section of this appraisal, this use would illustrate economic benefit, which would be considered to be financially feasible.

For valuation purposes herein, we have selected comparable sales which are indicative of this highest and best use. All of the sales were selling to investors or speculators who were buying properties in the area for various uses. These vary from immediate development to speculative investment, to placement of conservation easements. By using conservation easements, many owners in the area have been able to capitalize on the development potential of their properties, without physically subdividing the property. This is also an important factor of value within the context of this market. The property possesses development characteristics equivalent to those suggested by the comparable sales used in this report.

Taking all these factors into consideration, one must conclude that the overall highest and best use of the property as a 706 acre tract is as a transitional investment property with good potential development and investment features. The property actually represents a property which has multidimensional highest and best use and to simply say that the highest and best use of the property is development or investment would not be adequate representative of the use of the property. As identified, this is a complex issue complicated by location, zoning and size, and in consideration of these factors, the Appraisers must conclude that the overall highest and best use of the property is as a transitional investment property with high recognition of potential development features related to the town of Bozeman. The development characteristics associated with the property would primarily be residential with some limited commercial potential. The subject is not located in an area of growth designated by the city to include commercial or industrial uses.

<u>Highest and Best Use - "As Vacant"</u>

In consideration of the features, location, and indications of the market, we would conclude that the Highest and Best Use of the subject property is as an investment or speculative development property.

<u>Highest and Best Use - "As Improved"</u>

The onsite improvements are nominal and do not control or dictate the highest and best use of the subject. Therefore, as of March 3, 2006, the Highest and Best Use of the subject property is considered to be an investment or speculative development property as structurally improved.



C.    Approaches to Value - Definitions

There are three traditional approaches to value: the Income or Earnings Approach, the Cost Approach, and the Sales Comparison Approach. A general discussion of the approaches is followed by an analysis of the appropriateness of each of the approaches for the subject property.

The Sales Comparison Approach indicates the value of a property from a direct comparison of the subject property to sales of similar properties on a single, overall unit of measure. In applying this approach, the appraiser employs the principle of substitution: a prudent buyer is assumed to not be willing to pay more for a property than

Ex. 2, p. 38

it would cost him or her to buy another property with equally desirable characteristics. Conversely, a seller will sell his property for no less than what similar properties are selling for. Several "units of measure" such as square footage, acres, and animal units emerge when using this method depending on the type of property being appraised.

The Cost Approach employs the principle of contribution and is an estimation of the value of the property as if vacant, then adding the current costs of reproducing the improvements, less all forms of current depreciation. Vacant land sales are the most persuasive indicators of land value and individual, component values are assigned to each type and class of land as derived from the current market. Building residual values reflect the rates of contribution and depreciation applicable to improvements in a given market. Reproduction cost values used in this analysis are derived from the Marshall and Swift Valuation Service. These published costs are periodically checked against actual local construction costs for accuracy. Physical depreciation of the improvements is based on the age-life method for incurable items. Depreciation for curable items is based on estimates of the cost to cure such curable items. Land valuation is derived from a component analysis of the selected market data where individual component values are assigned to each type and class of land as derived from the market. Values assigned are based on market data of pure, one-component sales and suggested trends and ratios between the land classes.

The Income Approach in rural appraisals is based on the principle of anticipation and is a value indication of a property based on its anticipated ability to generate income. This method is employed by processing the anticipated net income of the subject property with a capitalization rate determined from the market. The division of the comparable sale property's net income by its sale price will yield a capitalization rate that is reflective of the overall rate of return for that specific property. This analysis of the comparable sales will provide a range of value of the rates of return that are occurring in the present market. From this range, a probable rate of return can then be applied to the subject property's estimated net income to predict a probable market value. The reader should realize that these cap rates and rates of return may appear to be low as compared to alternative investments, however, it appears to be acceptable due to the anticipated appreciation in land values and tax advantages from depreciation of improvements. It also indicates that buyers are investing in agricultural lands without expecting them to cash flow.

### D.     Approach Selection

The Cost Approach is deemed the most appropriate approach to value for estimating a market value of the subject. The property has two primary value assets, those being the land and buildings. The Cost Approach uses market comparison for valuing the land component, utilizing the same sales that would be used in the sales comparison approach. The building values are determined by calculating the current costs of reproduction less all forms of depreciation, which is a more reliable indicator of value in this market, as it is difficult to extract building value from land sales in this market. Buyers primarily

**Ex. 2, p. 39**

value the land component of a property, while the structures are typically a small percentage of overall value.

The property is not an economic sized unit for agricultural purposes and land values now far exceed payment allowed by agricultural income on these tracts. Being in a generally investment oriented transitional market where capitalization rates based on agricultural income often fall below zero, the Income Approach, as it is traditionally calculated, is deemed as not appropriate. The subject is a transitional agriculture property in an investment and development market. The Cost Approach to Value will be utilized in this report in order to take into consideration the differing types of buildings on sale properties as they compare to the subject's buildings.

### E.    Market Observations

For this assignment, the Appraisers have completed a wide review of the market in order to ascertain activity and value under market conditions for similar-sized investment or speculative development properties as of March 3, 2006. The primary market area is defined herein as the area lying west and south of the City of Bozeman, in close proximity to the City limits. This area includes properties located just within the newly expanded City limits, and rural properties lying a few miles outside the City and its associated services. These properties are all tracts that historically have been in agriculture, that are now in transition to some form of investment and/or development associated with the strong growth from Bozeman.

The current sales within this market area are all smaller in size than the subject property, ranging in size from 30 to 400 acres. The subject is unique in that there are few remaining large tracts of open land in such close proximity to Bozeman. Most tracts that come on the market are smaller, and any remaining large tracts are held or come on the market incrementally as smaller tracts. The influence of size on the value of the subject is difficult to determine, as there are no large tract sales in the market area to compare to the relatively abundant smaller tract sale data. As is typical in most markets, a discount for size would be expected.

In order to find large tract sale data similar to the subject, sales from a larger area outside the immediate Bozeman influence market would need to be utilized. These properties, though experiencing strong influence from relative proximity to Bozeman, are not the same market as the properties lying within a few miles of town. Despite the size differences, these smaller closer sales are the primary indicators of value. Larger sales located outside the immediate area will be referenced as augmenting data.

Applying values demonstrated by smaller tract sales directly to the subject property as a whole would require an extraordinary assumption that per acre values in this market apply to large tracts the same as smaller tracts. As stated earlier in the analysis, this appraisal assignment is to determine an opinion of the overall value of the property as a larger parcel. Given that the available sales data is limited to smaller tracts, that the subject contains multiple zoning and planning designations, and the fact that the subject

**Ex. 2, p. 40**

is legally divided into smaller parcels with varying features impacting value, it is the opinion of the Appraisers that the appropriate way to accurately value the subject property is to divide the property into two zones or tiers of value. These tiers of value represent differing states of development potential.

The southernmost 80 acre parcel has the highest immediate development potential, and represents the first tier of value. It fronts Durston Road to the south, which is a major artery and therefore has some commercial potential, and Flandersmill Road to the east. It borders the City limits on the south and west borders, and has newly annexed subdivision development directly to the west. The sales indicate the properties coming on the market for city annexed development are small tracts 40 to 80 acres in size.

The second tier of value includes the remaining 626 acres of property. This portion represents property that is less eligible or available for immediate annexation into the City, and is large enough in size to not be readily absorbed in the market as prime development land. The land is further from city services, and access is not as fully developed, and therefore it represents county rural land that does not have the development potential associated with the first tier of value.

The primary market area, though still largely remaining in agriculture use, is increasingly transitioning into investment and speculative investment oriented around subdivision development. This area is well into the transition from agriculture to development based values.

## F.   Market Data Presentation

The sales selected for analysis in this assignment are presented in summary form in the following pages of this report and will be followed by the application of the Cost Approach to value. Individual sale sheets are shown in the Addenda of this report under Tab 1. There are a total of fifteen sales described in this valuation. The sales took place from May 2005 through June 2006.

## G.   Cost Approach

The Cost Approach is an estimation of the value of the property by determining the cost of reproducing the structural improvements less all forms of depreciation, added to the value of the land as if it were vacant. Reproduction cost values used in this analysis are derived from the Marshall & Swift Valuation Service and Boeckh's Valuation Guide as well as market observations. The published costs are periodically checked against actual local construction costs for accuracy. Physical deprecation of the improvements is based on the age-life method for incurable items. Depreciation for curable items is based on estimates of the cost to cure such items. There was no external obsolescence indicated by the sales in this market. Most buildings with functional obsolescence in this market are completely physically depreciated and will have no contributory value. The depreciation rates indicated by the sales in this market area support the age-life method depreciation

rates with farmstead homes depreciating at around 2.0% per year and outbuildings depreciating from 2.5% to 4.0% depending on type and condition of building.

Land valuation is derived from a component analysis of the selected market data where individual component values are assigned to each type and class of land as derived from the market. This segregated approach allows the Appraisers to assess the similarities of each sale's particular land class as it relates to the subject property. Values assigned are determined from market data of pure, one-component sales and suggested trends and ratios between the land classes when available. As discussed earlier, the subject property is comprised of irrigated hay lands, permanent pasture, and farmstead lands; however, given the fact that the property is in transition only one land class is utilized, that is investment or speculative development.

### 1)   *Land Valuation*

In order to value the subject property, we have reviewed the area market and selected a cross section of sales to be utilized in the analysis of value. From this cross section of sales, we have identified specific sales which will be utilized in the final valuation of the subject property. In an initial analysis of value related to the property, we reviewed the area market to ascertain sales which were located in the valley area and which had a relationship to the town of Bozeman. Through this analysis, 15 sales as referenced on the *facing page* were analyzed.

The sales analyzed show a range in value of roughly $20,000 per acre to $100,000 per acre. This wide range in value illustrates differences primarily in development potential, as that is the primary driver of value in this market. As outlined above, the parcels that make up the subject property vary in development potential. At issue, is whether the full development of larger acreages can be readily absorbed by the market as high density residential development. The amount of lots coming on the market is dramatically increasing, and it is unknown at this time how much the market will bare before saturating. These larger tracts are subject to an absorption rate which adds time and expense to the full sellout of a development and therefore lowers the return. It would be an extraordinary assumption to assume that the large number of lots generated by the full development of these larger properties could be readily absorbed by the market. A study of recent developments in the immediate area shows that these developments are staged, with small parcels of fully developed parcels coming on the market at any one time.

A portion of the subject is comparable to the high value, higher development potential small acreage sales. The remaining portions of the subject are more comparable to the lower value, rural investment sales. The sales can be organized into two value tiers corresponding to the divisions of the subject property outlined previously.

For the purposes of the cost approach the subject lands have been classified as follows:

Tier one – Suburban Development – 80 acres
Tier Two - Rural Investment  – 626 acres

**Ex. 2, p. 42**

After a review of numerous sales from the market area fifteen sales were selected to estimate the value of the subject. These sales typify the transitional agriculture investment/development market for the subject and are considered to be a representative sample of the market. Five of the sales are representative of suburban development. Ten of the sales are representative of rural investment. The sales discussed herein are those which are deemed to be most similar to the subject property overall and are considered to be the best indicators of current value. The primary criteria of the market data search was for recent sales of properties of similar size with a similar highest and best use and with features and amenities like those of the subject.

The sale properties utilized in this assignment are all considered to be competing properties to a potential buyer who may be looking to purchase transitional agriculture/investment lands in the Gallatin Valley on the outskirts of Bozeman.

A discussion of the sale data and key factors of value in this market shall follow:

**Adjustments:** Typically the only adjustments made in the Cost Approach are for time and financing. Other factors of value will be discussed as they may apply in the sales discussion that follows.

<u>Time Adjustment</u>

All sales used in this analysis are within one year of the effective date of appraisal, and therefore are considered current. Appreciation rates in this sub-market of properties on the outskirts of Bozeman do not develop as a smooth curve over time. Instead, rates are sporadic and difficult to generalize as other factors, such as proximity to rapidly expanding city services, complicate the analysis. The data is inconsistent and does not show clear appreciation rates. What is clear is that rates are high, showing ranges of 30% to 140% over the past year. For this reason, no sales over one year old will be utilized.

Six of the fifteen sales are pending as of the date of this report, and one sale closed after the effective date of appraisal. The pending sales and the one retroactive sale are used for support only and will not be relied on as primary indicators of value.

<u>Financing Adjustment</u>

All of the sales were cash or sold based on terms equivalent to cash, therefore, no financing adjustments were made.

<u>Location Adjustment</u>

All of the sales used in valuation of the subject property are located within the same market area as the subject and warrant no adjustment for location. No quantitative adjustment for location will be applied.

Ex. 2, p. 43

6/15/2006

| Sale # | Date of Sale | Unimproved Per Acre Land Value | | | |
|--------|--------------|--------------------------------|------|-----------|-----------|
| 1 | 5/19/2005 | $96,491 | 0% | -$25,000 | $71,491 |
| 2 | 5/11/2005 | $66,390 | 0% | | $66,390 |
| 3 | 1/13/2006 | $63,060 | 0% | | $63,060 |
| 4 | 7/1/2005 | $83,333 | 0% | -$25,000 | $58,333 |
| 5 | 9/1/2006 | $56,250 | 0% | | $56,250 |
| 6 | 3/23/2007 | $73,540 | 0% | | $73,540 |
| 7 | 6/15/2005 | $60,617 | 0% | | $60,617 |
| 8 | 6/2/2006 | $51,250 | 0% | | $51,250 |
| 9 | 12/5/2005 | $45,000 | 0% | | $45,000 |
| 10 | 7/1/2006 | $35,000 | 0% | | $35,000 |
| 11 | 2/16/2006 | $30,567 | 0% | | $30,567 |
| 12 | 4/15/2006 | $30,000 | 0% | | $30,000 |
| 13 | 12/31/2006 | $29,032 | 0% | | $29,032 |
| 14 | 1/10/2006 | $24,545 | 0% | | $24,545 |
| 15 | 11/1/2005 | $20,700 | 0% | | $20,700 |

Ex. 2, p. 44

### Size Adjustment

The sales vary is size, and all are in fact smaller than the subject property. The Cost Approach determines the per acre value of the applicable land classes, and in this case, these sales provide accurate indications of suburban development or rural investment land values for the subject. The size difference will be handled qualitatively in the final analysis and not given a quantitative adjustment.

The chart on the *facing page* indicates the adjusted values of the sales utilized for the valuation as of March 3, 2006.

### Sales Discussion:

#### Value Tier One – Suburban Development Sales

**Sale 1 - $96,491 per acre unadjusted, $71,491 per acre adjusted for annexation.** This 40 acre unimproved sale sold in May of 2005 and is located adjacent to the subject property, along a west and south edge. The sale had preliminary plat and annexation approval from the city at the time of closing. This property had sold one year previously without annexation or pre-plat approval. The sale price showed a 69% increase for pre-plat and annexation into city over one year, which is higher than the 25 to 50% expected. The property has a small strip of Durston Road frontage.

**Sale 2 - $66,390 per acre unadjusted.** Sale #2 is located approximately one mile northeast of the subject in an area with substantial nearby commercial development related to the freeway interchange and 19th Avenue. It sold in May of 2005, totals 42 acres, was unimproved, and borders the City limits. The conditions of sale are unknown, but the property is being developed as a residential subdivision, and presumably being annexed into the City.

**Sale 3 - $63,060 per acre unadjusted.** The sale is located approximately 3 miles southeast of the subject. It is an 80 acre unimproved tract of pasture and hayland that sold in January of 2006. The property fronts South 19th Avenue and borders the Bozeman City Limits.

**Sale 4 - $83,333 per acre unadjusted, $58,333 per acre adjusted for annexation.** Sale #4 is located ½ a mile east of the subject property, and sold in July of 2005. It totals 60 acres and was approved for annexation into the city. It is located between Durston and Oak Street, two major roads. The property sold as 160 without approval at $31,875/acre in May of 2003. Shows a 62% increase for approval and two years.

**Sale 5 - $56,250 per acre unadjusted.** This is the pending sale of 240 acres located one mile directly south of the subject. The sale fronts Huffine Lane, and that portion of the property has strong commercial potential. The property borders the city limits on the east and north sides.

Ex. 2, p. 45

## Value Tier Two – Rural Investment Sales

**Sale 6 - $73,540 per acre unadjusted.** This pending sale is located approximately four miles south of the subject. The sale is contingent on pre-plat approval from the county, and achieving a minimum density. The buyers were very thorough in their research of the development potential of the property. The new sewer line from city brought in by the developers of Meadow Creek Subdivision borders north end of property. The closing date is not until March of 2007.

**Sale #7 - $60,617 per acre unadjusted.** Sale #7 is located approximately three miles north of the subject between two rural subdivisions; Baxter Creek and Valley Grove. The property totals 29 acres and its preliminary plan proposes about 50 lots with central sewer and water. The area is not zoned, but does fall within the Belgrade planning district. This sale has high development potential despite not being connected to city services.

**Sale #8 - $51,250 per acre unadjusted.** This 80 acre tract sold in June of 2006 and exists as three legal parcels thus it has some accelerated development potential. It is located approximately 5 miles southeast of the subject, and is approximately one mile from the city limits. The property was purchased without any conditions relative to available city services, plat approval, or minimum density. The property just north of the sale is Sale #9, which is being developed and annexed into the City. Reportedly, the property sold in November of 2004 for around $1 million. This would indicate approximately 140% annual compound appreciation.

**Sale # 9 - $45,000 per acre unadjusted.** Sale #9 is actually a combination of three or four transactions putting together the land for Meadow Creek Subdivision. The buyer reported that his average transaction cost for all sales was $45,000 per acre. The property totals 200 acres and is locate approximately 5 miles southeast of the subject, and is a quarter mile from the city limits. The developer brought sewer out at a cost of $6 million, to be partial reimbursed over time by fees charged by the City from new developers using the line. The property has some South 19th frontage.

**Sale #10 - $35,000 per acre unadjusted.** This a pending sale of 300 acre dairy farm located approximately three mile northwest of the subject along Jackrabbit Lane, or Highway 85, just south of Belgrade, Montana. Reportedly, there are no subdivision contingencies in the contract for this sale. The property is not eligible to be annexed into either Bozeman or Belgrade in the near future, though the property does have commercial and rural residential development potential.

**Sale #11 - $30,567 per acre unimproved.** Sale #11 is a rural ranch property located on Baxter land and Love Lane, sold under a year long contract that may allow buyer to gain plat approval for large tract subdivision similar to adjoining subdivision. The property is located approximately two miles northwest of the subject, and totals 353 acres. Somewhat more of a Belgrade then Bozeman location. The buildings are limited and are considered to have no contributory value.

**Ex. 2, p. 46**

Norman C. Wheeler Associates
Confidential Sales Data

**Marie Baxter Farm - Sales Data**

6/15/2006



**Sale #12 - $30,000 per acre unimproved.** This pending sale is comprised of 6 - 20 acre tracts totaling 120 acres, and is located approximately four miles south of the subject. The property is a few miles from the City limits, so it is a rural development property. The sale is set to close October of 2006.

**Sale #13 - $29,032 per acre unimproved.** This pending sale is set to close in December of 2006, and is located approximately ten miles south of the subject, and six miles south of Bozeman. Surveying and plat approval is in progress for rural subdivision. Preliminary plat set for 7/06. Presumably, sale is contingent on prelim plat approval.

**Sale #14 - $24,545 per acre unimproved.** Sale #6 totals 55 acres and is located approximately four miles northwest of the subject. It closed in January of 2006. This is a rural tract with no nearby services. It lies over a mile from any other rural subdivisions.

**Sale #15 - $20,700 per acre unimproved.** This is a staged sale of the Abigal ranch - the buyer closed on the custom home and 85 acres for $6,500,000 and has a two year option to purchase the balance of the ranch - 315 acres at $6,500,000 - the house is a large 10,000 sq ft custom home that was required to be bought first with the option - several groups had looked at this and hung up on how to resell the house - the land is outside the city limits but set for annexation within a few years - somewhat of a longer hold for development but due to area a guaranteed high return project. The house and 85 acres appraised out - and analysis indicates the land value ascribed to 315 acres at $20,600 is realistic of market for larger speculative tract.

**Sale analysis:**

Suburban Development -- Tier One Sales

The first value tier represents the prime or highest potential suburban development sales, and are shown on the *facing chart* as sales 1 - 5. The sales are in descending order based on adjusted per acre price per acre. The bars with yellow hash marks are the pending sales. Acreages are shown by the blue line. The tier one sales are typically smaller acreage tracts and located within or directly bordering the Bozeman City limits. City services are available to these tracts and they are eligible for annexation if not already within the city limits. These properties represent maximum residential development potential with some possible commercial development potential as well.

Sale #5 is pending, with a reported closing date of September 2006. It is the largest of the suburban development sales at 240 acres. Located along Huffine Lane, it has stronger commercial potential component than the subject. Sales #1 and #4 are the highest priced sales and are located near the subject. Sale #1 borders the subject. These sales sold with pre-plat and annexation approval from the City. This approval process from the City typically takes 8 to 12 months, and is reported by local Realtors and developers to increase land value on average $25,000 per acre. Sale #2 is the sale of 42 acres for a subdivision bordering the City boundary north of the subject. It is unreported whether this sale had any pre-approval at the time of the transaction. Sale #3 is the most similar to the subject in size and time, and it also borders the City limit boundary with primary road

Ex. 2, p. 48

frontage and nearby city services. The sale is located south of town in a desirable area for residential development. The property also has commercial development potential as it fronts South 19th Avenue which is a major artery into town. There was no city annexation pre-approval for this sale, which is comparable to the present condition of the subject property.

If a $25,000 per acre discount for preliminary annexation approval is applied to Sales #1 and #4, a value range of $56,250 to $71,000 per acre results for the five sales. Sale #3 at $63,000 per acre is the most comparable sale do to its size, time, and zoning status relative to the City boundary. Using this sale as the primary indicator of value, a value of $63,000 per acre is determined to be the appropriate value for prime suburban development in this market. This value is in the midrange of the other sales, and is supported by that range.

Suburban Development – 80 acres @ $63,000/acre = $5,040,000

Rural Investment – Tier Two Sales

The second tier of value represents land that has development potential that requires additional time and investment to fully maximize value. These properties are typically larger, located outside the City limits, and do not have access to city services. These sales may or may not be within the Donut, which does not appear to be a consistent indicator of value. The zoning regulations within the Donut do not hinder or limit most development. The market is strong enough for properties in close proximity to Bozeman, that investment buyers are not distinguishing between properties inside and outside of the Donut.

A total of ten sales have been verified that represent this value tier, and are shown on the previous page facing chart as sales 6 - 15. As with the first tier sales, these sales are ordered by price per acre, and pending sales have yellow hash marks. Of the ten sales, five sales are pending, with closing dates past June of 2006. The entire value range of all the rural investment sales is $20,700 to $73,540 per acre. Sale #6 is the highest sale, and will be discarded because the date of closing is not until March of 2007 and the conditions of sale are not known. Sale #7, the next highest sale, is a small sale located directly between two existing subdivisions which greatly enhances its immediate development potential. It will be discarded as well. Sale #8 is a pending sale of two twenty acre parcels and one 40 acre parcel. The property has some potential high water table issues, but the sale has superior development potential none-the-less and will be discarded. Sale #9 is a grouping of three or four sales which were put together for a subdivision development that is currently under construction. The buyer disclosed the average transaction price at $45,000 per acre. The location of these sales is superior relative to the subject. The south side of town is more desirable than the northwest end for homes.

The remaining six sales, Sale #10 – 15, have a range of $20,700 to $35,000 per acre, with an average of $28,000 per acre. Discarding the pending sales, the range is $20,700 to $30,567 per acre with an average of $25,270 per acre. Each of the sales have similar



**Anderson-Nelson Ranch
Gallatin County, Montana**

Sale 14
Sale 7
Sale 10
Sale 2
Sale 11
Subject
Sale 4
Sale 1
Sale 5
Sale 3
Sale 12
Sale 9
Sale 6
Sale 14
Sale 8
Sale 13

Legend
Bozeman City Limits
The "Donut" Zoning District

0    1    2 Miles

SCALE
1:94,300
1 inch equals 1.5 miles
MAP IS INTENDED TO SERVE AS A VISUAL GUIDE
AND ITS ACCURACY IS NOT WARRANTED

N
W    E
S

June 2006
Norman C. Wheeler
&
Associates
Bozeman, Montana

Ex. 2, p. 30

development potential, with Sale #11 at $30,000 being the most comparable overall sale in location and size. This value of $30,000 is considered to be the appropriate value for investment land, and is supported by the other sales.

Rural Investment – 626 acres @ $30,000/acre = $18,780,000

Land Value Summary

As of March 3, 2006:

80 acres of suburban development land @ $63,000/acre = $5,040,000
626 acres of rural investment land @ $30,000/acre = $18,780,000

Total land value = $23,820,000

2)    *Building Valuation*

In order to estimate the contributory value of the structural improvements associated with the subject property, we have reviewed the local and surrounding market and found that within the cost approach, similar improvements generally contribute a value equal to their depreciated reproduction cost at the time of sale. This is common of most areas and is believed to properly reflect contributory value of the buildings in the cost approach.

A review of market indicated depreciation rates concludes that the typical home is depreciating from 1.5% to 2.0% per year with outbuildings depreciating at a slightly higher rate of 2.5% to 4.0% depending on the building and its specific use. If well maintained, many outbuildings will have long useful lives. We have found that these market indicated rates also reflect the typical age-life method of physical depreciation with adjustments for curable physical items. The contributory value of the structural improvements in this assignment will be estimated and calculated based on the age-life method utilizing the following formula:

$$CV = RCN \times REL/TEL \text{ where:}$$

CV = Contributory Value
RCN = Replacement Cost New (accounting for functional
REL = Remaining Economic Life
TEL = Total Economic Life

The chart on the facing page summarize the values calculated for the building contribution as March 3, 2006. The total of the depreciated value of the buildings for is $98,394.

3)    *Leased Grazing Rights*

There are no leased grazing rights associated with the Marie Baxter Farm.

4)    *Valuation Summary*

The Cost Approach as herein applied suggests a market value as of March 3, 2006 of $23,900,000 for the subject property as shown below:

| | |
|---|---|
| Deeded land: 706 acres | $ 23,820,000 |
| Structural Improvements: | $      98,394 |
| Lease land: | $            0 |
| Total | $ 23,918,394 |

Rounded to:  $ 23,900,000

H.    Reconciliation and Value Conclusion

The Appraisers' employed traditional methods of estimating the market value of the subject property.  The market value suggested by these methods is shown below for an effective date of March 3, 2006.

| | |
|---|---|
| Cost Approach | $23,900,000 |
| Sales Comparison Approach | N/A |
| Income Approach | N/A |

There was an adequate amount of good quality sales data available in this assignment as the sales possessed features and characteristics generally similar to those of the appraised property.  This sales data was used within the cost approach to value and reflect a relatively good base of data with which to value the subject property.

In the final analysis, the cost approach was deemed to be the most accurate and reliable method of valuation for the appraised property.  Therefore, a final value conclusion based on the cost approach was drawn.

Final Value Conclusion:    $23,900,000

The above-concluded value considers the fee simple ownership rights of the real property described herein and is in term of cash including land and buildings.

Ex. 2, p. 52

| Sale # | Date | County | Buyer / Seller | Sale Price | Deeded Acres | Unimproved per acre |
|---|---|---|---|---|---|---|
| 1 | 5/19/2005 | Gallatin | DCM Inc. | $3,850,000 | 40 | $96,491 |
| | | | Dennis & Joni Balian | | | |
| 2 | 5/11/2005 | Gallatin | Cattail Lake, LLC | $2,800,000 | 42 | $66,390 |
| | | | Rocky Mountain Timberlands, | | | |
| 3 | 1/13/2006 | Gallatin | Eighteen 89 Equity Group, | $5,000,000 | 79 | $63,060 |
| | | | Cline Family Partnership | | | |
| 4 | 7/1/2005 | Gallatin | Harbour Towne Limited | $5,000,000 | 60 | $83,333 |
| | | | McDonald Land Company | | | |
| 5 | 9/1/2006 | Gallatin | pending | $13,500,000 | 240 | $56,250 |
| | | | Norton | | | |
| 6 | 3/23/2007 | Gallatin | pending | $10,200,000 | 139 | $73,540 |
| | | | Kraft | | | |
| 7 | 6/15/2005 | Gallatin | Wahoo Investments | $1,750,000 | 29 | $60,617 |
| | | | Ronal & Linda Allen | | | |
| 8 | 6/2/2006 | Gallatin | Hard contract to close - | $4,100,000 | 80 | $51,250 |
| | | | Mahar Homes | | | |
| 9 | 12/5/2005 | Gallatin | Meadow Creek Partners LLC | $9,000,000 | 200 | $45,000 |
| | | | Schaaf, Miller, Boylan, and | | | |
| 10 | 7/1/2006 | Gallatin | under contract | $10,500,000 | 300 | $35,000 |
| | | | Dykstra | | | |
| 11 | 2/16/2006 | Gallatin | Glacier River Properties, LLC | $10,790,000 | 353 | $30,567 |
| | | | Paugh | | | |
| 12 | 4/15/2006 | Gallatin | under contract | $3,600,000 | 120 | $30,000 |
| | | | Smith Land Company | | | |
| 13 | 12/31/2006 | Gallatin | pending | $1,800,000 | 62 | $29,032 |
| | | | Charles J. Kraft | | | |
| 14 | 1/10/2006 | Gallatin | | $1,600,000 | 55 | $24,545 |
| | | | Crow | | | |

| Sale # | Date | County | Buyer Seller | Sale Price | Deeded Acres | Unimproved per acre |
|---|---|---|---|---|---|---|
| | | | | | | 6/15/2006 |
| 15 | 11/1/2005 | Gallatin | Williams Plumbing | $13,000,000 | 400 | $20,700 |
| | | | Abigal Ranch | | | |

# REAL ESTATE SALE CONTRACT

THIS REAL ESTATE SALE CONTRACT ("Contract") is made as of the day and year this Contract is fully executed by the parties hereto (the "Effective Date"), by and between:

Bryan Klein (or assigns)
1735 South 19th Avenue, Suite B
Bozeman, MT 59718
("Buyer")

and

Baxter Ranch Holding LTD and Estate of Vesta F. Anderson
337 Bob White Lane (for Baxter Holding, Ltd.)
New Braunfels, Texas 78132

P.O. Box 3253 (for Estate of Vesta F. Anderson)
Billings, Montana 59103
("Seller")

1.    **OFFER**: Seller hereby offers and agrees to sell, and Buyer hereby offers and agrees to purchase any and all of Seller's right, title, and interest in and to the following described real property in the City of Bozeman, Gallatin County, Montana (the "Property"), as shown on the drawing attached hereto as Exhibit A:

Approximately 160.36 acres located at the southwest quadrant of the intersection of Baxter Lane and Harper Puckett Road in Gallatin County, Montana. Bordered to the south by West Oak Street and to the east by land owned by the City of Bozeman. Described as S04, T02, R05 E, COS 2552, Tract 5 NE4.

Excluding a proposed Public Street & Utility Easement [1.393 acres] & Fill Slope Easement [0.120 acres] as set forth in the attached Exhibits A & B, and further subject to a proposed Temporary Construction Easement [0.348 acres], together with a proposed Contract for Sale between Seller and the City of Bozeman.

2.    **PURCHASE PRICE**: The purchase price for the Property is Seven Million Nine Hundred Eighty Thousand and No/100 Dollars ($7,980,000.00) (the "Purchase Price"). The Purchase Price shall be paid as follows:

(a)    The Buyer shall have five (5) business days after the Effective Date to deposit with American Land Title Company, 1800 West Koch Street #1, Bozeman, MT 59715 (the "Title Company"), the sum of Fifty Thousand and No/100 Dollars ($50,000.00) by certified or cashier's check or by a wire transfer as an earnest money deposit. Such sum, together with all interest earned thereon, is herein called the "First Earnest Payment." The First Earnest Payment shall be credited against the Purchase Price in the event of a Closing pursuant to this Contract and, if no Closing occurs, it shall be delivered to Buyer or Seller pursuant to the terms and conditions of this Contract. The First Earnest Payment shall be refundable to Buyer until expiration of the

PLAINTIFFS'
EXHIBIT
B



**Ex. 2, p. 55**

Contingency Period and, if no Closing occurs, it shall be delivered to Buyer or Seller pursuant to the terms and conditions of this Contract.

(b)    Within five (5) business days of the expiration of the Contingency Period, as defined in Section 10 below, Buyer shall deposit an additional sum of Fifty Thousand and No/100 Dollars ($50,000.00) by certified or cashier's check or by wire transfer as an earnest money deposit, which the Title Company shall collect and deposit in a fully insured, interest-bearing account. Such sum, together with all interest earned thereon, is herein called the "Second Earnest Payment." The Second Earnest Payment shall be credited against the Purchase Price in the event of a Closing pursuant to this Contract and, if no Closing occurs, it shall be delivered to Buyer or Seller pursuant to the terms and conditions of this Contract. The Second Earnest Payment will be non-refundable to the Buyer except in the event of Seller's default.

(c)    The First Earnest Payment and the Second Earnest Payment will be collectively referred to as the "Earnest Payment". At Closing, subject to applicable prorations, the Buyer shall pay to Seller in cash or readily available funds the difference between the Purchase Price and the Earnest Payment.

**3.    CLOSING:** The closing ("Closing") of the sale of the Property shall occur on or before thirty (30) days following the expiration of the Contingency Period ("Closing Date"). Closing shall take place during normal business hours at the offices of the Title Company.

(a)    Buyer shall have the option to extend the Closing up to one hundred twenty (120) days beyond the Closing Date ("Closing Extension Option") by providing written notice to Seller on or before the Closing Date. If the Closing Extension Option is exercised, the Purchase Price will increase to Eight Million Eighty Thousand and No/100 Dollars ($8,080,000.00).

**4.    TITLE TRANSFER:** Title shall transfer at Closing. Seller shall transfer title by recordable General Warranty Deed reasonably acceptable to Buyer and the Title Company, subject only to the Permitted Exceptions (as defined below).

**5.    POSSESSION:** Seller shall deliver possession of the Property to Buyer upon title transfer, in its present condition except as otherwise provided in this Contract. Seller shall maintain property insurance on the buildings until Closing, such that in the event of a loss to such buildings, Seller shall assign, and Buyer shall accept proceeds payable by insurance for such loss as the equivalent of delivery of the property in its present condition.

**6.    CLOSING ADJUSTMENTS AND CHARGES:** The parties agree to be responsible for the following costs, if any, to be paid at Closing, or sooner if requested by Title Company:

(a)    Buyer shall pay:

1.    Title Company service charges customarily charged to Buyer (including one half (½) of any applicable escrow fees), Buyer's attorneys' fees, Title Company fees charged to Buyer, recording fees other than for lien releases to be paid by Seller, other customary closing costs charged to Buyer, and accruals and prorations as otherwise provided in this Contract; and other Buyer's costs as provided in this Contract.



(b)   Seller shall pay:

1.   Title insurance premium(s);

2.   Recording fees for lien releases;

3.   General Warranty Deed preparation;

4.   Seller's attorneys' fees, Title Company fees charged to Seller (including one half (½) of any applicable escrow fees), other customary closing costs charged to Seller, and accruals and prorations as otherwise provided in this Contract; and

5.   Other Seller's costs as provided in this Contract.

General taxes (based upon the assessment and rate for the current year or, if either is not available, the previous year's assessment or rate, provided that when the actual taxes for the year of Closing are known, upon the request of Buyer or Seller, the parties shall prorate the taxes for the year of Closing) shall be prorated on the basis of a thirty (30) day month, day of Closing to be charged to Seller, except where Buyer exercises its Closing Extension Option, in which case, taxes shall be prorated as of the Closing Date, that is, thirty (30) days following the expiration of the Contingency Period. Special taxes and special assessments against the Property which are due and payable prior to Closing shall be charged to Seller, except as provided herein with respect to Buyer's exercise of its Closing Extension Option.

7.   **INFORMATION TO BE PROVIDED BY SELLER:** Not later than 5:00 P.M. on the fifteenth (15) business day after the Effective Date, Seller shall, at Seller's cost, deliver to Buyer the following documents and/or information as are in the possession or control of Seller:

(a)   Any and all title reports, abstracts, title opinions, commitment letters, CCR's, development agreements, or other documents relating to or affecting Seller's title to the Property. The Property is presently subject to an IRS lien on the interest of the Estate of Vesta F. Anderson, and a *Lis Pendens* has been filed. Seller will provide separate documentation of the IRS claims. Seller knows of no other documents as described. This agreement is subject to approval of the IRS with respect to a release of its lien. Seller has consulted with the attorney for the IRS, who has indicated that, if the IRS approves the sale and has priority to proceeds of the Estate's interest at closing the IRS would provide the Title Company an appropriate lien release.

(b)   Any and all engineering studies, reports, soil tests, and environmental assessments/studies relating to the Property and information relating to any known underground structures, utilities and subsurface defects (e.g. sinkholes). Seller has received proposed Public Street & Utility Easement [1.393 acres] & Fill Slope Easement [0.120 acres] as described above, and further subject to a proposed Temporary Construction Easement [0.348 acres], together with a proposed Contract for Sale between Seller and the City of Bozeman.

Seller has been orally advised by its agricultural lessee that is installed 4" drain tiles on a portion of the Property, the exact location of which are known by the Lessee. Seller agrees to provide such assistance with the Lessee as Buyer may require regarding the location, nature and extent of such tiles.

3



Seller advised Buyer that the Property borders Oak Street and Cottonwood Harper Puckett rights-of-way. There is an existing easement with Northwest Energy (formerly Montana Power Company) for a power line which exists along the southern boundary of the property.

No other such documents are in the possession or control of Seller.

(c)    Recorded plats affecting the Property, or any part thereof, any and all proposed plats, if any, and all surveys of the Property. The only known recorded survey of the Property is the current survey, COS 2552, Tract 5 NE4, which is of record with the Gallatin County Clerk & Recorder.

(d)    All agreements, leases, and/or rental agreements involving any third party's rights with respect to the possession, use, or occupancy of or interest in the Property. [The Property is currently leased to Bos Hay & Grain, L.L.C., a copy of which has been provided to Buyer (the "Existing Lease"). The Existing Lease is presently on a year-to-year extension of the written lease.] Seller agrees that it shall cause the Existing Lease to terminate at the end of the current year-to-year tenancy and will not renew or otherwise extend the Existing Lease beyond the current year-to-year tenancy without the prior express written consent of Buyer.

(e)    Within sixty (60) days from the Effective Date, Seller shall, at Seller's sole cost and expense, provide to Buyer written evidence satisfactory to Buyer that Seller has received approval of this Contract from the appropriate representatives of the IRS stating that the existing IRS Lien and Lis Pendens will be released from the Property at Closing (the "IRS Approval"). Seller agrees that it shall promptly seek to obtain the IRS Approval and will take all reasonable steps necessary to timely obtain the IRS Approval. If Seller fails to timely provide the IRS Approval or the IRS Approval is not satisfactory to Buyer, then Buyer may, upon written notice to Seller, terminate this Contract, in which event the Earnest Payments shall be promptly returned to Buyer.

8.    **TITLE:**

(a)    The obligations of Buyer under this Contract are contingent upon Buyer's receipt on or before fifteen (15) days from the Effective Date of a commitment (and copies of all instruments reflected as exceptions thereon) (the "Commitment") from the Title Company, or such reasonable time as the Title Company may require, to issue as of Closing hereunder, a standard ALTA Owner's Policy of Title Insurance at standard premium rates insuring fee simple title to the Property in Buyer, access to and from the Property to a public street, if applicable, and any endorsements required by the Buyer in its sole discretion, and containing no exceptions other than current taxes not yet due and payable, the Permitted Exceptions and any other matters which have been approved in writing by Buyer. Seller shall, upon Closing, remove all liens against the Property reflected upon the Commitment which may be satisfied by the payment of money. It is acknowledged that any and all exceptions to title, other than those exceptions which are typically referred to as "Standard Exceptions", shall be objections to title. With regard to the "Standard Exceptions", Seller agrees to cooperate with Buyer to cause such Standard Exceptions to be removed from the Commitment. In the event of any exceptions to title, Seller shall have until sixty (60) days from the receipt of the IRS Approval in which to notify Buyer that Seller will agree to remedy some or all exceptions to Buyer's satisfaction or that Seller is electing not to remedy some or all of the

4



exceptions to Buyer's satisfaction. In the event that Seller fails to notify Buyer of its undertaking, fails to remedy some or all exceptions to title or elects not to remedy any or all exceptions to title on or before sixty (60) days from the receipt of the IRS Approval, Buyer shall either: (i) accept the state of title subject to said objectionable exceptions, in which event said conditions and exceptions shall be accepted for all purposes and shall thereby be deemed Permitted Exceptions, or (ii) reject the state of title, in which event this Contract shall become null and void and of no force and effect. The parties expressly acknowledge that all unresolved exceptions are rejected by the Buyer unless such exceptions, except Permitted Exceptions as provided herein, are accepted in writing by the Buyer prior to Closing. Any exception specifically accepted by Buyer is referred to in this Contract as a "Permitted Exception". Title to the Property shall be marketable in fact and insurable at Closing.

(b) If at any time following Buyer's receipt of the Commitment, any update or endorsement of the Commitment discloses any new or additional exceptions to title that are not caused or created by Seller (the "New Exception") Buyer shall have a period of thirty (30) days from the date of its receipt of such update or endorsement and a copy of the New Exception (the "New Exception Review Period") to review and to approve or disapprove the New Exception. If the New Exception is unacceptable to Buyer, Buyer shall object to the New Exception in writing within the New Exception Review Period. Upon receipt of Buyer's objection to the New Exception, Seller may, at its option and at its sole cost and expense, clear the title to the Property of the New Exception prior to Closing. In the event Seller fails, or elects not to clear the title to the Property of the New Exception prior to Closing, Buyer, as its sole remedy, may elect either: (i) to terminate this Contract, in which event the Earnest Payments shall be promptly returned to Buyer; or (ii) to waive such objections and proceed with the transactions contemplated by this Contract, in which event Buyer shall be deemed to have approved the New Exception. If Buyer fails to notify Seller in writing of its objection to any New Exception prior to the expiration of the New Exception Review Period, Buyer shall be deemed to have elected to waive its objections as described in the preceding clause (ii).

Buyer's right to object to a New Exception shall not apply to Exceptions created by Buyer or its representative(s).

9. **ADDITIONAL AGREEMENTS OF THE SELLER:** Seller shall not, prior to Closing, encumber, pledge, assign Seller's interest in, enter into any obligation, lease or rent, or create any exception to title insurance with respect to the Property, without Buyer's prior written consent. All bills and claims for labor and services furnished to or for the benefit of the Property for any period prior to Closing shall be paid by Seller in full by Closing, notwithstanding the foregoing, Seller shall not be responsible for any costs and expenses of Buyer's due diligence that were expressly incurred at the direction of or at the request of Buyer

10. **CONTINGENCIES FOR THE BENEFIT OF BUYER:** Buyer's obligation to close hereunder is subject to and contingent upon the following (the "Contingencies") occurring on or before the end of one hundred fifty (150) days following the receipt of the IRS Approval ("Contingency Period"):

5



(a)    Environmental Site Assessment.  Buyer's receipt of a phase one environmental site assessment satisfactory to Buyer, to be performed at Buyer's cost by an environmental engineer selected by Buyer.

(b)    Wetlands Delineation Study.  Buyer's receipt of a wetlands delineation study satisfactory to Buyer, to be performed at Buyer's cost by an environmental engineer selected by Buyer.

(c)    Annexation and Zoning with the City of Bozeman.  While Buyer does not anticipate final approval of annexation and zoning from City of Bozeman prior to the expiration of the Contingency Period, Buyer will begin the application process within the Contingency Period and will assess initial indications from the City of Bozeman regarding qualifications and requirements for approval.  Buyer shall be solely responsible for approvals associated with the Property and will prosecute approval of annexation and zoning with due diligence, but Seller agrees to cooperate to such extent reasonably necessary.

Buyer agrees to provide Seller with timely and full disclosure of all documents pertaining to the Environmental Site Assessment, Wetlands Delineation Study and application process for annexation and zoning from the City of Bozeman as such documents are received.

The Contingencies are contingencies for the benefit of Buyer, and some or all of such Contingencies may be waived by Buyer in writing.  Buyer may terminate this Contract at any time on or before the end of the Contingency Period if any of the Contingencies are unsatisfactory to Buyer, in Buyer's sole discretion.  If any of the Contingencies is not satisfied or waived by Buyer on or before the end of the Contingency Period, the Contingencies shall be deemed unsatisfied and unwaived.  If Buyer exercises its discretion to determine the Contingencies are unsatisfactory, unsatisfied and unwaived, Buyer agrees to provide Seller written notice of the termination of the Contract.  If Buyer terminates this Contract as set forth herein or if any of the Contingencies is unsatisfied or unwaived on or before the end of the Contingency Period, this Contract shall terminate and become null and void and of no force and effect, in which event the Earnest Payment shall be returned to Buyer, subject to Section 2(b) above, and all obligations of Buyer and Seller under this Contract shall cease and terminate.

11.    ACCESS TO PROPERTY:  Seller agrees to permit timely inspections of the Property by appraisers, inspectors, surveyors, and other parties who will need access to the Property pursuant to this Contract.  Buyer agrees to give Seller reasonable notice in advance of such activities.  Seller agrees that Buyer and its agents and contractors may conduct such activities and testing on the Property as Buyer deems reasonably necessary including, but not limited to, boundary line and topographical surveys, soil samples, boring, and hazardous substance tests and such other engineering investigations and inspections as Buyer may reasonably require.  Buyer agrees to instruct any such parties having access to the property exercise such access so as to avoid unreasonable interference with the conduct of agricultural and livestock activities on the Property.  By way of example, if entry is being conducted, Buyer will instruct all parties having access to insure that gates which are closed remain closed during and after entry.  Buyer shall instruct all parties having access that their access is limited solely to the activities and testing required by Buyer.  Buyer will exercise reasonable supervision of such activities and assist Seller to minimize access or entry by unauthorized personnel or activities.  In the event the Closing contemplated

hereby fails to occur for any reason whatsoever. Buyer shall restore the Property to the reasonably same condition existing prior to such activities, weather and season of the year permitting. Buyer shall defend, indemnify and hold Seller harmless from any and all claims caused by, arising out of or resulting solely from any activity of Buyer and its agents and contractors upon the Property.

Buyer agrees to provide Seller with timely and full disclosure of all documents produced or obtained from such access.

12.   **WATER:**  All water, including surface water or ground water, any legal entitlement to water, including statements of claim, certificates of water rights, permits to appropriate water, exempt existing rights, decreed basins or any ditches, ditch rights, or ditch easements appurtenant to and/or used in connection with the Property are included in the Property in proportion to the ratio that the Property represents to the entirety of the Property owned by Seller. Seller represents that it is entitled to an easement for irrigation, and has an existing irrigation pipeline, to the property from the Maynard-Border Ditch and Farmers Canal Company across property owned by the City of Bozeman soccer field (the "Water Easement"). Currently, the Water Easement has not been reduced to writing and Seller agrees that within sixty (60) days from the Effective Date, Seller shall, at Seller's sole cost and expense, provide to Buyer a written form of the Water Easement that has been approved by all necessary parties and is in a form that is satisfactory to Buyer and will be executed and recorded at Closing. Such 60-day period may be extended if, through no fault of Seller, neither the City nor soccer field has delivered a written Water Easement. Notwithstanding the foregoing, if Seller fails to timely provide the final written and approved Water Easement within the initial 60-day period (not during any extension), then Buyer may at any time prior to Seller's delivery of the final written and approved Water Easement, upon written notice to Seller, terminate this Contract, in which event the Earnest Payments shall be promptly returned to Buyer. Filing or transfer rights will be paid by Seller and documents will be prepared by Seller's representative.

13.   **REPRESENTATIONS AND WARRANTIES OF SELLER:**  Seller makes the following representations and warranties to Buyer, which representations shall be true as of Closing and shall survive Closing for a period of one (1) year:

(a)   Absence of Claims and Proceedings.  There is no claim, suit, action, arbitration, legal or other proceeding, or governmental investigation pending which affects the Property and none are threatened of, which Seller has knowledge or should have knowledge, except United States District Court for the District of Montana, Butte Division, Case No. 2:18-CV-00021-SHE, entitled *United States of America, Plaintiff v. Estate of Vesta Fern Anderson, Spencer N. Anderson, Bos Hay & Grain, LLC, and Baxter Ranch Holdings, Ltd.,* described as a civil tax collection suit to reduce unpaid federal estate tax assessments to judgement and to foreclose the federal tax lien against certain property of the estate. Seller represents that this Contract will be presented to counsel for the United States for its approval of the Contract, its commitment to release its lien against the Property in exchange for disbursement of money received from Closing. Seller reasonably believes that funds to be disbursed to the Estate from Closing will be sufficient to satisfy any unpaid federal tax assessments.

(b)   Hazardous Materials.  To the best of Seller's knowledge, no Hazardous Materials (as hereinafter defined) exist on or under the Property or on any properties immediately adjoining or upstream from the Property or have been transported to or from the Property or used, generated

7

manufactured, stored or disposed of on or under the Property or any properties immediately adjoining or upstream from the Property, and the Property is not in violation of any federal, state or local law, ordinance or regulation relating to industrial hygiene or the environmental conditions on or under the Property, including, without limitation, soil and groundwater conditions. For purposes hereof, "Hazardous Materials" shall mean (i) substances defined as "hazardous substances", "hazardous materials" or "toxic substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq.; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. Section 1801, et seq.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Section 6901, et seq.; (ii) those substances defined as "hazardous waste" in Section 260.360 and 260.500 promulgated pursuant to said laws; (iii) asbestos in any form, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid or other fluids containing levels of polychlorinated biphenyls in excess of fifty (50) parts per million; and (iv) any other chemical, material or substance, exposure to which is prohibited, limited or regulated by any governmental authority or may or could pose a hazard to the health and safety of the occupants of the Property or of property adjacent to or upstream from the Property.

Notwithstanding the foregoing, Seller advises Buyer that the Property has been in agricultural and livestock production for over 100 years, and the Seller is unaware of any such substance. Seller further advises that its Farm Lease with Bos Hay & Grain, LLC, para. 5 (c) provides that Lessees/Operators agree to comply with any statutes, administrative rules, or regulations, or terms and conditions of any programs or rights governing application or storage of water, fertilizers, herbicides or pesticides, preservation of wetlands, streambeds, water rights, discharge of manure, chemicals, wastes or effluents or land use regulation.

Seller further advises that the residence located on the Property was constructed in 1952, and that it is possible (but Seller does not have knowledge) that building materials used in the residence may have contained asbestos or foam insulation. Seller further advises that, in the past, there has been installation of a French drain on the south side of the residence to ameliorate excessive ground water which may have contributed to mold in the basement of the residence.

Seller further advises that Northwest Energy (formerly Montana Power Company) has power lines crossing the property in the vicinity of Oak Street and may have transformers or other equipment which may constitute "hazardous material," for which they may have liability. Seller makes no representation concerning such utility.

Seller advises that the Property is bordered on the south of Oak Street by Laurel Glen Subdivision, Flanders Creek Subdivision, and Rosa Subdivision and on the east by an 80-acre soccer field complex and a future high school. To the extent that such properties are "adjoining" or "upstream" from the property, Sellers are unaware of any "hazardous materials," but make no representation concerning such properties.

8

Statutory disclosures:

Mold Disclosure: There are many types of mold. Inhabitable properties are not, and cannot be, constructed to exclude mold. Moisture is one of the most significant factors contributing to mold growth. Information about controlling mold growth may be available from your county extension agent or health department. Certain strains of mold may cause damage to property and may adversely affect the health of susceptible persons, including allergic reactions that may include skin, eye, nose, and throat irritation. Certain strains of mold may cause infections, particularly in individuals with suppressed immune systems. Some experts contend that certain strains of mold may cause serious and even life-threatening diseases. However, experts do not agree about the nature and extent of the health problems caused by mold or about the level of mold exposure that may cause health problems. The Centers for Disease Control and Prevention is studying the link between mold and serious health conditions. The seller, landlord, seller's agent, buyer's agent, or property manager cannot and does not represent or warrant the absence of mold. It is the buyer's or tenant's obligation to determine whether a mold problem is present. To do so, the buyer or tenant should hire a qualified inspector and make any contract to purchase, rent, or lease contingent upon the results of that inspection. A seller, landlord, seller's agent, buyer's agent, or property manager who provides this mold disclosure statement, provides for the disclosure of any prior testing and any subsequent mitigation or treatment for mold, and discloses any knowledge of mold is not liable in any action based on the presence of or propensity for mold in a building that is subject to any contract to purchase, rent, or lease." Section 70-16-703, Mont. Code Ann.

Radon Gas Disclosure: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal guidelines have been found in buildings in Montana. Additional information regarding radon and radon testing may be obtained from your county or state public health unit. Section 75-3-606, Mont. Code Ann.

Noxious Weeds Disclosure: Buyers of property in the State of Montana should be aware that some properties contain noxious weeds. The laws of the State of Montana require owners of property within this state to control, and to the extent possible, eradicate noxious weeds. For information concerning noxious weeds and your obligations as an owner of property, contact either your local County extension agent or Weed Control Board.

Title to the Property. Seller has fee simple title to the Property. At Closing, there will be no unrecorded easements, "Property Rights" (as hereinafter defined), roadways, or other interests, claims, or liens affecting title to the Property, except as disclosed pursuant to the Contract. The Property is not subject to any agreement of lease, rent, sale, options, or other rights of third parties to use the Property or acquire any interest therein. For purposes of this Section 12(c), the term "Property Rights" will mean any and all rights, privileges, hereditaments or the like that affect or otherwise impact the Property and will include, but not be limited to, access rights, usage rights, water rights, rights-of-way in, on, across, in front of, contiguous to, abutting, adjoining or otherwise impacting the Property, mineral rights and air rights, except as may pertain to rights-of-way regarding Oak Street and Cottonwood-Harper Puckett Road. Lien rights of the IRS and lease rights of Bos Hay & Grain, LLC, and use by Seller may continue until Closing.

9

(c)   **Condemnation.** Seller has not received notice, nor does Seller have knowledge of the possible or anticipated condemnation of any part of the Property or the widening or change in grade of streets abutting the Property except as set forth in the proposed easement regarding the intersection of Cottonwood and Oak, and existing or proposed rights-of-way for Oak Street and Cottonwood-Harper Puckett Road.

(d)   **Full Disclosure.** Seller represents and warrants that there is no significant or adverse fact or condition relating to the Property or its use that has not been specifically disclosed in writing by Seller to Buyer.

14.   **REPRESENTATIONS AND WARRANTIES OF BUYER:**  Buyer hereby makes the following representations and warranties to Seller, which representations shall be true as of Closing and shall survive Closing for a period of one (1) year:

(a)   **Due Authorization.** The execution, delivery, and performance of this Contract by Buyer have been duly authorized by all necessary action on the part of Buyer. This Contract has been duly executed and delivered by Buyer, and assuming due execution and delivery of this Contract by Seller, constitutes the valid and binding obligation of Buyer, enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, moratorium, reorganization, or similar laws from time to time in effect that affect creditors' rights generally, and by legal and equitable limitations on the availability of specific remedies.

(b)   **Absence of Claims and Proceedings.** There is no claim, suit, action, arbitration, legal or other proceeding, or governmental investigation pending which affects the Buyer or its assigns and none are threatened of which Buyer has, or should have knowledge.

(c)   **Assignment.** Neither This Contract, nor any interest in the Contract, may be assigned, restricted, encumbered, subordinated or otherwise conveyed to a third party prior to Closing without five (5) days prior, written notice to Seller specifying the identity of the party to which assignment of any interest is contemplated and the material terms of such assignment. Buyer warrants that it will require any potential assignee of the Contract to agree to all terms of this Contract. Notwithstanding anything contained in this Contract to the contrary, Buyer may, without Seller's approval, assign this Agreement to an entity in which Buyer has an ownership interest.

15.   **NOTICES:**  Any notice required or permitted to be given hereunder shall be in writing and shall be deemed given (a) on the date delivered personally, (b) on the first business day after being deposited with a recognized overnight delivery service guaranteeing overnight delivery that requires signatures of recipients upon delivery and provides tracking services (e.g. Federal Express), or (c) two (2) business days after being deposited with the United States Postal Service, postage prepaid, certified, return receipt requested, and addressed as follows:

If to Seller, to:

        Baxter Ranch Holding LTD
        337 Bob White Lane
        New Braunfels, TX 78132

10



Estate of Vesta F. Anderson
c/o Michael B. Anderson
Anderson & Liechty, P.C.
P.O. Box 3253
Billings, MT 59103

Physical address:
TransWestern One, Suite 130
404 North 31st Street
Billings, MT 59101

If to Buyer, to:     Mr. Bryan Klein
                     PO Box 11890
                     Bozeman, Montana 59719

**16.    REMEDIES UPON DEFAULT:** If any party defaults in the performance of any obligation provided by this Contract, the party claiming a default shall notify the other party in writing of the nature of the default, and the time allotted for curing the default (if not otherwise specified in this Contract).

If the default is by Buyer, Seller shall be entitled, as its sole remedy, to terminate this Contract and retain the Earnest Payments as liquidated damages and not as penalty, in full satisfaction of any and all claims against Buyer hereunder and neither Buyer nor Seller shall have any further rights or obligations under the Contract. Seller and Buyer agree that Seller's damages resulting from Buyer's default are difficult, if not impossible, to determine and the Earnest Payments are a fair and acceptable estimate of those damages which is herein agreed to in an effort to cause the amount of such damages to be certain.

If default is by Seller, Buyer may release Seller from this Contract upon the Earnest Payments being paid to Buyer and the reimbursement to Buyer for all direct costs and expenses, as specified in Buyer's notice of default, including but not limited to, appraisal, inspection, title examination, survey, inspections, engineering, architectural and attorneys' fees. Buyer may elect, alternatively, to pursue any remedy at law or in equity.

**17.    REAL ESTATE COMMISSIONS:** Buyer and Seller are not represented by a licensed real estate broker. No commissions are to be paid by Buyer or Seller.

**18.    ATTORNEYS' FEES:** In the event a party brings an action or proceeding for a declaration of the rights of the parties or for any alleged breach or any other action arising out of this Contract or the transaction contemplated hereunder, the prevailing party in such action shall be entitled to an award of reasonable attorneys' fees, court costs, and expenses incurred in addition to any other damages or relief awarded, regardless of whether such action proceeds to final judgment. The provisions of this Section shall survive the termination of this Contract.

**19.    SEVERABILITY:** Whenever possible, each provision of this Contract and any related document shall be interpreted in such a manner as to be valid under Montana law. If any of the foregoing provisions are deemed to be invalid or prohibited under applicable law, such provisions

11

shall be ineffective to the extent of such invalidity or prohibition, without invalidating the remainder of such provision or the remaining provisions of this Contract or the related document.

20.    **BINDING EFFECT:** This Contract shall be binding on and shall inure to the benefit of the parties hereto, and their respective heirs, personal and legal representatives, successors, or assigns.

21.    **GOVERNING LAW:** This Contract shall be considered a contract for the sale of real property and shall be construed in accordance with the laws of the State of Montana. Venue for any legal action shall be Gallatin County, Montana.

22.    **WAIVER:** No claim or waiver, consent, or acquiescence with respect to any provisions of this Contract shall be made against any party hereto except on the basis of a written instrument executed by or on behalf of such party.

23.    **FURTHER ACTIONS:** Buyer and Seller agree to execute such further documents and take such further actions as may reasonably be required to carry out the provisions of this Contract or any agreement or document relating hereto or entered into in connection herewith.

24.    **SURVIVAL:** The covenants to be performed by the parties hereto after Closing and the representations and warranties of Seller and Buyer contained herein shall survive the execution and delivery of the deed from Seller to Buyer.

25.    **COUNTING DAYS:** Whenever it is provided in this Contract that days shall be counted, the first day to be counted shall be the day following the date on which the event causing the period to commence occurs. If the last day for the performance of any obligation or satisfaction or waiver of any condition or contingency under this Contract is a Saturday, Sunday or legal holiday in the State of Montana, then such last day shall be extended to the next business day.

26.    **ASSIGNMENT:** This Contract shall not be assignable by the Seller. Subject to the provisions of Paragraph 14(c) above, Buyer may assign this Contract without Seller's consent to an entity within which the Buyer has ownership.

27.    **ENTIRE AGREEMENT:** This Contract constitutes the ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO AND THERE ARE NO OTHER UNDERSTANDINGS, WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF, and may not be changed, modified or amended in whole or in part, except in writing signed by Buyer and Seller.

28.    **DEADLINE:** Unless the Contract is executed by Buyer and Seller and delivered Buyer prior to 5:00pm Mountain Daylight Time on August 3rd, 2018, this Contract will be void.

IN WITNESS WHEREOF, the parties have executed this Contract on the dates indicated below.

BUYER:

Bryan Klein

By: _~~~~~_

Date: 7.30.18

SELLER:

Baxter Ranch Holding LTD and Estate of Vesta F. Anderson

By: _Chris Miller Manager SDV Enterprises LTD_

Its: _General Partner_ 8/1/18

Estate of Vesta F. Anderson

By: _~~~~~_

Personal Representative

Date: 7/30/18

2100534_3.docx

13

Ex. 2, p. 67

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is entered into this _/_ day of July, 2018, by and between BAXTER RANCH HOLDINGS LTD (Collectively "Seller"), with a mailing address of 337 Bob White Lane, New Braunfels, Texas 78132, and ESTATE OF VESTA F. ANDERSON, with a mailing address of c/o Michael B. Anderson, Anderson & Liechty, P.C., P.O. Box 3253, Billings, MT 59103 ("Purchaser").

FOR VALUABLE CONSIDERATION, IT IS AGREED:

1.    **Description of Property.**  In consideration of the mutual covenants, conditions, representations, promises and agreements contained herein, Seller agrees to sell, assign and convey to Purchaser, and Purchaser agrees to purchase from Seller, certain real property located in Gallatin County, Montana, and more particularly described as follows:

> The real property owned by Seller as described on the attached Exhibit A, together with all fixtures and improvements of every nature and description; all water, water rights and ditch rights appurtenant thereto; all minerals and mineral rights owned by Seller and appurtenant to the property, including all right, title and interest in coal, oil, gas, gravel, royalties and royalty rights and other natural resources owed by Seller on or contained in the land, together with the rights and privileges of the dominant mineral estate; all timber and timber rights; all rights, title and interest, reversionary or otherwise, in and to all roads, easements, streets, and ways in, upon or bounding the real property; and rights of ingress and egress thereto (collectively referred to as the "Property").

2.    **Purchase Price.**  Purchaser agrees to pay Seller for the Property the total sum of $1,000,000.00 ("Purchase Price"), payable as follows:

(a)    $10,000.00 within five (5) business days of the execution of this Agreement ("Earnest Money") delivered to and held by Seller; and

(b)    $990,000.00 in cash funds upon the closing of this transaction.

In addition, Purchaser shall remit at the closing of the Klein Contract referenced below an additional amount of $ 14,610 to Seller which amount reflects Seller's share of an adjustment to the purchase price of the Klein Contract due to Seller that Purchaser has agreed to pay. Seller shall not return these funds to Purchaser in the event this Agreement fails to close.

3.    **Closing.**

A. This Agreement is expressly conditioned upon completion and final closing of the purchase agreement between Seller and Purchaser with Bryan Klein, Blackridge Company or assigns, (the "Klein Contract") by which Purchaser and Seller shall each receive one-half (1/2) of the closing

1



proceeds which are anticipated to be approximately Four Million Dollars ($ 4.0000,000.00).

B.  That in the event the Klein Contract fails to close, then this Agreement will be void and of no effect, and Seller will return the Earnest Money to Purchaser.

C.  That if the Klein Contract closes, Seller shall receive its 1,000,000.00 in exchange for a full and complete release of any and all claims in or to any real property, personal property assets or accounts of any and all property in which Seller currently holds an interest, and all such interest shall be conveyed and quitclaimed to Purchaser, provided that Seller shall keep all bank accounts of Seller.

D.  That closing of this Agreement shall occur only after (1) final closing and payment under the Klein Contract; (2) after payment in full of the IRS lien of Purchaser in the approximate amount of $ 3,000,000.00 or as otherwise specified by the United States or Department of Treasury; (3) after filing of a dismissal with prejudice of the outstanding foreclosure action filed by the United States against the Estate of Vesta F. Anderson, Baxter Ranch Holdings, Ltd., and Spencer N. Anderson, described above; (4) upon execution by Seller of a quitclaim deed of any and all of Baxter Ranch Holdings, Ltd. or the Estate of Mary Nelson to Purchaser and by the Estate of Mary Nelson through its authorized Personal Representative along with any other required realty transfer certificates, letters, documents or other writings required to complete this Agreement and convey all interest of Baxter Ranch Holdings Ltd. (less accounts of Baxter Ranch Holdings) or the Estate of Mary Nelson to Buyer.

E.  Notwithstanding paragraph D, the parties agree that the closing of this Agreement shall occur within three (3) business days following the issuance of an Order of Dismissal with Prejudice by the federal district court in United States District Court for the District of Montana, Butte Division, Case No. 2:18-CV-00021-SHE, entitled *United States of America, Plaintiff v. Estate of Vesta Fern Anderson; Spencer N. Anderson; Box Hay & Grain, LLC; and Baxter Ranch Holdings, Ltd.,* immediately following the closing of the Klein Contract.

Seller and Purchaser will deposit with the Closing Agent all instruments and monies necessary to complete the sale and purchase in accordance with this Agreement on the Closing Date. Each of the parties shall pay one-half of the closing fees of the Closing Agent. At the closing, Seller shall pay the cost of the title evidence required hereby, Purchaser shall pay the fees for recording and filing the conveyance documents.

4.    **Prorations.**  Seller has paid, or will pay at closing, all of Seller's 50% share of taxes and assessments on the Property for 2017 and previous years.  Taxes and assessments (including water assessments, if any) on the Property for 2018 shall be prorated between the parties as of the Closing Date based upon the most recent tax and assessment amounts.  Purchaser agrees to assume and pay all taxes and assessments on the Property for 2018 from and after the Closing Date and subsequent years.  Any taxes due for periods prior to the Closing Date shall remain the parties' joint obligation based upon the 50% ownership by each party.

5.    **Deeds and Documents of Transfer and Assignment.**  On or before the Closing Date, Seller shall execute and deliver to the Closing Agent a quitclaim deed, in a form acceptable to the Purchaser and Closing Agent, conveying fee simple title to the Property, with all tenements, fixtures, hereditaments and appurtenances thereunto belonging, to the Purchaser, free and clear of all liens, claims, encumbrances or exceptions whatsoever, except such as are approved or waived by the

2

Purchaser pursuant to Paragraph 7 of this Agreement. Seller shall also execute and deliver to Closing Agent on or before the Closing Date such further and such other documents and instruments as shall be deemed necessary or desirable by Purchaser as shall otherwise be required to fully and finally vest all right, title and interest in and to all Property to be conveyed to Purchaser hereunder and legal and actual access thereto, as provided in this Agreement.

Comment [ml]:

6.    **Permitted Exceptions.** The Property is sold and is to be conveyed subject to the following matters which will be permitted exceptions ("Permitted Exceptions") to the title conveyed from Seller to Purchaser:

    (a)    All building, use, zoning, sanitary and environmental laws, ordinances, maps, resolutions, regulations and restrictions of all governmental authorities having jurisdiction which affect the Fee Property and the use and improvements thereof, as approved by Purchaser.

    (b)    Any water, mineral or other rights previously granted to or reserved by other parties and any oil, gas and mineral leases of record.

    (c)    Lease between Purchaser and Seller and Bos Hay & Grain LLC.

7.    **Title Evidence.** The Parties agree that no title commitment shall be obtained nor a policy of Title Insurance shall be provided to Seller given that the Purchaser and Seller are both current owners of the property. Purchaser, at its expense, may obtain a title commitment.

8.    **Due Diligence.** The Parties agree that no due diligence period shall occur.

9.    **Possession.** Seller shall transfer possession of the Property to Purchaser on the Closing Date.

10.    **Seller's Representations and Warranties.** Seller represents, warrants and covenants with Purchaser that as of the execution of this Agreement and on the Closing Date, each of the following is and shall be true and correct:

    (a)    **Authority and Authorization.** Seller has all requisite power and authority to (i) enter into this Agreement and to execute and deliver the quitclaim deed and all other documents and instruments to be delivered to Purchaser hereunder, and (ii) carry out the transactions contemplated hereby. The execution and delivery of this Agreement and the performance of Seller's obligations hereunder are duly authorized, and no third party consents are required. This Agreement, upon execution and delivery by Seller, constitutes a legal, valid and binding obligation of Seller, enforceable against the Seller in accordance with its terms.

    (b)    **Other Agreements Relating to Property.** Seller is not in default under any agreements relating to the Property. Seller is not aware of any claims, demands, defenses or offsets against the Property or the Seller in connection therewith.

3

(c)    Use of Ranch Property.  Seller is not aware of any restrictions, actual or proposed, upon the Property that would limit Purchaser's use of the Property, other than laws of general application.  There are no other parties in possession of any part of the Property, except (1) pursuant to that lease between Purchaser and Seller and Bos Hay & Grain LLC and (2) that a portion of the Property is held as an undivided one-half interest in real property which is possessed in co-tenancy with the other owners.

(d)    Easements; Right of Entry.  Except for the lease between Purchaser and Seller and Bos Hay & Grain LLC, easements of record and public roads, Seller has not agreed to permit or otherwise authorize any individual or entity, other than that granted under the Klein Contract, to have access to or given the right to utilize the Property for ingress and egress to or from any other real property, or for hunting, fishing, grazing or any other purpose, which permission or authorization has a term extending beyond the Closing Date.  Further, to the best of Seller's knowledge, there are no oral or written easements or rights of way which have been acquired by prescription or which are otherwise not of record with respect to the Property, and there are no disputes, disagreements, claims or actions, of which Seller has notice or knowledge, with respect to easements and rights of way, the location of any fences or boundary monumentation and no third party claims any interest in the Property by possession thereof.

(e)    Water Rights.  There has been no conveyance, by Seller or otherwise, of Water Rights appurtenant to the Property to third persons and to the best of Seller's knowledge, there are no restrictions on the right to appropriate and use surface and subsurface waters for irrigation, stock watering and domestic use, necessary and desirable, to carry on a ranching operation and multiple residential dwellings on the Property, other than the restrictions and/or conditions imposed under or pursuant to Federal and State laws of general application.

(f)    No Violation of Regulations or Laws.  Seller has no knowledge or notice of any violation of any applicable regulation, law or order relating to any material respect to the Property, nor does Seller have knowledge of any notice from Gallatin County, the State of Montana, or the United States government or any other governmental authority of any (i) pollution, health, safety, fire environmental or building code violations with respect to the Property; (ii) a possible condemnation of any part of the Property; or (iii) the construction of public improvements or the imposition of any special taxes or assessments upon all or any part of the Property.

(g)    Pending Claims.  To the best knowledge of Seller, there are no claims, actions, proceedings or governmental investigations pending or threatened against or involving Seller or Seller's agents or employees alleged to have been acting in the course and scope of the business of Seller, in connection with the Property or against or involving any of the Property; nor to the best knowledge of Seller is there any reasonable basis for any such claim, litigation, proceedings or other governmental investigation.

4

**Ex. 2, p. 71**

11.     **Purchaser's Representations and Warranties.** Purchaser represents, warrants and covenants with Seller that as of the execution of this Agreement and on the Closing Date, each of the following is and shall be true and correct:

(a)     Purchaser is duly organized, validly existing and in good standing under the laws of the State of Montana. Purchaser has taken all action necessary to authorize its execution and performance of this Agreement, and the officer executing this Agreement on behalf of Purchaser has been duly authorized and directed to do so by Purchaser. Purchaser has full power and authority to enter into this Agreement and to carry out the transactions contemplated by this Agreement. This Agreement is, and Purchaser's other instruments when executed and delivered by Purchaser in accordance with the terms hereof will be, legal, valid and binding obligations of the Purchaser and enforceable in accordance with their terms, except as the same may be affected by bankruptcy, insolvency, moratorium or similar laws, or by legal or equitable principles relating to or limiting the rights of contracting parties generally.

(b)     Save and except for an action filed against Purchaser and Seller in United States District Court for the District of Montana, Butte Division, Case No. 2:18-CV-00021-SHE, entitled *United States of America, Plaintiff v. Estate of Vesta Fern Anderson; Spencer N. Anderson; Bar Hay & Grain, LLC; and Baxter Ranch Holdings, Ltd.,* there is no legal action, suit, arbitration, governmental investigation or other legal or administrative proceeding, nor any order, decree or judgment in progress, pending or in effect, or, to the knowledge of Purchaser, threatened against or relating to Purchaser in connection or relating to the transaction contemplated by this Agreement, and Purchaser does not know or have any reasons to be aware of any basis for the same;

(c)     The performance by Purchaser of Purchaser's obligations hereunder will not violate or constitute an event of default under the terms or provisions of any agreement, document or instrument to which Purchaser is a party or by which Purchaser is bound and which would materially adversely affect the ability of Purchaser to perform its obligations under this Agreement.

12.     **Conveyance Documents.**

(A)     Seller agrees to execute and deliver (or cause to be executed and delivered) to Purchaser at or prior to Closing the following (the "Conveyance Documents"):

(1)     A quitclaim deed conveying ownership of the Property;

(2)     A realty transfer certificate, including a water right transfer for transfer of all water rights and water rights claims appurtenant to the Property;

(3)     A closing statement, in a form and substance satisfactory to Closing Agent; and

5

Ex. 2, p. 72

(4) All other documents and writings necessary or desirable to effectuate the transactions contemplated by this Agreement.

(B) Purchaser agrees to execute and deliver a closing statement in a form and substance satisfactory to Closing Agent and all other documents and writings necessary or desirable to effectuate the transactions contemplated by this Agreement.

13. **Preservation of Property.** During the term of this Agreement, Seller shall prevent and refrain from using or permitting others to use the Property for any purpose or in any manner or enter into any agreements which would adversely affect the Purchaser's intended use or condition of the Property. In the event of such materially adverse use or agreement, Purchaser may, without liability, refuse to close the purchase of the Property, in which event the Earnest Money, together with accrued interest, shall be refunded to Purchaser.

14. **Risk of Loss and Damage.** In the event that prior to Closing any loss or damage to the Property occurs which materially adversely affects the intended use, condition or value of the Property to Purchaser, Purchaser may, without liability, terminate this Agreement, in which event the Earnest Money, together with accrued interest, shall be refunded to Purchaser; or Purchaser alternatively may elect to close the purchase upon the condition that there be an equitable adjustment of the Purchase Price at or prior to closing, based on the change in circumstance.

15. **Independent Investigation.** Purchaser enters into this Agreement in full reliance upon Purchaser's independent investigation and judgment, and neither Seller nor Seller's agents or attorneys make any warranties or representations to Purchaser about the Property except as specifically stated herein. There are no verbal or other agreements which modify or affect this Agreement.

16. **Broker.** The parties represent and warrant each to the other that they have not dealt with any real estate broker, salesperson or finder in connection with the transactions contemplated hereby. Each party agrees to indemnify, defend and hold the other harmless from and against any and all loss, costs, liability or expense, including but not limited to reasonable attorney fees, suffered or incurred by the other party/parties as a result of a claim or claims for brokerage commission, finder's fees or other similar fees from any party or firm which is based on the action or omission of the party in breach of the above.

17. **Notices.** All notices and other communications required or permitted to be given under this Agreement shall be in writing and shall be served personally or sent by certified or registered United States mail, return receipt requested, postage prepaid, to the addresses of the parties set forth on the first page of this Agreement or to the attention of such other person as either party may designate by notice to the other pursuant hereto. Each notice shall be deemed to have been given on the date deposited in the United States mail as provided above or on the date personally delivered.

18. **Entire Agreement.** This Agreement and the documents and agreements referenced herein embody and constitute the entire understanding between the parties with respect to the transaction contemplated herein, and all prior or contemporaneous negotiations, communications,

6

**Ex. 2, p. 73**

conversations, understandings and agreements between the parties, oral or written, are merged into this Agreement.

19.   **Binding Effect.**  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, personal and legal representatives, successors and assigns.

20.   **Severance.**  Should any portion of this Agreement be declared invalid and unenforceable, then such portion shall be deemed to be severed from this Agreement and shall not affect the remainder hereof.  Notwithstanding the foregoing, in the event Purchaser, in good faith, deems any such unenforceable or invalid portion of this Agreement to be material, Purchaser may elect to terminate this Agreement, in which event the entire Earnest Money and interest thereon shall be returned to Purchaser.

21.   **Amendment Waiver.**  No provision of this Agreement may be amended, waived or otherwise modified without the prior written consent of all the parties hereto.  No waiver of default by any party shall be implied from any omission by a party to take action on account of such default if such default persists or is repeated, and no express waiver shall affect any default other than the default specified in the express waiver, and then only for the time and to the extent therein stated.  One or more waivers of any covenant, term or condition of this Agreement by a party shall not be construed to be a waiver of any subsequent breach of the same covenant, term or condition.  The consent or approval by any party shall not be deemed to waive or render unnecessary the consent or approval of said party of any subsequent or similar act.

22.   **Termination of Contract.**  In the event that the closing provided for under the Klein Contract does not occur as set forth in the Klein Contract, this Agreement will be terminated and Seller shall return the Earnest Money to Purchaser.

23.   **Headings.**  Headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

24.   **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed by facsimile or electronic signature, which shall be deemed original signatures.

25.   **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Montana.

26.   **Time.**  Time is of the essence as to every term and condition of this Agreement.

27.   **Attorney Fees.**  Should either party incur any costs or expenses, including reasonable attorney fees, in enforcing any provision of this Agreement, then the unsuccessful party shall reimburse the prevailing party on demand for all such costs or expenses.

28.   **Further Assurances.**  The Purchaser and Seller agree to execute and deliver, without additional consideration, such further assurances, instruments and documents, and to take such further actions as the Purchaser or Seller may request and as may be necessary in order to fulfill the intent of

7

this Agreement and the transactions contemplated hereby and fully vest title to and possession of the Property in Purchaser.

29. **Noxious Weeds Disclosure Statement.** Montana Code Annotated § 7-22-2116 provides that it is unlawful for any person to permit any noxious weeds to propagate or go to seed on the person's land, with the exception stated in the statute. The parties recognize that there are noxious weeds on farm and ranch lands in Montana and may exist on the Property.

30. **Water Right Ownership Update Disclosure.** Under Montana law, failure of the parties at a closing or other transfer of real property to pay the required fee to the Montana Department of Natural Resources and Conservation for updating water right ownership may result in the transferee of the property being subject to penalty. Additionally, in the case of water rights being exempted, severed or divided, failure of the parties to comply with Mont. Code Ann. § 85-2-424 could result in a penalty against the transferee and rejection of the deed for recording. Seller makes no warranty regarding the validity, extent or transferability of any water or ditch rights conveyed pursuant to this Agreement.

31. **Remedies Upon Default.** If any party defaults in the performance of any obligation provided by the Agreement, the party claiming default shall notify the other party in writing of the nature of the default.

If the default is by Purchaser, Seller shall be entitled, as its sole remedy, to terminate this Contract and retain the Earnest Money as liquidated damages and not as penalty, in full satisfaction of any and all claims against Purchaser hereunder and neither Purchaser nor Seller shall have any further rights or obligations under the Contract. Seller and Purchaser agree that Seller's damages resulting from Purchaser's default are difficult, of not impossible, to determine and the Earnest Monies is a fair and acceptable estimate of those damages which is herein agreed to in an effort or cause the amount of such damages to be certain.

If default is by Seller, Purchaser shall release Seller form the Contract upon the Earnest Money being paid to Purchaser and the reimbursement to Purchaser of all direct costs and expenses, as specified in Purchaser's notice of default, including but not limited to, appraisal, inspection, title examination, survey, inspections, engineering, architectural and attorneys' fees.

32. **Assignment.** This Agreement shall not be assignable by Purchaser without the consent of the Seller.

IN WITNESS WHEREOF, this Agreement was executed the day and year first above written.

"SELLER"                                "PURCHASER"

BAXTER RANCH HOLDINGS LTD               ESTATE OF VESTA F. ANDERSON
BY:_____            BY:_____
TITLE:_____            TITLE:_____

"SELLER"                              "PURCHASER"

BAXTER RANCH HOLDINGS LTD            ESTATE OF VESTA F. ANDERSON
BY: _Ann Middler_                    BY: _____
TITLE: _Manager SDV Enterprise LTD_  TITLE: _Personal Representative_
_General Partners_

9

Ex. 2, p. 76

# AGREEMENT

THIS AGREEMENT entered into by and between Spencer N. Anderson, individually and as Personal Representative for the Estate of Vesta F. Anderson, on behalf of the beneficiaries of the Estate of Vesta F. Anderson.

## RECITALS

WHEREAS, the property generally known as the "Baxter Ranch" was inherited in undivided ownership by Vesta F. Anderson and Mary Baxter Nelson, as heirs of the Estate of R. George Baxter and has been held in undivided ownership. The parties understand and believe that Mary Baxter Nelson, as Limited Partner, entered into an Agreement of Limited Partnership known as Baxter Ranch Holdings, Ltd., with 5DV Enterprises, L.L.C., a Texas limited liability company, as General Partner. The Estate of Vesta F. Anderson owns an undivided one-half (½) ownership interest and Baxter Ranch Holdings Ltd. holds an undivided one-half (½) interest in the Baxter Ranch property;

WHEREAS, the remaining Baxter Ranch property presently consists of approximately 560 acres, including the acreage anticipated to be sold to Bryan Klein (or assigns) and or an L.L.C. in which Klein will serve as Managing Member, ("Klein/Blackridge Contract") described herein;

WHEREAS, the Anderson Estate has paid One Million Nine Hundred Thirty Six Thousand Three Hundred Sixty Two and 13/100 Dollars ($ 1,936,362.13) in taxes, penalties and interest through January 3, 2018, as set forth in "Attachment 1";

WHEREAS, on March 14, 2018, the United States of America filed in U.S. District Court for the District of Montana, Butte Division, Cause No. CV-18-21-BU-SHE, a Complaint to Reduce Federal Estate Tax Assessments to Judgment and Foreclosed Tax Liens against the Estate of Vesta Fern Anderson; Spencer N. Anderson; Bos Hay & Grain, LLC; and Baxter Ranch Holdings Ltd., Defendant. The Complaint alleges estate tax due of $ 2,982,877.04 as of June 30, 2018, plus pre-judgment and post-judgment interest and penalties until paid;

WHEREAS, the United States Attorney has provided a preliminary commitment to release its claimed lien and *lis pendens* for taxes, penalties and interest upon payment of approximately $ 2,982,877.04 and to dismiss its lawsuit with prejudice in a letter dated August 9, 2018, as set forth in "Attachment 2";

WHEREAS, the Anderson Estate (the Estate) and Baxter Ranch Holdings, Ltd. (Baxter) timely filed Answers and Affirmative Defenses in the foreclosure case. Bos Hay & Grain, LLC has filed a Disclaimer of Interest and Stipulation; the United States has filed Notice of Voluntary Dismissal, and the Court issued a Remark dated July 17, 2018 in which Bos Hay & Grain L.L.C. has been dismissed from the case without further Order of the Court;

1



PLAINTIFFS' EXHIBIT

D

Ex. 2, p. 77

WHEREAS, the Estate, through its Personal Representative, Spencer N. Anderson has undertaken efforts to sell sufficient properties in order to satisfy the foreclosure action and tax lien, as set forth in "Attachment 1";

WHEREAS, Bryan Klein (or assigns), as "Managing Member" for Blackridge Company, LLC or entities to be formed in which he will serve as "Managing Member, has submitted the proposed "Klein/Blackridge Contract" to purchase 160.36 acres (less 1.53 acres which is subject to an agreement to be negotiated with Bozeman School District No. 7/City of Bozeman for an easement for construction of a round-about) located in the southwest quadrant of the intersection of Baxter Lane and Harper Puckett Road also described as S04, T02, R05E, COS 2552, Tract 5 NE4 ("Subject Property") for the approximate sale price of Seven Million Nine Hundred Eighty Thousand and No/100 Dollars ($ 7,980,000.00). The executed "Klein/Blackridge Contract" is set forth as "Attachment 3";

WHEREAS, the Estate has agreed to pay Baxter Ranch Holdings Ltd. the sum of Fourteen Thousand Six Hundred Ten and no/100 Dollars ($ 14,610) as its 50% share of the difference between the reduction in the "Klein/Blackridge Contract" for a 2-acre sale instead of the anticipated 1.53-acre sale to the Bozeman School District No. 7/City of Bozeman;

WHEREAS, Baxter Ranch Holdings, Ltd. upon closing of the "Klein/Blackridge" Contract" desires to divest itself of any and all of its undivided ownership interest in any of the "Baxter Ranch" property and convey its interest to the Estate of Vesta F. Anderson for the additional consideration of One Million Dollars ($1,000,000.00), as set forth in the attached "Baxter Ranch Holdings, Ltd. Purchase and Sales Agreement" ("Baxter Holdings Agreement, "Attachment 4");

WHEREAS, Baxter Ranch Holdings, Ltd. has insisted that, as a condition of its acceptance of the "Klein/Blackridge Contract" that it receive payment of an additional $ 1 million from the Estate;

WHEREAS, the Personal Representative has determined that it is in the best interest of the Estate to agree to pay Baxter, One Million Dollars ($1,000,000.00) after closing of the "Klein/Blackridge Contract," and the terms set forth in the "Baxter Holdings Agreement;"

WHEREAS, the Personal Representative offered the Estate of Vesta Fern Anderson beneficiaries an opportunity to accept, on an individual contribution by each beneficiary the "Baxter Holdings" $ 1 million offer. The beneficiaries were either unable or unwilling to commit to pay the $ 1 million asking price of Baxter Ranch Holdings;

WHEREAS, given that the Estate of Vesta Fern Anderson and the Anderson beneficiaries will benefit by the Estate's acceptance of the "Baxter Holdings Agreement." Among such benefits are:

Baxter Holdings has conditioned its acceptance of the "Klein/Blackridge Contract" on acceptance of the "Baxter Holdings Agreement;"

2

The beneficiaries of the Estate and counsel were advised and neither objected nor consented to the Personal Representative taking any necessary action to obtain the funds necessary for the Estate to accept the Baxter Ranch Holdings, Ltd.'s condition; and that acceptance of the Baxter Ranch Holdings, Ltd.'s offer was in the best interest of the Estate and essential to the ability of the Estate to satisfy its obligations to the IRS;

The closing of the "Klein/Blackridge Contract" is essential for the satisfaction of the Estate's obligation for the IRS lien;

The offer of the Personal Representative, in his individual capacity to the Estate, was the only available and feasible means by which the Estate would have been able to consummate the proposed "Klein/Blackridge" and "Baxter Ranch Holdings" agreements;

The beneficiaries were also advised and authorized acceptance of the "Baxter Holdings Agreement" by the Estate and thereby end undivided ownership interest, simplifying present and future undertakings with respect to the Baxter Ranch property;

Acceptance of the "Baxter Holdings Agreement" consolidates ownership of the property in local owners who are descendants of Vesta Fern Anderson; and

Acceptance of the "Baxter Holdings Agreement" represents the sole, known and feasible offer to avoid IRS foreclosure and sale, and dismissal of the pending federal case.

**WHEREAS**, the Personal Representative disclosed to the beneficiaries of the Estate his willingness and financial capacity to obtain and provide the funds necessary and to assume the risks associated with the financial ability of the Estate to accept the "Baxter Holdings Agreement", including having received a loan commitment in an amount sufficient to finance and fund payment of the "Baxter Holdings Agreement" for the Estate;

**WHEREAS**, a condition of the commitment to advance funds sufficient to accept the "Baxter Holdings Agreement" the lender requires that its loan to Spencer Anderson be secured by an aliquot parcel of forty (40) acres satisfactory to the Bank of the Rockies from his interest as successor to Baxter Ranch Holdings Ltd's undivided one-half ownership interest in the Baxter Ranch Property, until such time as the loan principal plus associated interest and costs are paid. Such aliquot portion represents a fraction of the undivided interest to be conveyed by Baxter Ranch Holdings, Ltd., and frees the remaining undivided interest from any claimed security interest.

**WHEREAS**, Spencer N. Anderson, as Personal Representative and individually, desires to enter into an agreement with the Estate of Vesta Anderson on behalf of the Anderson

3

beneficiaries to memorialize this transaction;

**WHEREAS**, the parties intend all recitals contained herein to be an integral part of this Agreement;

**THEREFORE, IN CONSIDERATION OF THE MUTUAL PROMISES, COVENANTS, AND CONDITIONS CONTAINED HEREIN AND OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND ADEQUACY OF WHICH IS ACKNOWLEDGED, THE PARTIES AGREE AS FOLLOWS:**

1.    It is in the best interests of the heirs and beneficiaries of the Anderson Estate that Spencer N. Anderson, as Personal Representative of the Estate, execute this Agreement upon the following terms and conditions:

   A.  That the purchase and sale agreement between Baxter Holdings, Ltd. and the Estate of Vesta F. Anderson is expressly conditioned upon completion and final closing of the Klein/Blackridge Contract by which the Estate of Vesta Fern Anderson and Baxter Holdings, Ltd. shall each receive one-half (½) of the closing proceeds, which are anticipated to be approximately Three Million Four Hundred Ninety Thousand Dollars ($ 3,490,000.00), subject to payment of $14,610 as and for payment of an adjustment in the "Baxter Holdings Agreement" with the Estate, to reflect the payment of $ 14,610 to Baxter Ranch Holdings, Ltd. for the share of the Estate at closing. Such amount is intended to reflect Baxter Ranch Holding, Ltd.'s undivided one-half (2) share of the adjustment in acreage and price in the "Klein/Blackridge Contract" for the 1.53 acres contained in the round-about easement;

   B.  That in the event the Klein/Blackridge Contract fails to close then the Baxter Holdings, Ltd. Agreement shall be void and of no effect and this Agreement shall be void and of no effect;

   C.  That if the "Klein/Blackridge Contract" closes, then the Estate of Vesta Fern Anderson shall pay Baxter Holdings, Ltd. $1,000,000.00, which funds are to be provided by Spencer N. Anderson, in exchange for a full and complete release and conveyance of any and all interest of Baxter Holdings, Ltd. or the Estate of Mary Nelson in or to their interest in the Baxter Ranch Property;

   D.  That closing of the Baxter Holdings Agreement shall occur only after the following conditions have been satisfied:

      (1) Closing and payment of the Klein/Blackridge Contract;

      (2) Payment of the outstanding IRS lien in the approximate amount of $2,982,877.04 or as otherwise specified by the United States or Department of Treasury, and satisfaction of its lien and release of its *lis*

4

*pendens*;

(3) Filing of a dismissal with prejudice of the outstanding foreclosure action filed by the United States against the Estate of Vesta F. Anderson, Baxter Holdings Ltd., and Spencer N. Anderson, individually, described above; provided that funds payable to the Estate of Vesta F. Anderson are sufficient to pay such taxes, interest and/or penalties as may be due, or upon compromise of such amounts between the Estate of Vesta F. Anderson and the United States;

(4) Execution of a Quitclaim Deed or other satisfactory deed of conveyance of any and all interest of Baxter Ranch Holdings, Ltd., and the Estate of Mary Nelson, if required, in the Property, along with any other required realty transfer certificates, letters, documents or other writings required to complete the transaction and convey all of Baxter Holdings Ltd.'s (or the Estate of Mary Nelson's) interest in the Baxter Ranch properties;

E.  Conveyance by the Estate of Vesta Anderson, through its Personal Representative, of the Baxter Ranch Holdings' interest in the "Baxter Ranch" properties to Spencer N. Anderson, individually and designation of a specific aliquot portion or portions for securing the loan to the Bank of the Rockies.

2.      The parties further acknowledge and agree that Spencer N. Anderson has individually paid $10,000.00 earnest money, and received a commitment for a personal loan for $990,000.00, for a total of $1,000,000.00 to be paid to Baxter Ranch Holdings, Ltd. in consideration for all of its claims or interests in the "Baxter Ranch" properties;

3.      Upon closing of (1) the "Klein Blackridge Contract" and (2) the "Baxter Ranch Agreement," the Estate will convey to Spencer N. Anderson the undivided interest of Baxter Ranch Holdings, Ltd. including designation of a specified aliquot portion of forty (40) acres required to secure the loan advanced by Bank of the Rockies;

4.      Spencer N. Anderson, individually, shall be responsible for all payments, including fees, costs, late penalties or other expenses, associated with repayment of the loan proceeds advanced by the Bank of the Rockies.

5.      Spencer N. Anderson, as Personal Representative for the Estate, may exercise reasonable efforts to sell property held by the Estate of Vesta Fern Anderson, subject to the following conditions:

A.  That Spencer Anderson may apply sale proceeds from property sales acquired under the "Baxter Holdings Agreement" toward the balance of Bank of the Rockies loan;

5

B.  That Spencer N. Anderson may use reasonable efforts to obtain the highest available market price, given market conditions.

C.  The Estate may seek to partition the remaining "Baxter Ranch" property among the four (4) Anderson heirs.

6.  In the event of partition of the interests of the named beneficiaries, each shall be solely and individually responsible for payment of any and all taxes, including but not limited to, capital gains taxes, income taxes required to be paid to the United States Treasury or Montana Department of Revenue or state and local taxes as to their individual properties.

7.  The parties further understand, acknowledge and agree that market values are subject to change based upon the national local economy, local real estate prices, and other variables or changes beyond the control of the parties which may increase or decrease the value of any or all of the "Baxter Ranch" Property.

8.  The parties hereby consent to the terms and conditions of this Agreement.

9.  The parties further acknowledge that receipt of a copy of this Agreement, have read and accept its terms, and consent that it represents fair disclosure of any substantial conflict of interest as contemplated under Section 72-3-615, MCA.  Acceptance of the Baxter Holdings, Ltd. offer is in the best interest of the Estate, and court approval is waived.

10.  The Agreement shall be binding upon the parties, their successors, personal representatives, heirs, devisees, beneficiaries, and assigns.

11.  Merger/Integration.  The parties hereby agree that all prior representations, discussions or communications of any kind shall be and are hereby integrated and merged into this Agreement which forms the final and complete understanding and agreement of the parties.

12.  This Agreement shall be governed and construed in accordance with the laws of the State of Montana.

13.  Any modification or amendment of this Agreement shall be in writing, signed by the parties, or their lawful representatives.

WHEREFORE, the parties hereby agree to the foregoing terms and conditions on the 23 day of August, 2018.

_____
Spencer N. Anderson, Individually

6

Estate of Vesta F. Anderson

By: _____

Spencer N. Anderson,
         Personal Representative

Approved:

_____          _____
Mary L. Donaghy                      Michael B. Anderson
Date: _____           Date: _____

_____          _____
Christin E. Seifert                  Lisa C. Perkins
Date: _____           Date: _____

Approved as to form:
Michael B. Anderson, attorney for the Estate.
Ralph W. Steele, attorney for Spencer N. Anderson, individually
Susan B. Swimley, attorney for Christin E. Seifert.

7

**IRS Transcript**
**Payments**

| 12/17/12 | Sale of Cherry residence | 190,669.40 |
|---|---|---|
| 04/01/13 | Levy | 52,422.28 |
| 04/15/13 | Levy - Rocky Mtn Bank | 119,751.64 |
| 07/02/14 | Sale of 40-acre - high school | 553,000.00 |
| 07/30/14 | Sale of 80-acre - Soccer | 997,518.81 |
| 01/03/17 | Levy - Bos lease | 11,500.00 |
| 01/05/18 | Levy - Bos lease | 11,500.00 |
| | | 1,936,362.13 |
| | | |
| | | |

Attachment 1

Ex. 2, p. 84



**U.S. Department of Justice**

**Tax Division**

*Trial Attorney: Ryan S. Watson*
*Attorney's Direct Line: 202-514-5173*
*Fax No. 202-307-0054*
*Ryan.Watson@usdoj.gov*

*Please reply to:*  *Civil Trial Section, Western Region*
*P.O. Box 683*
*Washington, D.C. 20044*

RSZ:RW.RSWatson
DJ 5-44-2046
CMN 2018100105

**August 9, 2018**

<u>Via Email</u>
Michael B. Anderson
Anderson & Liechty, P.C.
404 N. 31st Street, Suite 130
Billings, MT 59103
manderson@al-llaw.com

Re:   *United States v. Estate of Vesta F. Anderson, et al.*
       D. Mont. 2:18-cv-00021-SEH

Dear Mr. Anderson:

I am writing in response to your request that the United States provide you with confirmation that the property to be transferred under the August 1, 2018 Real Estate Sale Contract ("the Contract"), will be discharged from the United States' federal tax liens upon the sale of the property and the payment of Vesta F. Anderson's Estate's ("the Estate's) 2006 federal estate tax liabilities in full.

Based on our previous discussions, it is our understanding that the sale is expected to close by December 31, 2018. The total 2006 estate tax due, as of December 31, 2018 will be $2,982,877.04. Upon the receipt of $2,982,877.04 on or before December 31, 2018, the United States will release its liens and *lis pendens* against the property described in the Contract and dismiss the above-referenced lawsuit, with prejudice. If the closing is expected to occur after December 31, 2018, you must contact me for a new payoff amount. Also, upon request, the United States will revise this commitment letter to provide a more accurate payoff in the event payment will be received on a date earlier than December 31, 2018.

The payment may be made out to "U.S. Department of Justice" and sent via FedEx or UPS to:

Department of Justice, Tax Division
ATTN: TAXFLU
Room 6647 – Judiciary Center Building
555 4th Street NW
Washington, D.C. 20001

Attachment 2

Ex. 2, p. 85

August 9, 2018
Page - 2 -

The check should make reference to the "The Estate of Vesta F. Anderson" and also reference "CMN2018100105. If you would prefer to wire the funds, I will arrange for those instructions to be provided to you.

If you have any questions, please feel free to call me at 202.514.5173 or email me at ryan.watson@usdoj.gov. Thank you for your attention to this matter.

Sincerely yours,

RYAN S. WATSON
Trial Attorney
U.S. Department of Justice
Civil Trial Section, Western Region

Enclosures:

    Payoff Calculation

cc (via email) w/ enclosures:

    Brad Stratton
    American Land Title Co.
    brad@altc.biz

    Jared M. Le Fevre
    jlefevre@crowleyfleck.com

Payoff Calculator                                                      Page 1 of 1

**PAYOFF CALCULATOR**      Name: VESTA F ANDERSON ESTATE    SSN: [ ]6124V

Calculation Result Based on INTST

| MFT | Tax Period | Assessed Tax/Penalty | 12/31/2018 (Target Date) | | | 01/30/2019 (Target Date + 30 Days) | | | IDRS Cond |
|---|---|---|---|---|---|---|---|---|---|
| | | | Total FTP | Total Interest | Balance | Total FTP | Total Interest | Balance | |
| 52 | 000000 | 1,196,278.87 | 497,642.98 | 1,288,955.19 | 2,982,877.04 | 497,642.98 | 1,288,955.19 | 2,982,877.04 | COMPU HOLD O INTERE UNREVE TC 340 341 MF STA CODE 1 |

Print | Close | Return to Calculator

Ex. 2, p. 87

CLERK OF THE
DISTRICT COURT
TERRY HALPIN

2019 FEB 15 PM 1 26

FILED

47

## MONTANA THIRTEENTH JUDICIAL DISTRICT COURT
## YELLOWSTONE COUNTY

DEPUTY

IN THE MATTER OF THE ESTATE OF )
                           )      Probate No. DP 06-072

VESTA F. ANDERSON,           )

                         )      Judge:   Rodney Souza

           Deceased.       )

                         )

### STIPULATION

This Stipulation arises out of a hearing on January 30, 2019 before the honorable Rodney Souza with the parties represented by counsel; the Personal Representative, Spencer Anderson represented by Mike Anderson for the Estate, Andrew Billstein for the Personal Representative and Ralph Steele for the Personal Representative individually, Lisa Perkins represented by Leah Corrigan and Christin Seifert represented by Susan Swimley; Mary Donaghy received Notice of Hearing but made no appearance or objection; Mike Anderson received Notice of Hearing but made no appearance on his own behalf nor lodged objection.

The Personal Representative, under questioning by counsel for the Estate Mike Anderson presented evidence in support of his *Petition to Approve*

1



PLAINTIFFS' EXHIBIT

E

Ex. 2, p. 88

*Transactions pursuant to Montana Code Annotated Section 72-3-615,* and prior to the presentation of evidence or argument by counsel for beneficiaries Lisa Perkins or Christin Siefert, the parties and the Court agreed[1] to suspend the hearing to allow for agreement in writing to the stipulations set forth herein.

The parties entered into the following stipulation:

A.    The parties stipulate and agree that the Court should enter the Order Approving Transactions and for Judicial Mediation filed herewith which has been approved as to form and content by the Parties.

B.    The parties stipulate and agree that the Order approving the transactions shall not be used to preclude the beneficiaries of the Estate of Vesta Anderson from bringing any and all existing or future claims against Spencer Anderson, whether in his capacity as Personal Representative or in his individual capacity, for breach of fiduciary duty or any other legally recognized statutory or common law claim, whether arising out of the transactions approved in the Order, preceding the transactions approved in the Order, and subsequent to the transactions approved in the Order and issuance of the Order shall not constitute a defense to any such claim.

---

[1] The Court summarized on the record the verbal agreement made by the parties, and directed counsel for the parties to prepare an agreed stipulation and proposed order reflecting the verbal agreement.

Ex. 2, p. 89

The parties agree that the beneficiaries shall not have the right to void the transaction between Spencer Anderson and the Estate contemplated by Exhibit C *Petition to Approve Transactions pursuant to Montana Code Annotated Section 72-3-615.*

C.    The parties to this stipulation shall participate in good faith, appearing in person, in a Judicial Mediation for the purpose of resolving disputes arising out the of Exhibit C *Petition to Approve Transactions* and allegations of violations of fiduciary obligations arising therefrom to be conducted by a retired Montana District Court Judge at an agreed location in Billings, Montana.    The Court will notify the parties within approximately ten (10) days upon its selection of the Judicial Mediator and the parties shall arrange the Judicial Mediation of all issues arising out this Estate matter with the Judicial Mediator within a reasonable period of time and subject to the Judicial Mediator's schedule and directive to the parties.

D.    The parties hereby stipulate and agree to the terms and conditions of this stipulation which is incorporated into the Order Approving Transactions and for Judicial Mediation.

[signatures to follow]

3

Dated this ____ day of February, 2019.

_____          _____
Michael B. Anderson                 Susan B. Swimley
Attorney for the Estate             Attorney for Christin Seifert

_____          _____
Ralph W. Steele                     Leah K. Corrigan
Attorney for Spencer Anderson,      Attorney for Lisa Perkins
Individually

_____
Andrew T. Billstein
Attorney for Spencer Anderson,
Personal Representative

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was duly served by mail/inter-office delivery upon the parties or their attorneys of record at their last know addresses this 15th day of _____February_____, 2019.

                    By: _____
                         Andrew Billstein
                         Attorney for the Personal Representative

Leah K. Corrigan
Moffett & Corrigan, L.L.P.
140 South Cache Street
P.O. Box 4797
Jackson, WY 83001

4

Ex. 2, p. 91

Dated this _14th_ day of February, 2019.

_____          _____
Michael B. Anderson                   Susan B. Swimley
Attorney for the Estate               Attorney for Christin Seifert

_____          _____
Ralph W. Steele                       Leah K. Corrigan
Attorney for Spencer Anderson,        Attorney for Lisa Perkins
Individually

_____
Andrew T. Billstein
Attorney for Spencer Anderson,
Personal Representative

## CERTIFICATE OF SERVICE

This is to certify that the foregoing was duly served by mail/inter-office delivery upon the parties or their attorneys of record at their last know addresses this _____ day of _____, 2019.

                              By: _____
                                   Andrew Billstein
                                   Attorney for the Personal Representative

Leah K. Corrigan
Moffett & Corrigan, L.L.P.
140 South Cache Street
P.O. Box 4797
Jackson, WY 83001

4

Ex. 2, p. 92

Susan B. Swimley
Attorney at Law
1807 West Dickerson, Unit B
Bozeman, Montana 59715

Ralph W. Steele
Ralph W. Steele, P.C.
202 West Main Street, Suite 201
Bozeman, MT 59715

Andrew T. Billstein
Billstein Law Firm, PLLC
3860 Avenue B, Suite C West
Billings, MT 59102-6273

Michael B. Anderson
Anderson and Liechty, P.C.
P.O. Box 3253
Billings, MT 59101-3253

**2646897**
Page 1 of 6  06/07/2019 02:46:56 PM   Fee: $52.00
Eric Semerad - Gallatin County, MT     DEED

RETURN DOCUMENT TO:
American Land Title Company
1800 W. Koch, Bozeman, MT 59715
Order No. 1-108694
document electronically recorded

When recorded, return to:
NWX, LLC
1735 South 19th Avenue, Suite B
Bozeman, MT 59718

## DEED

FOR VALUABLE CONSIDERATION, the receipt of which is acknowledged, **Baxter Ranch Holding, Ltd.,** a Texas limited partnership, and **Estate of Vesta F. Anderson,** as Grantors, hereby grant, bargain, sell and convey unto NWX, LLC, a Montana limited liability company, as Grantee, all their right, title and interest in and to certain real property in Gallatin County, Montana, described as follows (collectively, the "Property"):

See Exhibit "A" attached hereto

Together with all and singular the hereinbefore described premises, all tenements, hereditaments and appurtenances thereto belonging to or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and also all the estate, right, title and interest, right of dower and right of homestead, possession, claim and demand whatsoever, as well as in law as in equity, of Grantors of, in or to the Property, and every part and parcel thereof, TO HAVE AND TO HOLD the same, together with all rights and appurtenances to the same belonging, to the extent not encumbered, restricted or reserved as contemplated by this Deed, unto Grantee and its heirs, successors and assigns forever, SUBJECT ONLY TO THOSE MATTERS SET FORTH ON EXHIBIT "B" ATTACHED HERETO.

Grantors hereby covenant that they and their successors and assigns shall and will WARRANT AND DEFEND the title unto the Property unto Grantee, and its successors and assigns, forever against the lawful claims of all persons claiming by, through or under Grantors, excepting, however, the matters on Exhibit "B", the general taxes for the year 2019 and thereafter, and special taxes becoming a lien after the date of this Deed.

FURTHER, by their execution hereof Grantors hereby reaffirm their obligations referenced and described in the Abstract of Amendment to Real Estate Sale Contract recorded on April 10, 2019, a Document No. 2641968, records of Gallatin County, Montana and agree that

Deed - Baxter Ranch Holding, Ltd. & Estate of Vesta F. Anderson to NWX, LLC.
2280285.5
Page 1



Ex. 2, p. 94

the obligations referenced and described therein and in the Amendment to Real Estate Contract described therein survive the delivery and recordation of this Deed.

IN WITNESS WHEREOF, Grantors have hereunto set their hands and seals the day and year first hereinbefore written.

Baxter //Ranch Holding, Ltd.,
a Texas limited partnership

By:    5DV Enterprises, Ltd.,
       its General Partner

       By: _Ann M Allen_____
           Ann M. Allen, Manager

Estate of Vesta F. Anderson

By: _____
    Spencer N. Anderson
    Personal Representative

STATE OF TEXAS  )
                ) ss.
County of Comal )

On this 6 day of June, 2019 before me, the undersigned, a Notary Public for the State of Texas, personally appeared Ann M. Allen, Manager of 5DV Enterprises, Ltd.,* known to me to be the person whose name is subscribed to this instrument and acknowledged to me that she executed the same.  *General Partner of Baxter Ranch Holding, Ltd.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year in this certificate first above written.

_Colleen M Primm_____
[print name] _Colleen M Primm_____
Notary Public for the State of Texas
Residing at _Comal_, Texas
My Commission Expires: _8/18/2020_

COLLEEN MARIE PRIMM
Notary Public, State of Texas
Comm. Expires 08-18-2020
Notary ID 13078504-2

Deed – Baxter Ranch Holding, Ltd. & Estate of Vesta F. Anderson to NWX, LLC
2280285.5
Page 2

the obligations referenced and described therein and in the Amendment to Real Estate Contract described therein survive the delivery and recordation of this Deed.

IN WITNESS WHEREOF, Grantors have hereunto set their hands and seals the day and year first hereinbefore written.

Baxter Holding, Ltd.,
a Texas limited partnership

By:    5DV Enterprises, Ltd.,
its General Partner

By: _____
Ann M. Allen, Manager

Estate of Vesta F. Anderson

By: _____
Spencer N. Anderson
Personal Representative

STATE OF TEXAS    )
                                    :ss.
County of Comal      )

On this ____ day of _____, 2019 before me, the undersigned, a Notary Public for the State of Texas, personally appeared Ann M. Allen, Manager of 5DV Enterprises, Ltd., known to me to be the person whose name is subscribed to this instrument and acknowledged to me that she executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year in this certificate first above written.

_____

[print name]_____
Notary Public for the State of Texas
Residing at _____, Texas
My Commission Expires: _____

Deed - Baxter Ranch Holding, Ltd. & Estate of Vesta F. Anderson to NWX, LLC
2280285.5
Page 2

STATE OF MONTANA )

                 :ss.

County of Gallatin )

     On this _____ day of ___June___, 2019 before me, the undersigned, a Notary Public for the State of Montana, personally appeared Spencer N. Anderson, Personal Representative of the Estate of Vesta F. Anderson, known to me to be the person whose name is subscribed to this instrument and acknowledged to me that he executed the same.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year in this certificate first above written.

_____

[print name] _____
Notary Public for the State of Montana
Residing at _____, Montana
My Commission Expires: _____

**CRESTA SUNDLING PAHUT**
**NOTARY PUBLIC for the**
**State of Montana**
**Residing at**
**Bozeman, Montana**
**My Commission Expires**
**February 01, 2020**
SEAL

Deed - Baxter Ranch Holding, Ltd. & Estate of Vesta F. Anderson to NWX, LLC
2280285.5
Page 3

Ex. 2, p. 97

**Exhibit "A"**
**to**
**Deed**

Parcel 1

Tract 5 of Certificate of Survey No. 2552, a Tract of Land being the N½ of Section 4, and the E½NE¼ of Section 5, Township 2 South, Range 5 East, P.M.M., Gallatin County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder of Gallatin County, Montana.

Parcel 2: Water Rights Being Conveyed

(1)    A One Hundred percent (100%) interest in Water Right Number: 41H 139913-00 - Groundwater/well - 20 gpm, dated December 31, 1918.

(2)    A One Hundred percent (100%) interest in Water Right Number: 41H C115493 - Groundwater/well - 12 gpm, dated March 23, 2001.

(3)    A Fifty percent (50%) interest in Water Right Number: 41H 139915-00 - Stock water, Baxter Creek - 30 gal/day/animal unit, dated December 31, 1918.

(4)    A Twenty-Eight and Fifty-Seven One Hundredths percent (28.57%) interest in Water Right Number: 41H 126871-00 - Irrigation, Baxter Creek - 3.75 cfs, dated April 25, 1877.

(5)    A Forty percent (40%) interest in Water Right Number: 41H 138937-00 - Irrigation/Farmers Canal, West Gallatin - 1 cfs, dated June 15, 1870.

(6)    In addition to the water rights in the Farmers Canal referenced in (5) above, one and two-thirds (1 2/3) additional ownership shares in Farmers Canal, which Grantor believes are evidenced by Certificate Nos. 1 & 2. The water rights being conveyed in the Farmers Canal pursuant to this item (6) are being conveyed without any warranty of title by Grantor.

(7)    Any and all other water rights owned by Grantor and associated with the Property.

Deed - Baxter Ranch Holding, Ltd. & Estate of Vesta F. Anderson to NWX, LLC
2280285.5
Page 4

Ex. 2, p. 98

**Exhibit "B"**
**to**
**Deed**

Permitted Exceptions:

(1)    All applicable building, use, zoning, health, sanitation, environmental and similar laws, restrictions, ordinances, rules and regulations as well as all waivers or agreements given to or entered into with governmental entities.

(2)    All general and special taxes and assessments for the year 2019 and subsequent years.

(3)    Any right, title, or interest in minerals in or under said land including, but not limited to, metals, oil, gas, coal, other hydrocarbons, sand gravel or other common variety materials, stone, mineral rights, mining rights, easement rights, water rights, claims of title to water or other matters relating thereto, whether expressed or implied and whether or not shown by the public records.

(4)    Public Street & Utility Easement & Fill Slope Easement recorded June 5, 2019, as Document No. 2644563, records of Gallatin County, Montana.

(5)    Right of Way for any portion falling within Baxter Lane.

(6)    Agreement recorded May 4, 1950 in Book 14, page 122, records of Gallatin County, Montana, including the terms and provisions therein.

(7)    Right-of-Way Easement to The Montana Power Company recorded December 8, 1986 in Film 95, page 273, records of Gallatin County, Montana, including the terms and provisions therein.

(8)    Pipeline Easement to Northwestern Corporation D/B/A Northwestern Energy recorded April 21, 2009, as Document No. 2327940, records of Gallatin County, Montana and Re-recorded May 8, 2009, as Document No. 2329665, including the terms and provisions therein.

(9)    Temporary Construction Easement between Estate of Vesta F. Anderson & Baxter Ranch Holding, Ltd., as Grantors to Bozeman High School District 7, as Grantee, recorded May 10, 2019, as Document No. 2644441, records of Gallatin County, Montana, including the terms and provisions therein.

(10)    All reservations or exceptions of record or in patents from the United States or the State of Montana.

(11)    All existing easements and rights-of-way on file in the records of Gallatin County, Montana.

Deed – Baxter Ranch Holding, Ltd. & Estate of Vesta F. Anderson to NWX, LLC
2280285.5
Page 5

Return To:
**Security Title Company**
P.O. Box 6550
Bozeman, MT 59771-6550
When recorded, return to:
Estate of Vesta F. Anderson
c/o Anderson & Liechty, P.C.
P.O. Box 3253
Billings, MT 59103-3253

STC-GI82003A



2647265
Page: 1 of 8   06/12/2019 11:56:36 AM   Fee: $56.00
Eric Semerad - Gallatin County, MT   DEED

## DEED

FOR VALUABLE CONSIDERATION, the receipt of which is acknowledged, the undersigned, **Baxter Ranch Holdings, Ltd.**, a Texas limited partnership, of 337 Bobwhite Lane, New Braunfels, TX, 78132, as Grantor, hereby quitclaims unto **Spencer N. Anderson, as Personal Representative of the Estate of Vesta F. Anderson, deceased**, of PO Box 3253, Billings, MT 59103, as Grantee, all its right, title and interest in and to certain real property in Gallatin County, Montana, described as follows:

Parcel A:

Tracts 1, 2, 3 and 4, of Certificate of Survey No. 2552, located in Township 2 South, Range 5 East, P.M.M., Gallatin County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder of Gallatin County, Montana.

Parcel B:

Tract 1, of Certificate of Survey No. 2553, consisting of the Southeast Quarter of Section 33, of Township 1 South, Range 5 East, P.M.M., Gallatin County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder of Gallatin County, Montana.

EXCLUDING a Public Street & Utility Easement & Fill Slope Easement as set forth in the attached Exhibit A.

FURTHER EXCLUDING a Temporary Construction Easement between the Estate of Vesta F. Anderson, deceased, and Baxter Ranch Holdings, Ltd., as Grantors, to Bozeman High School District 7, as Grantee, recorded May 10, 2019, as Document No. 2644441, records of Gallatin County, Montana, including the terms and provisions therein.



PLAINTIFFS' EXHIBIT

Ex. 2, p. 100

Together with all and singular the hereinbefore described premises, all tenements, hereditaments and appurtenances thereto belonging to or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and also all the estate, right, title and interest, right of dower and right of homestead, possession, claim and demand whatsoever, as well as in law as in equity, of the said Grantor of, in or to the said premises, and every part and parcel thereof, with the appurtenances thereto belong; TO HAVE AND TO HOLD, all singular the above mentioned and described premises unto the Grantee, SUBJECT TO

(a) Reservations and exceptions in patents from the United States or the State of Montana;

(b) All existing easements and rights-of-way; and

(c) All building, use and zoning restrictions.

IN WITNESS WHEREOF, the Grantor has hereunto set its hand and seal the day and year first hereinbefore written.

Baxter Ranch Holdings, Ltd.

By: _Ann M Allen_
Ann M. Allen, Manager, 5DV Enterprises, Ltd., its General Partner

STATE OF TEXAS    )
                  :ss.
County of Comal   )

On this 11 day of June, 2019  before me, the undersigned, a Notary Public for the State of Texas, personally appeared Ann M. Allen, as Manager of 5DV Enterprises, Ltd., the General Partner of Baxter Ranch Holdings, Ltd., known to me to be the person whose name is subscribed to this record and acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year in this certificate first above written.

_Colleen M Primm_
[notary signature/affix seal to left or below]

COLLEEN MARIE PRIMM
Notary Public, State of Texas
Comm. Expires 08-18-2020
Notary ID 13078504-2

Ex. 2, p. 101

2647265  Page 3 of 8 06/12/2019 11:56:38 AM

1-108694

Return To:

City Clerk

PO Box 1230

Bozeman, MT 59715

## PUBLIC STREET & UTILITY EASEMENT & FILL SLOPE EASEMENT

ESTATE OF VESTA F. ANDERSON & BAXTER RANCH HOLDING, LTD., GRANTOR(S),

in consideration of $50,780 and for other and valuable considerations, receipt of which is hereby

acknowledged, grants to The City of Bozeman, a Municipal Corporation of the State of Montana,

with offices at 121 North Rouse, Bozeman, Montana 59715, GRANTEE, a perpetual street and

utility easement, and a fill slope easement for the use of the public in, through, and across a

portion of a parcel of real property situated in Gallatin County, Montana, which is

located on the following described property: A tract of land, said tract being Tract 5 of

Certificate of Survey No. 2562, said tract being located in the NE 1/4 of Sec. 4, T2S, R5E,

P.M.M., Gallatin County, Montana.

The public, street and utility easement, containing 1.393 acres, is more particularly

described on the attached Exhibit A, and the fill slope easement, containing 0.120 acres, is more

particularly described on the attached Exhibit B, which by this reference are both made a part

hereof.

It is recognized by the parties that the fill slope easement may be terminated or revised by

an agreement between the parties when the need for a fill slope changes or ceases to exist.

The GRANTOR (S) states that they possess the real property described above and that

they have a lawful right to grant an easement thereon.

The GRANTOR (S) further agrees that the GRANTEE may peaceably hold and enjoy the

rights and privileges herein granted without any interruption by the GRANTOR.

The terms, covenants, and provisions of this easement shall extend to and be binding

upon the heirs, executors, administrators, personal representatives, successors, and assigns of the

parties hereto.

EXHIBIT A

Ex. 2, p. 102

DATED this _____7_____ day of _SEP_, 20_18_ .

LANDOWNER:    ESTATE OF VESTA F. ANDERSON

By: _____    _Spencer Anderson Personal Representative_
    Signature                                Printed name and title

STATE OF MONTANA    )
                ) ss.
County of Gallatin    )

    On this _7_ day of _September_ , 20_18_ , before me the undersigned, a Notary Public for the State of Montana, personally appeared, _SPENCER ANDERSON_ known to me to be the _PERSONAL REPRESENTATIVE_ of ESTATE OF VESTA F. ANDERSON and the person whose name is subscribed to the within instrument and acknowledged to me that he executed the within instrument for and on behalf of ESTATE OF VESTA F. ANDERSON.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal the day and year first above written.

(SEAL)

> WES McCRIMMON
> Notary Public
> for the State of Montana
> Residing at:
> Bozeman, Montana
> My Commission Expires:
> July 13, 2021

_____
Notary Public for the State of Montana
_WES McCrimmon_
(Printed Name)
Residing in _Bozeman_
My Commission Expires _7_ / _13_ /20_21_

EXHIBIT A

Ex. 2, p. 103

DATED this _____ day of _____, 20__

LANDOWNER:    BAXTER RANCH HOLDING, LTD.

By: _____    _____
    Signature                     Printed name and title

STATE OF MONTANA        )
                        ) ss.
County of Gallatin      )

On this ___ day of _____, 20__, before me the undersigned, a Notary Public for the State of Montana, personally appeared, _Ann M Allen_, known to me to be the _Manager_ of BAXTER RANCH HOLDING, LTD. and the person whose name is subscribed to the within instrument and acknowledged to me that he executed the within instrument for and on behalf of BAXTER RANCH HOLDING, LTD.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal the day and year first above written.

COLLEEN MARIE PRIMM
Notary Public, State of Texas
Comm. Expires 08-18-2020
Notary ID 13078504-2

_____
Notary Public for the State of Montana

_Colleen M Primm_
(Printed Name)
Residing in _Comal County_
My Commission Expires _8 18 20 20_

EXHIBIT A

Ex. 2, p. 104

DATED this _____ day of _November_____, 20_18_.

CITY OF BOZEMAN

Title _____

ATTEST:

City Clerk

STATE OF MONTANA    )
                    )ss.
County of Gallatin  )

On this _____ day of _November_____, 20__, before me, a Notary Public for the State of Montana, personally appeared ANDREA SURRATT and ROBIN CROUGH, known to me to be the City Manager and City Clerk, respectively, of the City of Bozeman and the persons whose names are subscribed to the within instrument, and acknowledged to me that they executed the same for and on behalf of the City of Bozeman.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal the day and year first above written.

(SEAL)    BRENDA SWEENEY
          Notary Public
          for the State of Montana
          Residing at:
          Bozeman, Montana
          My Commission Expires:
          December 02, 2018

_____
Notary Public for the State of Montana

_Brenda Sweeney_____
(Printed Name)
Residing at _Bozeman_____
My Commission Expires _12 / 2 /20_18_

EXHIBIT A

Ex. 2, p. 105



Ex. 2, p. 106

EXHIBIT A

Ex. 2, p. 107



EXHIBIT A

EXHIBIT B

FILL SLOPE EASEMENT

ACROSS A PORTION OF TRACT 5 OF CERTIFICATE OF SURVEY NO. 2552
LOCATED IN THE NE 1/4 SEC. 4, T2S, R6E P.M.M.
GALLATIN COUNTY, MONTANA

2647265  Page 8 of 8 06/12/2019 11:56:38 AM

SURVEYOR'S CERTIFICATION

I certify that this survey was conducted by me or under my
supervision between March 2014 and July 20, 2017, and that the
information shown is true and correct to the best of my knowledge.

Steven C. Anderson, PLS
Montana License No. 12251 LS

3/29/2018
Date

STEVEN C. ANDERSON 12251LS REGISTERED MONTANA LAND SURVEYOR

Return To:
Security Title Company
P.O. Box 6550
Bozeman, MT 59771-6550
When recorded, return to:
Estate of Vesta F. Anderson
c/o Anderson & Liechty, P.C.
P.O. Box 3253
Billings, MT 59103-3253
② STC - G182003



**2647267**
Page: 1 of 8    06/12/2019 11:56:88 AM    Fee: $56.00
Eric Semerad - Gallatin County, MT                DEED

### DEED

FOR VALUABLE CONSIDERATION, the receipt of which is acknowledged, the undersigned, Spencer N. Anderson, in his capacity as Personal Representative of the Estate of Vesta F. Anderson, PO Box 3253, Billings, MT 59103, as Grantor, hereby grants unto Spencer N. Anderson, of 402 E. Granite Ave., Bozeman, MT 59718, as Grantee, its undivided fifty percent right, title and interest in and to certain real property in Gallatin County, Montana, described as follows:

Parcel A:

Tracts 2, 3 and 4, of Certificate of Survey No. 2552 located in Township 2 South, Range 5 East, P.M.M., Gallatin County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder of Gallatin County, Montana.

Parcel B:

Tract 1, of Certificate of Survey No. 2553, consisting of the Southeast Quarter of Section 33, of Township 1 South, Range 5 East, P.M.M., Gallatin County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder of Gallatin County, Montana.

EXCLUDING a Public Street & Utility Easement & Fill Slope Easement as set forth in the attached Exhibit A.

FURTHER EXCLUDING a Temporary Construction Easement between the Estate of Vesta F. Anderson, deceased, and Baxter Ranch Holdings, Ltd., as Grantors, to Bozeman High School District 7, as Grantee, recorded May 10, 2019, as Document No. 2644441, records of Gallatin County, Montana, including the terms and provisions therein.



PLAINTIFFS
EXHIBIT
H

**Ex. 2, p. 108**

Together with all and singular the hereinbefore described premises, all tenements, hereditaments and appurtenances thereto belonging to or in anywise appertaining; and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and also all the estate, right, title and interest, right of dower and right of homestead, possession, claim and demand whatsoever, as well as in law as in equity, of the said Grantor of, in or to the said premises, and every part and parcel thereof, with the appurtenances thereto belong; TO HAVE AND TO HOLD, all singular the above mentioned and described premises unto the Grantee, SUBJECT TO

(a) Reservations and exceptions in patents from the United States or the State of Montana;

(b) All existing easements and rights-of-way; and

(c) All building, use and zoning restrictions.

IN WITNESS WHEREOF, the Grantor has hereunto set its hand and seal the day and year first hereinbefore written.

_____
Spencer N. Anderson, Personal Representative of the
Estate of Vesta F. Anderson, deceased

STATE OF MONTANA     )
                     :ss.
County of Gallatin     )

On this 11 day of June, 2019 before me, the undersigned, a Notary Public for the State of Montana, personally appeared Spencer N. Anderson, Personal Representative of the Estate of Vesta F. Anderson, known to me to be the person whose name is subscribed to this record and acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year in this certificate first above written.

TIFFANY STRATMAN
Notary Public
for the State of Montana
Residing at:
Bozeman, Montana
My Commission Expires:
September 01, 2021

[notary signature after seal (right or below)]

Ex. 2, p. 109

1-198694

Return To:

City Clerk

PO Box 1230

Bozeman, MT 59715

### PUBLIC STREET & UTILITY EASEMENT
### & FILL SLOPE EASEMENT

ESTATE OF VESTA F. ANDERSON & BAXTER RANCH HOLDING, LTD., GRANTOR(S), in consideration of $90,780 and for other and valuable considerations, receipt of which is hereby acknowledged, grants to The City of Bozeman, a Municipal Corporation of the State of Montana, with offices at 121 North Rouse, Bozeman, Montana 59715, GRANTEE, a perpetual street and utility easement, and a fill slope easement for the use of the public in, through, and across a portion of a parcel of real property situated in Gallatin County, Montana, which is located on the following described property: A tract of land, said tract being Tract 5 of Certificate of Survey No. 2552, said tract being located in the NE 1/4 of Sec. 4, T2S, R5E, P.M.M., Gallatin County, Montana.

The public street and utility easement, containing 1.393 acres, is more particularly described on the attached Exhibit A, and the fill slope easement, containing 0.120 acres, is more particularly described on the attached Exhibit B, which by this reference are both made a part hereof.

It is recognized by the parties that the fill slope easement may be terminated or revised by an agreement between the parties when the need for a fill slope changes or ceases to exist.

The GRANTOR (S) states that they possess the real property described above and that they have a lawful right to grant an easement thereon.

The GRANTOR (S) further agrees that the GRANTEE may peaceably hold and enjoy the rights and privileges herein granted without any interruption by the GRANTOR.

The terms, covenants, and provisions of this easement shall extend to and be binding upon the heirs, executors, administrators, personal representatives, successors, and assigns of the parties hereto.

EXHIBIT A

**Ex. 2, p. 110**

DATED this ___7___ day of _SEP_, 20_18_ .

LANDOWNER    ESTATE OF VESTA F. ANDERSON

By: _____    _Spencer Anderson (Personal) Representative_
    Signature                    Printed name and title

STATE OF MONTANA    )
                    ) ss.
County of Gallatin   )

    On this _7_ day of _September_, 20_18_ , before me the undersigned, a Notary Public for the State of Montana, personally appeared, _SPENCER ANDERSON_ known to me to be the _Personal Representative_ of ESTATE OF VESTA F. ANDERSON and the person whose name is subscribed to the within instrument and acknowledged to me that he executed the within instrument for and on behalf of ESTATE OF VESTA F. ANDERSON.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal the day and year first above written.

(SEAL)

WES MCCRIMMON
Notary Public
for the State of Montana
Residing at
Bozeman, Montana
My Commission Expires:
July 13, 2021

_____
Notary Public for the State of Montana

_WES McCrimmon_
(Printed Name)

Residing in _Bozeman_
My Commission Expires _7_ / _13_ /20_21_

EXHIBIT A

Ex. 2, p. 111

DATED this _____ day of ____ 20__

LANDOWNER:     BAXTER RANCH HOLDING, LTD.

By: _____          _Ann M Allen  Manager_
        Signature                          Printed name and title

STATE OF MONTANA       )
                                          ) ss.
County of Gallatin          )

On this ___ day of _____, 20__, before me the undersigned, a Notary Public for the State of Montana, personally appeared _Ann M Allen_, known to me to be the _Manager_ of BAXTER RANCH HOLDING, LTD. and the person whose name is subscribed to the within instrument and acknowledged to me that he executed the within instrument for and on behalf of BAXTER RANCH HOLDING, LTD.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal the day and year first above written.

[Notary Seal: COLLEEN MARIE PRIMM, Notary Public, State of Texas, Comm. Expires 08-15-2020, Notary ID 130785042]

_____
Notary Public for the State of Montana
_Colleen M. Primm_
(Printed Name)
Residing in _Comal County_
My Commission Expires _8 / 15 / 20 20_

EXHIBIT A

**Ex. 2, p. 112**

DATED this ___ day of _November_____, 20 18

**CITY OF BOZEMAN**

Title _____

ATTEST:

_____
City Clerk

STATE OF MONTANA  )
                  )ss.
County of Gallatin )

On this ___ day of _November_____, 2017, before me, a Notary Public for the State of Montana, personally appeared ANDREA SURRATT and ROBIN CROUGH, known to me to be the City Manager and City Clerk, respectively, of the City of Bozeman and the persons whose names are subscribed to the within instrument, and acknowledged to me that they executed the same for and on behalf of the City of Bozeman.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal the day and year first above written.

(SEAL)

BRENDA SWEENEY
Notary Public
for the State of Montana
Residing at:
Bozeman, Montana
My Commission Expires:
December 02, 2018

_____
Notary Public for the State of Montana
Brenda Sweeney
(Printed Name)
Residing at _Bozeman_
My Commission Expires _12/2_/20 18

EXHIBIT A

Ex. 2, p. 113



EXHIBIT A

Ex. 2, p. 115

Return To:
**Security Title Company**
P.O. Box 6550
Bozeman, MT 59771-6550
When recorded, return to:
Estate of Vesta F. Anderson
c/o Anderson & Liechty, P.C.
P.O. Box 3253
Billings, MT 59103-3253
④ STC - G182003



**2647266**
Page: 1 of 8   06/12/2019 11:56:00 AM   Fee: $56.00
Eric Semerad - Gallatin County, MT   DEED

### DEED

FOR VALUABLE CONSIDERATION, the receipt of which is acknowledged, the undersigned, Spencer N. Anderson, in his capacity as Personal Representative of the Estate of Vesta F. Anderson, PO Box 3253, Billings, MT 59103, as Grantor, hereby grants unto Spencer N. Anderson, of 402 E. Granite Ave., Bozeman, MT 59718, as Grantee, all its right, title and interest in and to certain real property in Gallatin County, Montana, described as follows:

Tract 1 of Certificate of Survey No. 2552, located in Township 2 South, Range 5 East, P.M.M., Gallatin County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder of Gallatin County, Montana.

EXCLUDING a Public Street & Utility Easement & Fill Slope Easement as set forth in the attached Exhibit A.

FURTHER EXCLUDING a Temporary Construction Easement between the Estate of Vesta F. Anderson, deceased, and Baxter Ranch Holdings, Ltd., as Grantors, to Bozeman High School District 7, as Grantee, recorded May 10, 2019, as Document No. 2644441, records of Gallatin County, Montana, including the terms and provisions therein.

Together with all and singular the hereinbefore described premises, all tenements, hereditaments and appurtenances thereto belonging to or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and also all the estate, right, title and interest, right of dower and right of homestead, possession, claim and demand whatsoever, as well as in law as in equity, of the said Grantor of, in or to the said premises, and every part and parcel thereof, with the appurtenances thereto belong; TO HAVE AND TO HOLD, all singular the above mentioned and described premises unto the Grantee, SUBJECT TO

(a) Reservations and exceptions in patents from the United States or the State of Montana;



PLAINTIFFS' EXHIBIT

Ex. 2, p. 116

(b) All existing easements and rights-of-way; and

(c) All building, use and zoning restrictions.

IN WITNESS WHEREOF, the Grantor has hereunto set its hand and seal the day and year first hereinbefore written.



_____

Spencer N. Anderson, Personal Representative of the Estate of Vesta F. Anderson, deceased

STATE OF MONTANA          )
                          :ss.
County of Gallatin        )

On this 11 day of June, 2019 before me, the undersigned, a Notary Public for the State of Montana, personally appeared Spencer N. Anderson, Personal Representative of the Estate of Vesta F. Anderson, known to me to be the person whose name is subscribed to this record and acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal the day and year in this certificate first above written.

TIFFANY STRATMAN
Notary Public
for the State of Montana
Residing at:
Bozeman, Montana
My Commission Expires:
September 01, 2021

[notary signature/after seal to left or below]

Ex. 2, p. 117

1-108694

Return To:

**City Clerk**

**PO Box 1230**

**Bozeman, MT 59715**

## PUBLIC STREET & UTILITY EASEMENT
## & FILL SLOPE EASEMENT

ESTATE OF VESTA F. ANDERSON & BAXTER RANCH HOLDING, LTD., GRANTOR(S), in consideration of $90,760 and for other and valuable considerations, receipt of which is hereby acknowledged, grants to The City of Bozeman, a Municipal Corporation of the State of Montana, with offices at 121 North Rouse, Bozeman, Montana 59715, GRANTEE, a perpetual street and utility easement, and a fill slope easement for the use of the public in, through, and across a portion of a parcel of real property situated in Gallatin County, Montana, which is located on the following described property: A tract of land, said tract being Tract 5 of Certificate of Survey No. 2552, said tract being located in the NE 1/4 of Sec. 4, T2S, R5E, P.M.M., Gallatin County, Montana.

The public street and utility easement, containing 1.393 acres, is more particularly described on the attached Exhibit A, and the fill slope easement, containing 0.120 acres, is more particularly described on the attached Exhibit B, which by this reference are both made a part hereof.

It is recognized by the parties that the fill slope easement may be terminated or revised by an agreement between the parties when the need for a fill slope changes or ceases to exist.

The GRANTOR(S) states that they possess the real property described above and that they have a lawful right to grant an easement thereon.

The GRANTOR(S) further agrees that the GRANTEE may peaceably hold and enjoy the rights and privileges herein granted without any interruption by the GRANTOR.

The terms, covenants, and provisions of this easement shall extend to and be binding upon the heirs, executors, administrators, personal representatives, successors, and assigns of the parties hereto.

EXHIBIT A

**Ex. 2, p. 118**

DATED this ___7___ day of _SEP_, 20_18_

LANDOWNER:    ESTATE OF VESTA F. ANDERSON

By: _____    _Spencer Anderson  Personal Representative_
      Signature                                 Printed name and title

STATE OF MONTANA    )
                                      ) ss.
County of Gallatin       )

    On this _7_ day of _September_, 20_18_, before me the undersigned, a
Notary Public for the State of Montana, personally appeared, _SPENCER ANDERSON_ known to
me to be the _PERSONAL REPRESENTATIVE_ of ESTATE OF VESTA F. ANDERSON and
the person whose name is subscribed to the within instrument and acknowledged to me that he
executed the within instrument for and on behalf of ESTATE OF VESTA F. ANDERSON.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal the
day and year first above written.

(SEAL)

WES MCCRIMMON
Notary Public
for the State of Montana
Residing at:
Bozeman, Montana
My Commission Expires:
July 13, 2021

_____
Notary Public for the State of Montana
_WES McCrimmon_
(Printed Name)
Residing in _Bozeman_
My Commission Expires _7 / 13 / 20 21_

**EXHIBIT A**

**Ex. 2, p. 119**

DATED this _____ day of _____ , 20___ .

LANDOWNER:    BAXTER RANCH HOLDING, LTD.

By: _____    _Ann M Allen, Manager_
    Signature                    Printed name and title

STATE OF MONTANA        )
                        ) ss.
County of Gallatin       )

On this ___ day of _____ , 20__ , before me the undersigned, a Notary Public for the State of Montana, personally appeared, _Ann M Allen_ , known to me to be the _Manager_ of BAXTER RANCH HOLDING, LTD. and the person whose name is subscribed to the within instrument and acknowledged to me that he executed the within instrument for and on behalf of BAXTER RANCH HOLDING, LTD.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal the day and year first above written.

COLLEEN MARIE PRIMM
Notary Public, State of Texas
Comm. Expires 08-18-2020
Notary ID 13078504-2

_Colleen M Primm_
Notary Public for the State of Montana Texas
_Colleen M Primm_
(Printed Name)
Residing in _Comal County_
My Commission Expires _8 / 18 / 20 20_

EXHIBIT A

Ex. 2, p. 120

DATED this _____ day of _November_____, 20 _18_.

_____

**CITY OF BOZEMAN**

Title _____

**ATTEST:**

_____

**City Clerk**

**STATE OF MONTANA** )
                      )ss.
**County of Gallatin** )

      On this _9th_ day of _November_____, 20 _18_, before me, a Notary Public for the State of Montana, personally appeared ANDREA SURRATT and ROBIN CROUGH, known to me to be the City Manager and City Clerk, respectively, of the City of Bozeman and the persons whose names are subscribed to the within instrument, and acknowledged to me that they executed the same for and on behalf of the City of Bozeman.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal the day and year first above written.

(SEAL)

BRENDA SWEENEY
Notary Public
for the State of Montana
Residing at
Bozeman, Montana
My Commission Expires
December 02, 2018

_____
Notary Public for the State of Montana

_Brenda Sweeney_____
(Printed Name)
Residing at _Bozeman_____
My Commission Expires _12 / 2 /20 18_

**EXHIBIT A**

**Ex. 2, p. 121**

**SURVEYOR'S CERTIFICATION**

I certify that this survey was conducted by me or under my supervision between March 2014 and July 20, 2017, and that the information shown is true and correct to the best of my knowledge.

Steven C. Anderson, PLS    3/29/2018    Date
Montana License No. 12251 LS

MONTANA
STEVEN C.
ANDERSON
12251 LS
REGISTERED
LAND SURVEYOR

N

0    200'
S C A L E
BEARING BASIS: COS 2554A

1.5" ALUMINUM CAP
NW COR. SEC. 3
PER COR REC 4-265

STREET TRACT 1
COS 2554C
60'

TRACT 1A1A COS
2554C

EXHIBIT A
STREET AND UTILITY EASEMENT
ACROSS A PORTION OF TRACT 6 OF CERTIFICATE OF SURVEY NO. 2552
LOCATED IN THE NE 1/4 SEC. 4, T2S, R5E, P.M.M.
GALLATIN COUNTY, MONTANA

COS 1302
TRACT 6 COS 2552

S88°51'14"E
50.00'

N01°08'46"E
125.25'

N74°43'05"E
272.63'

S01°08'46"E
215.96'

FD 2" ACAP "9518 LS"
PER COR. REC. 2-1427
FOR C 1/4 COR.

FD 2"
ALUMINUM CAP
"9518ES"

PUBLIC STREET & UTILITY
EASEMENT IS HATCHED AND
CONTAINS 1.393 ACRES.

N00°22'08"W
31.98'

N89°37'49"E   1089.05'
S89°37'49"W           1324.72'

1287.99'
S89°39'27"W

LOT 5A MINOR
SUB. 201A

COMMON OPEN
SPACE 1

60'

FINAL PLAT OF TRADITIONS
SUBDIVISION - PHASE 3
(J-691)

BLOCK 1
LOT 1

S89°39'27"W
37.03'

MAIN MARY AVENUE

WEST OAK STREET

COMMON AREA NO. 1

6'

BLOCK 6

6'

4'

FINAL PLAT OF FLANDERS
CREEK SUBDIVISION (J-434)

3'

COTTONWOOD ROAD
S01°07'40"W

5/8" REBAR 1/4
COR. SEC. 3 & 4
PER COR REC 2-251

60'

TRACT 1A2
COS 2554B

THOMAS DEAN & HOSKINS, INC.
ENGINEERING CONSULTANTS

DRAWN BY:
UTILITY CHECK:
DATE:
JOB NO.
CAD NO.

TD&H

EXHIBIT A

2647266  Page 7 of 8 06/12/2019 11:56:38 AM

**Ex. 2, p. 122**

2647266  Page 8 of 8 06/12/2019 11:56:38 AM



SURVEYOR'S CERTIFICATION

I certify that this survey was conducted by me or under my supervision between March 2014 and July 20, 2017, and that the information shown is true and correct to the best of my knowledge.

Steven C. Anderson, PLS
Montana License No. 12251 LS                  3/29/2018
                                                    Date

MONTANA
STEVEN C.
ANDERSON
12251 LS
(REGISTERED)
LAND SURVEYOR

N

0    200'
S C A L E
BEARING BASIS: COS 2554A

1.5" ALUMINUM CAP
NW COR. SEC. 3
PER COR REC 4-285

EXHIBIT B
FILL SLOPE EASEMENT
ACROSS A PORTION OF TRACT 6 OF CERTIFICATE OF SURVEY NO. 2552
LOCATED IN THE NE 1/4 SEC. 4, T2S, R5E, P.M.M.
GALLATIN COUNTY, MONTANA

STREET TRACT 1
COS 2554C

TRACT 1A1A COS 2554C

N08°51'14"E
60.00'

COS 1302
TRACT 6 COS 2552

SC1°08'45"W
88.47'

S01°06'46"W
51.76'

FILL SLOPE EASEMENT IS
HATCHED AND CONTAINS
3,211 SF

N87°10'31"E
S74°05'E
22.33'

FD 2" ACAP "9518 LS"
PER COR. REC. 2-1427
FOR C 1/4 COR.

FD 2"
ALUMINUM CAP
"9518ES"

S88°37'49"W 1,324.72'

5/8" REBAR 1/4
COR. SEC. 3 & 4
PER COR REC 2-25

WEST OAK STREET

S88°37'49"W
18.91'

LOT 3A MINOR
SUB. 201A

FINAL PLAT OF TRADITIONS
SUBDIVISION - PHASE 3
(J-591)

COMMON AREA NO. 1

BLOCK 1
LOT 1

BLOCK 6

COTTONWOOD ROAD

TRACT 1A2
COS 2554B

FINAL PLAT OF FLANDERS
CREEK SUBDIVISION (J-454)

TWIN LAKES AVENUE

COMMON
SPACE 1

THOMAS DEAN & HOSKINS, INC.
ENGINEERING CONSULTANTS
TD&H

EXHIBIT A

Ex. 2, p. 123

Return To:
**Security Title Company**
P.O. Box 6550
Bozeman, MT 59771-6550
STC-GI82003

**2647268**
Page: 1 of 10  06/12/2019 11:55:38 AM   Fee: $70.00
Eric Semerad - Gallatin County, MT    MTG

FOR RECORDER'S USE ONLY

## MORTGAGE

**MAXIMUM LIEN.** The total principal indebtedness that may be outstanding at any given time which is secured by this Mortgage is $1,022,428.00.

**THIS MORTGAGE** dated June 11, 2019, is made and executed between Spencer N. Anderson, whose address is 402 E Granite Avenue, Bozeman, MT 59718-6423 (referred to below as "Grantor") and Bank of the Rockies N.A., whose address is 205 West Main, P.O. Box 709, White Sulphur Springs, MT 59646-0709 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor mortgages and conveys to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Gallatin County, State of Montana:

    Tract 1 of Certificate of Survey No. 2552, located in the Northeast Quarter of Section 5, Township 2 South, Range 6 East, P.M.M., Gallatin County, Montana, according to the official plat thereof on file and of record in the office of the County Clerk and Recorder of Gallatin County, Montana

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

    **Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property. The following provisions relate to the use of the Property or to other limitations on the Property.

    **Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

    **Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a)

PLAINTIFFS' EXHIBIT

## MORTGAGE
### (Continued)

Page 2

neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such improvements with improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of the Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Montana law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens

Ex. 2, p. 125

## MORTGAGE
### (Continued)

specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any

Ex. 2, p. 126

MORTGAGE
(Continued)

Page 4

amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to the Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the

**Ex. 2, p. 127**

## MORTGAGE
### (Continued)

indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and, (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-In-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for, and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or

**MORTGAGE**
(Continued)

Page 6

condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The death of Grantor, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Grantor under the terms of any other agreement between Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any Indebtedness or other obligation of Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Right to Cure.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Mortgage within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty that Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

## MORTGAGE
### (Continued)

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Nonjudicial Sale.** If permitted by applicable law, Lender may foreclose Grantor's interest in all or in any part of the Personal Property or the Real Property by non-judicial sale.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written

Ex. 2, p. 130

## MORTGAGE
### (Continued)

Page 8

notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

OTHER EXPENSES. Without notice and without Borrower's consent, Lender may incur expenses to collect amounts due under the Note, enforce the terms of the Note or any other Loan Documents secured in connection with the Note, and preserve or dispose of any or all of the Collateral securing the Note. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add expenses to the principal balance.

WATER ASSETS RIDER. An exhibit, titled "WATER ASSETS RIDER," is attached to this Mortgage and by this reference is made a part of this Mortgage just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Mortgage.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Mortgage:

Amendments. This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Annual Reports. If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

Caption Headings. Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

Governing Law. This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Montana without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Montana.

Choice of Venue. If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Meagher County, State of Montana.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

Severability. If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

Merger. There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

Successors and Assigns. Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**MORTGAGE**
(Continued)                                                    Page 9

---

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Montana as to all Indebtedness secured by this Mortgage.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Spencer Anderson and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Default.** The word "Default" means the Default set forth in this Mortgage in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means Spencer Anderson.

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.

**Lender.** The word "Lender" means Bank of the Rockies N.A., its successors and assigns.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means the promissory note dated June 11, 2019, in the original principal amount of $1,022,425.00 from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The maturity date of the Note is December 11, 2020.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

## MORTGAGE
(Continued)

Page 10

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness; except that the words do not mean any guaranty or environmental agreement, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

X _____
Spencer Anderson
N.

### INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Montana_ )
                                              ) SS
COUNTY OF _Gallatin_ )

This record was acknowledged before me on _11 June_, 20 _19_ by Spencer N. Anderson.

TIFFANY STRATMAN
Notary Public
for the State of Montana
Residing at:
Bozeman, Montana
My Commission Expires:
September 01, 2021

(Signature of notarial officer)

Title of officer (if not shown in stamp)

(OFFICIAL SEAL)

LaserPro, Ver. 18.4.20.055  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - MT
F:\APPS\FRED\CFI\LPL\G03.FC  TR-10432  PR-28

Ex. 2, p. 133

# DL

**Trial Attorney**

**David P. Legare**

P.O. Box 1080
Billings, MT 59103-1080
(406) 294-9450
Fax (406) 294-9451
dplegare@legarelaw.com

October 25, 2019

*VIA Email*

Hartford Casualty Insurance Company
Claims Department
One Hartford Plaza
Hartford, CT 06155
Phone: (877) 625-2652
auroraclaims@thehartford.com

| Re: | |
|---|---|
| *Named Insured:* | *Anderson & Liechty, P.C.* |
| *Claim No.:* | *GL 001 851 9306* |
| *Account No.:* | *34543* |
| *Policy No.:* | *65 SBA FS4968* |
| *USAA Member No.:* | *103442612* |
| *Policy Period:* | *12/28/2018 – 12/28/2019* |
| *Case:* | *Perkins v. Anderson, et al.* |
| *Cause No.:* | *Gallatin County Cause No. DV 19-1185C* |

Dear Claims Department,

Thank you for taking the time to speak with me to file the above-referenced claim. As we discussed, Michael B. Anderson retained David Legare Law to represent him, individually, in Civil Action No. DV 19-1185C filed by Lisa Perkins and Christin Seifert against him. Please find attached to this letter a complete copy of the Complaint filed as Civil Action No. DV 19-1185C in the Montana Eighth Judicial District Court of Gallatin County. If you fail to receive the attachment by email, please contact me immediately. We will mail a hardcopy of the Complaint when we receive verification of the proper mailing address.

Mike and I are tendering to Hartford Claims the Complaint to defend and indemnify Mike in Cause No. DV 19-1185C under Policy No. 65 SBA FS4968. Mike was served with the Complaint on October 21, 2019. His responsive pleading is due on or before November 12, 2019 whether he files an Answer or other preliminary motions. Please contact me as soon as possible to protect Mike's rights and defenses in the above-referenced case.

Finally, based on Montana law, we believe the proper venue is in Yellowstone County, Montana. I understand Hartford Claims may have their panel counsel to defend Mike in this case; however, please contact me to discuss possible recommendations for defense counsel, depending on the final venue for the case.

**Ex. 3, p. 1**

Thank you in advance for your prompt attention to this most serious matter.  I look forward to working with you.

Sincerely

David P. Legare

DPL/djs
Enclosure
Cc:  Client (via email)

2



THE HARTFORD
WESTERN GL OFFICE
PO BOX 14265
LEXINGTON KY 40512

November 6, 2019

-- 01 000068 09479 H 1 A121
ıınʼlʼlʼlııʼıdʼıqınʼlʼlıııʼıdʼlʼlıqıʼıʼdʼıqʼlʼlʼıqʼlʼlʼıdʼlʼlʼıdʼlʼlʼ

David Legare
Po Box 1080
Billings MT 59103-1080

Re: Insured:      ANDERSON & LIECHTY, P.C.
     Claimant:      Lisa Perkins and Christin Seifert
     Date of Loss:      June 6, 2019
     Event Number:      GL0018519306
     Claim Number:      Y53 LP 89018

Dear David Legare:

### COVERAGE DISCLAIMER

This letter will serve to provide you with the Hartford Casualty Insurance Company's ("The Hartford") coverage position relative to the above captioned claim and lawsuit "Perkins et al. v Anderson et al.," Gallatin County District Court civil action no. DV-19-1185C. We have completed our review of the information provided, as well as the policy issued by The Hartford, and we have determined that there is no coverage under the Business Liability Form. As a result we will not be able to provide either defense or indemnity. The basis for our determination is outlined below.

**ALLEGATIONS:**

Plaintiffs Lisa Perkins and Christin Seifert allege that they are two of four remaining beneficiaries of the estate of Vesta Anderson (the Estate), who died in 2006. They allege that defendant Michael Anderson (Michael), who is also a beneficiary, has been counsel for the Estate. They allege that his son, Spencer Anderson (Spencer), was appointed as personal representative of the Estate, which opened in Yellowstone County, Montana in March 2006. However, they allege that Michael has acted as counsel for the Estate and directly handled the administration of the Estate as personal representative.

They allege that the primary asset of the Estate was an interest in a property known as the Baxter Ranch in Gallatin County, Montana. The Estate was tenant in common in the Ranch with BRH, an entity controlled by the beneficiaries' aunt, Mary Nelson. The Estate's tax liability was over $3 million and the Estate lacked other assets sufficient to satisfy the tax liability.

Plaintiffs allege that during the period from 2006 to 2008, the Baxter Ranch increased in value, but Spencer and Michael did not actively market the Ranch for sale or attempt to partition the Estate's share for sale. They allege that in 2008 the value of the Ranch collapsed with real estate generally but the tax liability increased, and Spencer and Michael claimed personal representative's fees and attorney's fees which they later collected from liquidated portions of the Ranch.

Ex. 4, p. 1

Plaintiffs allege that Mary Nelson died in 2009. From 2008 to 2016, Michael and Spencer leased and sold portions of the Ranch and negotiated with the Internal Revenue Service regarding payments toward the tax lien, but did not keep plaintiffs apprised of these transactions. Michael and Spencer used the Ranch for their own personal interests without collecting rents for such use. As the real estate market rebounded in 2010, even with the acquiescence of BRH to list the Ranch for sale, Michael and Spencer did not actively attempt to partition or sell the Ranch or secure financing to satisfy the tax lien.

Plaintiffs allege that In March 2018 the IRS filed an action to foreclose on the Baxter Ranch. They allege that the tax lien had grown by nearly $2 million. Michael entered an appearance as attorney for the Estate but made no attempt to partition the Ranch or to list it for sale. In March 2018, Bryan Klein offered to purchase a parcel of the Ranch for $8 million. Plaintiffs allege that Spencer and Michael colluded to facilitate Spencer's purchase of the BRH interest in the Ranch at the expense of plaintiffs.

In July 2018 plaintiffs were first notified of the IRS action and the negotiations regarding Spencer's intention to purchase the BRH share of the Ranch unless all four beneficiaries each funded $250,000 for the $1 million purchase price. They allege that Michael and Spencer did not disclose all of the ongoing facts about the BRH negotiations or that Spencer intended to purchase the BRH interest for himself and not the Estate. Some of the beneficiaries to the Estate could not provide $250,000 at that time. Plaintiffs allege that over July and August 2018, Spencer rejected proposals from the beneficiaries to purchase the BRH share for the Estate, and Michael and Spencer did not disclose that Spencer intended to encumber the Estate's interest in the Ranch by securing a loan to fund his individual purchase of the BRH share of the Ranch.

Plaintiffs allege that in August 2018, the Klein sale and the Estate purchase of the BRH interest were executed, the IRS lien was satisfied, the IRS action was stayed, and Spencer executed a contract with himself as personal representative of the Estate to purchase BRH's interest. The result is that Spencer used his position as personal representative to purchase BRH's one-half interest in the Ranch, valued at $10,500,000, for $1 million, and to convey to himself a forty-acre parcel of the Ranch to secure financing of his purchase of the BRH share.

Plaintiffs allege that they stipulated to court approval of the transactions in February 2019, however, they allege that Spencer did not disclose his intent to convey the forty-acre parcel to himself. The plaintiffs reserved the right to assert claims regarding the administration of the Estate. Plaintiffs allege that the Klein, BRH, and Spencer transactions closed in June 2019. Spencer deeded the forty-acre parcel to himself, valued at $1 million, without consideration to the Estate.

Plaintiffs assert causes of action for breach of fiduciary duty, unjust enrichment and constructive trust, constructive fraud under MCA section 28-2-406 or common law, removal of personal representative and forcible withdrawal of defendant Michael Anderson as attorney for the estate, intentional misrepresentation, negligent misrepresentation regarding the financing of the purchase of the BRH interest in the Ranch, tortious interference with expectancy interest, attorney malpractice, quiet title pursuant to MCA section 70-28-101, and petition to void transaction pursuant to MCA section 72-3-615.

Plaintiffs seek an accounting of Estate assets, compensatory damages, removal of Spencer Anderson as personal representative and Michael Anderson as attorney for the Estate, disgorgement of the Andersons' personal representative and attorney fees, imposition of a constructive trust on Spencer's interest in the Ranch, an order barring Michael Anderson from collecting any damages or securing an interest in the constructive trust, treble damages pursuant to MCA section 37-61-407, imposition of joint and several liability on the defendants, attorney fees and costs, interest, an order quieting title in the forty-acre parcel, and an order voiding the transactions regarding the forty-acre parcel deed and mortgage.

We understand the above allegations are presently unsubstantiated and that you may well dispute them. However, we must address coverage as it applies to the allegations that have been made. Please note that nothing in this letter is intended to suggest that the allegations have any factual or legal merit.

**THE HARTFORD POLICY:**

The Hartford issued Policy Number 65SBAFS4968 to Anderson & Leichty PC. The span of coverage is December 28, 2018 to December 28, 2019. The liability limit is $1,000,000.00 for each occurrence, with a $2,000,000.00

Ex. 4, p. 2

general aggregate limit under the Business Liability coverage. The guiding form is the Business Liability Coverage Form, SS 00 08 04 05, as amended by form SS 00 60 09 15 Business Liability Coverage Amendatory Endorsement and form SS 50 38 10 03 Limited Exclusion – Personal and Advertising Injury – Lawyers.

## THE BUSINESS LIABILITY POLICY

The policy provides coverage for "bodily injury" and "property damage" caused by an "occurrence" and for specific enumerated "personal and advertising injury" offenses, subject to provisions and exclusions.   The guiding form reads in part:

### BUSINESS LIABILITY COVERAGE FORM

A.  **COVERAGES**
    1.  **BUSINESS LIABILITY COVERAGE (BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY)**
        **Insuring Agreement**
        a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury",  "property damage"  or "personal and advertising injury" to which this insurance does not apply.

        ...

        b.      This insurance applies:
        **(1)** To "Bodily Injury" and "property damage" only if:
            **(a)** The "bodily injury" or "property damage" is caused by an "occurrence"...
            **(b)** The "bodily injury" or "property damage" occurs during the policy period.

        ...

        **(2)** To "Personal and advertising injury" caused by an offense arising out of your business, but only if the offense is committed during the policy period.

        ...

B.  **EXCLUSIONS**
    1.  **Applicable To Business Liability Coverage**
        This insurance does not apply to:

        a. **Expected Or Intended Injury**
            **(1)** "Bodily injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" or "property damage" resulting from the use of reasonable force to protect persons or property; or
            **(2)** "Personal and advertising injury" arising out of an offense committed by, at the direction of or with the consent or acquiescence of the insured with the expectation of inflicting "personal and advertising injury."

        ...

        j. **Professional Services**
            "Bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional service.  This includes but is not limited to:

            **(1)** Legal, accounting or advertising services;

MT00057

**Ex. 4, p. 3**

...

   **p. Personal And Advertising Injury**
    "Personal and advertising injury":

    **(1)** Arising out of oral, written or electronic publication of material, if done by the direction of the insured knowledge of its falsity;

...

## C. WHO IS AN INSURED

  **1.** If you are designated in the Declarations as:
    **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.
    **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.
    **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.
    **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.
    **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

...

## G. LIABILITY...DEFINITIONS

...

  **5.** "Bodily injury" means physical:
    **a.** Injury
    **b.** Sickness; or
    **c.** Disease
    sustained by a person and, if arising out of the above, mental anguish or death at any time.

...

**16.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**17. (as modified by form SS 00 60 09 15)**
    "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:
    **a.** False arrest, detention or imprisonment

    **b.** Malicious prosecution;

    **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person or organization occupies, committed by or on behalf of its owner, landlord or lessor;

    **d.** Oral, written or electronic publication of material that slanders or

**Ex. 4, p. 4**

libels a person or organization or disparages a person's or organization's goods, products or services.

**e.** Oral, written or electronic publication of material that violates a person's right of privacy;

**f.** Copying, in your "advertisement," a person's or organization's "advertising idea" or style of "advertisement";

**g.** Infringement of copyright, slogan or title…

…

**20.** "Property damage" means:

**a..** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of "occurrence" that caused it…

…

The coverage provisions quoted above in the Business Liability Coverage Form, SS 00 08 04 05, are modified by form SS 50 38 10 03 Limited Exclusion – Personal and Advertising Injury – Lawyers, which provides as follows:

**A.** Exclusion 1.j. Professional Services of Section B. Exclusions is changed to replace 1.j.(1) with the following:

j.(1) Accounting or advertising services;

**B.** The following is added to Exclusion p. "Personal and Advertising Injury" of Section B. Exclusions:

This insurance does not apply to "personal and advertising injury" arising out of the rendering of or failure to render professional services as a lawyer.

### COVERAGE DETERMINATION

As the named insured in the Declarations, Anderson & Leichty PC is an insured under the policy. It is our understanding that Michael Anderson is a principal of Anderson & Leichty PC and, therefore, pursuant to section C. WHO IS AN INSURED, Michael Anderson is an insured as an executive officer or director of Anderson & Leichty PC.

The insuring agreement, quoted above, indicates in section A.1. that coverage could be triggered if there are damages because of "bodily injury" or "property damage" caused by an "occurrence", or if there are damages because of "personal and advertising injury" as defined which occurred during the policy period. However, plaintiffs Lisa Perkins and Christin Seifert do not allege damages because of "bodily injury" or "property damage," as defined, caused by an "occurrence," that is, an accident. Moreover, they do not allege damages because of "personal and advertising injury" as defined.

Even in the event that a determination was made that there was an "occurrence" resulting in damages because of "bodily injury" or "property damage," which is denied, coverage for any such "bodily injury" or "property damage" would be excluded by the expected and intended exclusion in section B.1.a.(1) and B, 1, j, (1) which excludes coverage for said damages resulting from professional legal, accounting or advertising services.

Further, in the event that a determination was made that there was a "personal and advertising injury" resulting in damages caused by one of the defined offenses, which is denied, coverage for any such "personal and advertising

injury" would be excluded by several exclusions, including the following: the expected and intended exclusion in section B.1.a.(2); the exclusion for publication of material with knowledge of its falsity in section B.1.p.(1); and the exclusion in Form SS 50 38 10 03 for "personal and advertising injury" arising out of the rendering of or failure to render professional services as a lawyer.

In addition, there is no coverage for the declaratory and injunctive relief plaintiffs seek because such relief does not the trigger the insuring agreement promise to "pay those sums that the insured becomes legally obligated to pay as damages."

For these reasons there is no duty to indemnify or defend any party under the Business Liability Policy relative to this loss.

**CONCLUSION:**

Based upon the foregoing, The Hartford has determined that there is no insurance coverage under the Policy for this claim and we will not provide defense or indemnify to any party seeking coverage relative to the subject matter. Please report the matter to any other carriers that may provide coverage.

This communication is not intended to be and should not be construed as an exhaustive listing of all policy terms and conditions that may apply to the claim. The Hartford hereby reserves all its rights, positions and defenses. Neither this communication, nor any prior or subsequent communications, should be construed as a waiver of any rights, positions or defenses held by The Hartford. The Hartford reserves the right to supplement and/or to amend its coverage positions should facts and circumstances indicate the need to do so in connection with the claim. The exact terms of the Policy must be determined by reference to the Policy itself. This letter does not modify the terms and conditions of the Policy.

Our coverage analysis is based on the information that is currently available. If you believe that we have overlooked any applicable facts, allegations or legal authority, please let us know, and we will carefully consider your position. In addition, if there are new allegations, which you believe trigger coverage, please forward all relevant information and documents to us for consideration.

Should you have any questions or you do not understand the contents of this letter, please feel free to contact me.

Sincerely,

*David Ferro*

David Ferro
Claim Consultant
Direct Number: (602) 572 - 6875
Toll Free Number: (877) 625 - 2652
Fax: (866) 809 - 1955
David.Ferro@thehartford.com

Writing Company Name: Hartford Casualty Insurance Company

CC: David Legare via Email
    David Legare, ANDERSON & LIECHTY, P.C., USAA INSURANCE AGENCY INC via U.S.Mail

RECEIVED

NOV 18 2019

Ex. 4, p. 6